# 24-0681-cv

# United States Court of Appeals
*for the*
# Second Circuit

JOSEPH MILLER, individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school, SHADY LANE SCHOOL, EZRA WENGERD, as representative of all Amish schools in the State of New York, JONAS SMUCKER, individually and on behalf of his minor children, DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL,

*Plaintiffs-Appellants,*

– v. –

DR. JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the State of New York, DR. BETTY A. ROSA, in her official capacity as Commissioner of Education of the State of New York,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS**

CHRISTOPHER D. WIEST
CHRIS WIEST
ATTORNEY AT LAW, PLLC
50 East Rivercenter Boulevard,
Suite 1280
Covington, Kentucky 1011
(516) 257-1895

HIRAM SASSAR
JUSTIN BUTTERFIELD
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444

ELIZABETH A. BREHM
WALKER D. MOLLER
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
(888) 747-4529

KYLE HAWKINS
SHANNON GRAMMEL
LEHOTSKY KELLER COHN LLP
408 West 11th Street, Fifth Floor
Austin, Texas 78701
(512) 693-8350
*Attorneys for Plaintiffs-Appellants*

CP COUNSEL PRESS (800) 4-APPEAL • (329167)

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This case implicates the foundational First and Fourteenth Amendment question whether the State of New York can compel Amish schoolchildren living in remote Amish communities to receive vaccinations that conflict with their sincerely held religious beliefs and Amish way of life. The district court held "yes," dismissing this civil rights case under Federal Rule of Civil Procedure 12(b)(6). That outcome is inconsistent with decades of First and Fourteenth Amendment jurisprudence and the U.S. Supreme Court's recent decisions in *Tandon v. Newsom*, 593 U.S. 61 (2021), and *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). Oral argument is likely to aid the Court's resolution of these weighty issues.

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT ....................i
TABLE OF AUTHORITIES .................... iv
INTRODUCTION AND PRELIMINARY STATEMENT ....................1
JURISDICTIONAL STATEMENT ....................5
ISSUES PRESENTED ....................6
STATEMENT OF THE CASE ....................6
I. Factual Background ....................6
A. Appellants are part of an Amish community that lives apart from society and shuns the trappings of modernity....................6
B. Governments and courts have long accommodated the Amish by granting exemptions from laws and regulations. ....................9
II. Regulatory Background....................11
A. New York requires certain vaccines for schoolchildren. ....................11
B. From 1966 to 2019, New York grants medical and religious exemptions to its school vaccine requirements. ....................12
C. In 2019, driven by hostility to what legislators call "fake" and "garbage" religious beliefs, New York abolishes its policy of granting religious exemptions but continues to allow medical exemptions. ....................14
III. Procedural History ....................20
A. Nearly three years after eliminating religious exemptions, New York issues its first notice of violation against Appellants. ....................20
B. Appellants bring this claim under Section 1983. ....................23
SUMMARY OF THE ARGUMENT ....................26
STANDARD OF REVIEW ....................30

ARGUMENT .......... 31
I. The District Court Erred In Applying The *Smith* Framework Here. .......... 31
A. PHL 2164 is not generally applicable. .......... 31
1. PHL 2164 treats comparable secular activity more favorably than religious exercise. .......... 32
2. PHL 2164's medical exemption precludes a finding of general applicability. .......... 39
3. The district court erred in relying on *We the Patriots* to reach a contrary conclusion. .......... 42
B. PHL 2164 is not neutral. .......... 47
1. The bill amending PHL 2164 was facially discriminatory, and its sponsors denigrated sincere religious opposition to vaccines as "fake" "garbage." .......... 49
2. The DOH applied PHL 2164 to impose severe penalties on Appellants because of their religious motivations .......... 54
C. Appellants have plausibly pleaded a hybrid-rights claim under *Yoder*. .......... 56
D. PHL 2164 is amenable to exemptions. .......... 60
II. PHL 2164 Fails Strict Scrutiny. .......... 62
A. The State has no compelling interest in requiring these particular Amish Appellants to vaccinate their children. .......... 63
B. PHL 2164 is not narrowly tailored because it is both underinclusive and overbroad. .......... 67
CONCLUSION .......... 73
CERTIFICATE OF SERVICE .......... 75
CERTIFICATE OF COMPLIANCE .......... 75

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) .......... 36

*Bell v. Reno*,
218 F.3d 86 (2d Cir. 2000) .......... 49

*Bosarge v. Edney*,
669 F. Supp. 3d 598 (S.D. Miss. 2023) .......... 14

*Brown v. Entm't Merchs. Ass'n*,
564 U.S. 786 (2011) .......... 44, 56

*Cap. Mgmt. Select Fund Ltd. v. Bennett*,
680 F.3d 214 (2d Cir. 2012) .......... 30, 66

*Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygien*e, 763 F.3d 183 (2d Cir. 2014) .......... 32, 39

*CFCU Cmty. Credit Union v. Hayward*,
552 F.3d 253 (2d Cir. 2009) .......... 33

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*,
508 U.S. 520 (1993) .......... passim

*City of Boerne v. Flores*,
521 U.S. 507 (1997) .......... 57

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*,
No. 21-1414, 2024 WL 2012317 (10th Cir. May 7, 2024)....33

*Does 1-3 v. Mills*,
142 S. Ct. 17 (2021)....45

*Employment Division v. Smith*,
494 U.S. 872 (1990)....passim

*F.F. v. State*,
194 A.D.3d 80 (App. Div. 2021)....52

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2013).... 30, 66

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999)....47

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021)....passim

*Gillette v. United States*,
401 U.S. 437 (1971)....48

*Goe v. Zucker*,
43 F. 4th 19 (2d Cir. 2022).... 17, 20, 41, 47

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006)....67

*Henderson v. McMurray*,
987 F.3d 997 (11th Cir. 2021)....58

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ........................................................ 43

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........................................................ passim

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003) ........................................................ 57, 58, 59

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
753 F.3d 395 (2d Cir. 2014) ........................................................ 57

*M.A. v. Rockland Cnty. Dep't of Health*,
53 F.4th 29 (2d Cir. 2022) ........................................................ passim

*Mast v. Cnty. of Fillmore*,
993 N.W.2d 89 (Minn. Ct. App. 2023) ........................................................ 10

*Mast v. Fillmore County*,
141 S. Ct. 2430 (2021) ........................................................ 7, 8, 10

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
584 U.S. 617 (2018) ........................................................ 48, 51

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ........................................................ 31

*New Hope Family Servs., Inc. v. Poole*,
966 F.3d 145 (2d Cir. 2020) ........................................................ 54, 56

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ........................................................ 32, 49, 72

*Shrum v. City of Coweta*,
449 F.3d 1132 (10th Cir. 2006)....................................................................48

*State v. Yoder*,
182 N.W.2d 539 (Wis. 1971)........................................................................58

*Tandon v. Newsom*,
593 U.S. 61 (2021).................................................................................passim

*United States v. Lee*,
455 U.S. 252 (1982).............................................................................. 28, 61

*United States v. Santiago*,
268 F.3d 151(2d Cir. 2001)........................................................................26

*We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2023).........................................................passim

*We The Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021).................................................................. 35, 38

*Wisconsin v. Yoder*,
406 U.S. 205 (1972).................................................................................passim

**Statutes**

10 N.Y. Comp. Codes R. & Regs. § 66 ........................................................ 20, 40

105 Ill. Comp. Stat. § 5/27-8.1.......................................................................13

16 R.I. Gen. Laws § 16-38-2 .........................................................................13

1966 N.Y. Laws ch. 994 ....................12

2019 N.Y. Laws ch. 35, §§ 1, 2 ....................14

28 Pa. Code § 27.77 ....................70

28 Pa. Cons. Stat. §§ 23-83, -84 ....................13

28 U.S.C. § 1292 .................... 5, 33

28 U.S.C. § 1291 ....................5

28 U.S.C. §§ 1331 ....................5

28 U.S.C. §§ 1343 ....................5

42 U.S.C. § 1983 .................... 4, 18, 21

Ala. Code § 16-30-3 ....................13

Alaska Admin. Code tit. 7, § 57.550 ....................13

Ariz. Rev. Stat. Ann. §§ 15-872 -873 ....................13

Ark. Code Ann. § 6-18-702 ....................13

Colo. Rev. Stat. §§ 25-4-902, -903 ....................13

D.C. Code §§ 38-501, -506 ....................13

Del. Code Ann. tit. 14, § 131 ....................13

Fla. Stat. § 1003.22 ........ 13

Ga. Code Ann. § 20-2-771 ........ 13

Haw. Rev. Stat. §§ 302A-1154, -1156 ........ 13

Idaho Code §§ 39-4801, -4802 ........ 13

Ind. Code § 21-40-6 ........ 13

Ind. Code § 9-24-16.5 (2016) ........ 11

Iowa Code § 139A.8 ........ 13

Kan. Stat. Ann. § 72-6262 ........ 13

Ky. Rev. Stat. § 189.820 ........ 11

Ky. Rev. Stat. Ann. § 214.034 ........ 13

La. Stat. Ann. §§ 17:170, 40:31.16 ........ 13

Mass. Gen Laws ch. 76, § 15 ........ 13

Md. Code Ann., Educ. § 7-403 ........ 13

Mich. Comp. Laws §§ 333.9208, .9215 ........ 13

Minn. Stat. § 121A-15 ........ 13

Mo. Rev. Stat. §§ 167.181, 210.003 ........ 13

Mont. Code Ann. §§ 20-5-403, -405 .......... 13

N.C. Gen. Stat. §§ 130A-155, -157 .......... 13

N.D. Cent. Code § 23-07-17.1 .......... 13

N.H. Rev. Stat. Ann. § 141-C:20-a, :20-c .......... 13

N.J. Admin. Code § 8:57-4.4 .......... 70

N.J. Stat. Ann. § 26:1A-9.1 .......... 13

N.M. Stat. Ann. § 24-5-1, -3 .......... 13

N.Y. Pub. Health Law § 2164 .......... passim

N.Y. Pub. Health Law §§ 12, 206 .......... 12

Neb. Rev. Stat. §§ 79-217, 221 .......... 13

Nev. Rev. Stat. §§ 392.435, .437 .......... 13

Oh. Rev. Code § 3313.671 .......... 70

Oh. Rev. Code Ann. § 3313.671 .......... 13

Okla. Stat. tit. 70, §§ 1210.191, .192 .......... 13

Or. Rev. Stat. § 433.267 .......... 13

S.C. Code Ann. § 44-29-180 .......... 13

S.D. Codified Laws § 13-28-7.1 .......... 14

Tenn. Code Ann. § 49-6-5001 .......... 14

Tex. Educ. Code Ann. § 38.001 .......... 14

Utah Code Ann. § 53G-9-303 .......... 14

Va. Code Ann. §§ 22.1-271.2, 32.1-46 .......... 14

Vt. Stat. Ann. tit. 18, §§ 1121, 1122 .......... 14

Wash. Rev. Code § 28A.210.080, .090 .......... 14

Wis. Stat. § 252.04 .......... 14

Wyo. Stat. Ann. § 21-4-309 .......... 14

**Other Authorities**

Assembly Bill 2371A .......... 15, 49

Assembly Bill A2371A Sponsor Memo .......... 15, 33

Assembly Record for Assembly Bill 2371A .......... passim

Senate Bill S2994A .......... 15, 49

Senate Bill S2994A Sponsor Memo .......... 15, 33

Senate Bill S2994A Senate Record .......... passim

Vt. Dep't of Health, *School Year 2023-24 Religious Immunization Exemption Child Care and Schools*, https://perma.cc/Y48L-PMDC ............70

## INTRODUCTION AND PRELIMINARY STATEMENT

This case is about whether the First and Fourteenth Amendments permit the State of New York to compel Amish schoolchildren—who attend private Amish-only schools in rural Amish communities removed from the modern world—to receive vaccinations in violation of their sincerely held religious beliefs in order to attend Amish community schools.

The Amish share "a fundamental belief that salvation requires life in a church community" that is "insulate[d] … from the modern world" and its modern trappings. *Wisconsin v. Yoder*, 406 U.S. 205, 210 (1972). As part of their rejection of modernity, the Amish have an undisputed and sincerely held religious objection to vaccinations. A-11, 13 to 14, 21 to 23, 25.[1] For over 50 years, from 1966 until 2019, New York accommodated that religious belief by granting the Amish religious exemptions from the State's school vaccination requirements, N.Y. Pub. Health Law § 2164 ("PHL 2164"). But in 2019, the State eliminated that religious exemption. Now, New York allows only

---

1 Citations to the Joint Appendix are designated "A-__." Citations to the Special Joint Appendix are designated "SPA-__."

secular—not religious—exemptions to its school vaccination requirements. In 2022, the State brought an enforcement action against the Amish Appellants here imposing catastrophic penalties.

This lawsuit is an as-applied challenge under Section 1983 to that enforcement action as well as the application of the vaccine requirements to these Amish Appellants. In a 108-paragraph verified complaint, Appellants pleaded that the U.S. Constitution bars New York's enforcement action as well as the application of the vaccine requirements to these Amish Appellants. They asserted the right not to "perform[] … physical acts,'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (citation omitted), that will "endanger their own salvation and that of their children," *Yoder*, 406 U.S. at 209.

The district court nevertheless dismissed Appellants' claims under Federal Rule of Civil Procedure 12(b)(6) and denied Appellants' motion for a preliminary injunction. It relied almost entirely on this Court's decision last year in *We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2023), which in turn applied *Employment Division v. Smith*, 494 U.S. 872 (1990), to uphold under rational basis review

Connecticut's school vaccine mandate as both generally applicable and neutral to religion. The district court reflexively concluded that it was bound by *We the Patriots*—even though that case was a facial challenge involving students in metropolitan areas to a different statute with a different legislative history that permits less discretionary exemptions than the New York statute now before this Court.

Respectfully, that was error: PHL 2164 is not generally applicable because it prefers secular concerns over religious interests, and it remains subject to discretionary medical exemptions that are applied on a case-by-case basis. It is not neutral because its 2019 amendment targeted *only* religious exemptions for elimination based on hostility to religious beliefs, which the amendment's sponsors decried as "fake" and "garbage." Appellants' claim also falls outside the *Smith* rational-basis framework because Appellants have plausibly pleaded a hybrid-rights claim under *Yoder*, and because PHL 2164's amenability to religious exemptions—as demonstrated by their history in New York and elsewhere—does not implicate *Smith*'s animating rationale. Indeed, 45 states today successfully maintain religious exemptions,

making New York an "extreme outlier." *M.A. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 41 (2d Cir. 2022) (Park, J., concurring).

Because neither *Smith* nor *We the Patriots* applies, the government must overcome strict scrutiny. It cannot. Whatever generalized interest the State may have in preventing transmission of a pathogen does not supply the sort of "precise analysis" trained at these "'particular religious claimants'" that strict scrutiny's compelling-interest prong requires. *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021) (citation omitted). Furthermore, PHL 2164 is not narrowly tailored because it is both underinclusive and overbroad. It applies to only one group of people who may transmit (students) in only one setting where transmission may occur (K-8 schools) and requires vaccines that the complaint alleges, and that Appellees did not refute, do not operate to prevent transmission of the targeted pathogen. It was also adopted in lieu of far less burdensome alternatives to prevent transmission that would have retained a religious exemption, and was based on virtually no evidence that religious exemptions—particularly in Amish communities—actually cause transmission.

Simply put, there is no valid basis to compel these particular Amish children to receive vaccines that violate their sincere religious beliefs in order for them to attend Amish schools. The judgment below should be reversed.

## Jurisdictional Statement

Appellants bring their cause of action under 42 U.S.C. § 1983. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a) because the district court entered final judgment dismissing the action on March 11, 2024, SPA-1 to 36, and also denied Appellants' request for a preliminary injunction. Appellants filed a timely notice of appeal on March 11, 2024. A-974 to 975.

## ISSUES PRESENTED

This case concerns whether, as applied, PHL 2164 unconstitutionally abridges Appellants' rights under the First and Fourteenth Amendments. The district court below held "no" under *Employment Division v. Smith*, 494 U.S. 872 (1990). This appeal presents two principal issues:

**1.** Is Appellants' as-applied challenge to PHL 2164 subject to rational-basis review under *Smith*?

**2.** Does PHL 2164 overcome strict scrutiny?

## STATEMENT OF THE CASE

### I. Factual Background

#### A. Appellants are part of an Amish community that lives apart from society and shuns the trappings of modernity.

**1.** Appellants are three Amish individuals—Joseph Miller, Jonas Smucker, and Ezra Wengerd—and three Amish schools—the Dygert Road School, Pleasant View School a/k/a Twin Mountain School, and Shady Lane School. A-12 to 13.

The three individual Appellants, along with their families, belong to Amish communities in rural Chautauqua and Montgomery Counties in New York. A-13. Messrs. Miller and Smucker are fathers of Amish children who attend Amish schools. A-13. Mr. Wengerd serves as a representative of Amish families and Amish schools in their dealings with the government. A-13. The three school Appellants are private Amish community schools, funded solely by the Amish, and located exclusively on Amish land within the Amish communities. A-12 to 13.

**2.** Appellants and the Amish communities "are religiously committed to living separately from the modern world." *Mast v. Fillmore County*, 141 S. Ct. 2430, 2430 (2021) (Gorsuch, J., concurring); *see also Yoder*, 406 U.S. at 210 ("Old Order Amish communities today are characterized by a fundamental belief that salvation requires life in a church community separate and apart from the world and worldly influence."). Their way of life has "not altered in fundamentals for centuries." *Yoder*, 406 U. S. at 217. It has "remained constant" despite "unparalleled progress in human knowledge generally." *Id*. at 216.

This "traditional way of life … is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Id.* The "Old Order Amish religion pervades and determines virtually their entire way of life." *Id.* "They grow their own food, tend their farms using pre-industrial equipment, and make their own clothes." *Mast*, 141 S. Ct. at 2430 (Gorsuch, J., concurring). They have "reject[ed] … telephones, automobiles, radios, and television." *Yoder*, 406 U.S. at 217. They "have established their own elementary schools in many respects like the small local schools of the past." *Id.* at 212. And at those schools, they "educat[e] their children in the Amish way, with Amish teachers, … on Amish owned property." A-11.

**3.** Inherent in the Amish "traditional way of life," *Yoder*, 406 U.S. at 216, is an undisputedly sincere and abiding "religious objection[] to injecting their children with vaccines," A-14; *see also* A-11, 13, 21-23, 25. As Mr. Wengerd has explained:

> Our almighty God wants us to fully put our faith + trust in Him. Which is in conflict to put our trust in vaccines. We are also commanded to not be conformed to this world, Romans 12[:]1-2. If we honestly obey this, then it will affect everything we do, yes even in

> the way we try to remain healthy…. Also since some of the vaccines are based on fetal or aborted cell lines, we believe it would be an abomination to our Creator to inject such into our bodies.

A-22 to 23.

### B. Governments and courts have long accommodated the Amish by granting exemptions from laws and regulations.

As modern society has "become more populous, urban, industrialized, and complex," the Amish lifestyle has "come into conflict increasingly with requirements of contemporary society." *Yoder*, 406 U.S. at 217. To resolve these conflicts between religion and government, legislatures and courts regularly create and interpret laws to balance these competing interests in a way that is fair to both the Amish and the public and respects Amish religious tradition that predates the Founding of this Nation.

Notably, the Supreme Court in *Yoder* held that the Amish were exempt from a state law requiring all students to remain in school until the age of 16. As the Court noted, "[f]ormal high school education beyond the eighth grade is contrary to Amish beliefs." *Id.* at 211. Forcing the Amish to violate these beliefs pursuant to compulsory secondary education laws was "precisely the kind of objective danger to the free exercise of religion that the First

Amendment was designed to prevent." *Id.* at 218. Absent an exemption, the Amish would "not only expose themselves to the danger of the censure of the church community, but … also endanger their own salvation and that of their children." *Id.* at 209. The Court recognized the State's "admittedly strong interest in compulsory education," but it concluded that the State had failed to "show with … particularity how [that interest] would be adversely affected by granting an exemption to the Amish." *Id.* at 236.[2]

Consistent with the values underlying *Yoder* and its progeny, many states affirmatively sought to accommodate and have seamlessly accommodated the Amish and their religious beliefs. In 2015, for example, Wisconsin crafted a religious exemption to the state's housing code for the Amish that allowed them to build homes without carbon monoxide detectors, smoke

---

2 In the wake of *Fulton*, the Supreme Court granted, vacated, and remanded a case so that the lower court could reevaluate its denial of an exemption for the Amish. *See Mast*, 141 S. Ct. at 2430. That case, like this one, concerned a regulation targeting public health. On remand, the lower court recognized such an exemption. *See Mast v. Cnty. of Fillmore*, 993 N.W.2d 895, 910 (Minn. Ct. App. 2023) (recognizing Amish exemption to state law mandating installation of certain septic systems).

detectors, or indoor plumbing.[3] Also in 2015, Indiana passed a bill allowing a religious exemption for the Amish from photographs for state-issued identification. *See* Ind. Code § 9-24-16.5 (2016). And in 2012, Kentucky passed a bill providing Amish buggies an exemption from a law requiring bright orange warning signs on vehicles. *See* Ky. Rev. Stat. § 189.820(4).

## II. Regulatory Background

### A. New York requires certain vaccines for schoolchildren.

New York—like all other states—mandates that children attending schools receive certain vaccines. This requirement is codified at PHL 2164. *See* N.Y. Pub. Health Law § 2164(7)(a). PHL 2164 requires children who attend schools to be vaccinated for "poliomyelitis, mumps, measles, diphtheria, rubella, varicella, Haemophilus influenzae type b (Hib), pertussis, tetanus, pneumococcal disease, and hepatitis B." *Id.* § 2164(2)(a). Generally speaking, no school "shall permit any child to be admitted to such school, or

[3] *See* Rich Kremer, *State Rules Amish Can Build a Home Without a Smoke Detector, Indoor Plumbing*, Wis. Pub. Radio (Sept. 29, 2015), https://perma.cc/KDC5-KW9W.

to attend such school, in excess of fourteen days" without proof of the required vaccinations. *Id.* § 2164(7)(a). This mandate applies broadly to "any public, private or parochial" school. *Id.* at § 2164(1)(a). But it does not apply to teachers, aides, administrators, bus drivers, or any adults who work in or with schools.

PHL 2164 carries stiff penalties for noncompliance. As relevant here, each violation warrants a civil penalty of up to $2,000. *See* N.Y. Pub. Health Law §§ 12(1), 206(4)(c). And the State has taken the position, as reflected in the record against the Amish, that each day each student attends school contrary to PHL 2164 is a separate violation. *See* A-89 to 90; A-127 to 128.

### B. From 1966 to 2019, New York grants medical and religious exemptions to its school vaccine requirements.

For half a century, from 1966 until 2019, New York offered two exemptions to PHL 2164. A-16; *see* 1966 N.Y. Laws ch. 994. *First*, it provided a medical exemption. Pursuant to this exemption, a child need not be vaccinated if "any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health." N.Y. Pub. Health L. § 2164(8). *Second*, New York provided a religious exemption. Pursuant to this

exemption, a child did not need to be vaccinated if the child's "parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to" vaccination. *Id.* § 2164(9) (2015).

Religious exemptions have long been the norm when it comes to school vaccination laws. New York successfully recognized and administered such an exemption for more than 50 years. A-16, 33. And 45 states (plus the District of Columbia) currently offer religious exemptions to their school vaccination laws. A-16.[4] Only five states do not, and for most of them, this is a

[4] *See* Ala. Code § 16-30-3; Alaska Admin. Code tit. 7, § 57.550; Ariz. Rev. Stat. Ann. §§ 15-872(G), -873(A)(1); Ark. Code Ann. § 6-18-702(d)(4)(A); Colo. Rev. Stat. §§ 25-4-902, -903(b)(V); Del. Code Ann. tit. 14, § 131(a)(6); D.C. Code §§ 38-501, -506(1); Fla. Stat. § 1003.22(1); Ga. Code Ann. § 20-2-771(e); Haw. Rev. Stat. §§ 302A-1154, -1156(2); Idaho Code §§ 39-4801, -4802(2); 105 Ill. Comp. Stat. § 5/27-8.1(6); Ind. Code § 21-40-6; Iowa Code § 139A.8(4)(a)(2); Kan. Stat. Ann. § 72-6262(b)((2); Ky. Rev. Stat. Ann. § 214.034(2); La. Stat. Ann. §§ 17:170(E), 40:31.16(D); Md. Code Ann., Educ. § 7-403(b)(1); Mass. Gen Laws ch. 76, § 15; Mich. Comp. Laws §§ 333.9208, .9215(2); Minn. Stat. § 121A-15; Mo. Rev. Stat. §§ 167.181(3), 210.003; Mont. Code Ann. §§ 20-5-403, -405(1)(a); Neb. Rev. Stat. §§ 79-217, 221(1); Nev. Rev. Stat. §§ 392.435, .437; N.H. Rev. Stat. Ann. § 141-C:20-a, :20-c; N.J. Stat. Ann. § 26:1A-9.1; N.M. Stat. Ann. § 24-5-1, -3(A); N.C. Gen. Stat. §§ 130A-155, -157; N.D. Cent. Code § 23-07-17.1(3); Ohio Rev. Code Ann. § 3313.671(B)(4); Okla. Stat. tit. 70, §§ 1210.191, .192; Or. Rev. Stat. § 433.267(1)(c)(A); 28 Pa. Cons. Stat. §§ 23-83, -84; 16 R.I. Gen. Laws § 16-38-2(a); S.C. Code Ann. § 44-29-

relatively recent development.[5]

### C. In 2019, driven by hostility to what legislators call "fake" and "garbage" religious beliefs, New York abolishes its policy of granting religious exemptions but continues to allow medical exemptions.

On June 13, 2019, the New York Legislature reversed its five-decade tradition of religious accommodation and repealed the religious exemption, targeting religious practice while leaving medical exemptions untouched. *See* 2019 N.Y. Laws ch. 35, §§ 1, 2. Governor Cuomo immediately signed the bill into law. The State continues to recognize medical exemptions to PHL

180(D); S.D. Codified Laws § 13-28-7.1; Tenn. Code Ann. § 49-6-5001(b)(2); Tex. Educ. Code Ann. § 38.001(c)(1)(B); Utah Code Ann. § 53G-9-303(3); Vt. Stat. Ann. tit. 18, §§ 1121, 1122(3)(A); Va. Code Ann. §§ 22.1-271.2(C), 32.1-46(D)(1); Wash. Rev. Code § 28A.210.080, .090(1)(c); Wis. Stat. § 252.04(3); Wyo. Stat. Ann. § 21-4-309(a). Mississippi now offers a religious exemption after a federal court issued a permanent injunction following a free exercise challenge requiring Mississippi to provide a religious exemption process. *See Bosarge v. Edney*, 669 F. Supp. 3d 598, 625 (S.D. Miss. 2023).

[5] *See* Cal. Health & Safety Code § 120325 *et seq.* (religious exemption eliminated in 2016); Conn. Gen. Stat. § 10-204a (religious exemption eliminated in 2021); Me. Stat. tit. 20-A, § 6355 (religious exemption eliminated in 2019). West Virginia has never offered a religious exemption. W. Va. Code § 16-3-4; *see We the Patriots*, 76 F.4th at 135.

2164. New York's present refusal to recognize any religious exemptions makes it an "extreme outlier." *M.A.*, 53 F.4th at 41 (Park, J., concurring).

Assembly Bill 2371A ("A2371A"),[6] which was sponsored primarily by Assemblyman Jeffrey Dinowitz, stated that its purpose was to "repeal all non-medical exemptions from vaccination requirements for children" to ensure "prevention of disease outbreaks." A2371A Sponsor Memo.[7] The bill was introduced on the heels of a measles outbreak that was "largely … concentrated in communities in Brooklyn and Rockland County" within the New York City metropolitan area. S2994A Sponsor Memo[8]; *see* Sarah Maslin Nir & Michael Gold, *An Outbreak Spreads Fear: Of Measles, of Ultra-Orthodox Jews, of Anti-Semitism*, N.Y. Times (Mar. 29, 2019), https://perma.cc/9P59-C73Z (As a result of the measles outbreak, "some residents say they now wipe public bus seats and cross the street when they see ultra-Orthodox

---

6 The text of A2371A is available at https://perma.cc/48KT-STNR. The companion bill in the Senate, S2994A, was sponsored primarily by Senator Brad Hoylman-Sigal. The text of S2994A is available at https://perma.cc/3QSJ-VGUM.

7 A2371A's sponsor memo is available at https://perma.cc/PS3N-254C.

8 S2994A's sponsor memo is available at https://perma.cc/7ZDG-5VHJ.

Jews. Hasidic leaders said they feared not only a rise in anti-Semitism but an invasion of their cloistered community by the authorities under the guise of public health."). None of those communities were Amish or similar to the remote rural areas where the Amish live. *See* A-32.

Lawmakers at the time questioned whether there was evidence that religious exemptions—as opposed to medical exemptions, noncompliance, or non-students who are not subject to the vaccination requirements—were responsible for the outbreak. *See, e.g.*, Assembly Record[9] at 91 (Abinati, A.) ("There has not been one instance that has been pointed out to us that anyone with a religious exemption had measles during the last outbreak."); Senate Record[10] at 5386 (SENATOR ANTONACCI: "Am I to understand that all 924 cases [of measles] are individuals … claiming the religious exemption under New York State law? SENATOR HOYLMAN: The answer is no,

[9] Citations to "Assembly Record" are to the transcript of the Assembly proceedings, which is available at the link for "6-13-19 Session Part 1" at https://perma.cc/4F9T-NM8Z.

[10] Citations to "Senate Record" are to the transcript of the Senate proceedings, which is available at https://perma.cc/SFH8-VZTC.

probably not."). As some Senators noted, New York City had a track record of withholding religious exemptions. *See* Senate Record at 5390 (Antonacci, S.) ("[T]he de Blasio administration has been very difficult on recognizing religious exemptions."); *id.* at 5425 (Lanza, S.) ("[I]n every case in New York City, the answer [when requesting a religious exemption] has been no.").

Nonetheless, the bill's sponsors could not be deterred from their attack on religious exercise and exemptions. Regrettably, the legislative record reflects that their preoccupation was rooted in animus toward religion.[11] Senator David Carlucci, a sponsor of the bill in the Senate, vilified those who had invoked the religious exemption: "[A] group of people has decided their ideological beliefs are more important than public health. Putting people in harm[']s way … is selfish and misguided."[12] In his words, the goal of the bill

---

11 This Court may consider legislative history when evaluating a district court's resolution of a motion to dismiss. *See, e.g.*, *We the Patriots*, 76 F.4th at 136; *Goe v. Zucker*, 43 F. 4th 19, 29 (2d Cir. 2022).

12 Brad Hoylman-Sigal, N.Y. State Senate, *As New York Faces Worst Measles Outbreak in Decades, Hoylman, Dinowitz, Carlucci, Childhood Cancer Survivors, and Transplant Recipients Urge End to Non-Medical Exemptions for Vaccination* (May 28, 2019), https://perma.cc/4MG9-THFA.

was to "take any of that misconception" about religious views on vaccinations "out of the puzzle."[13]

Senator James Skoufis, another sponsor of the bill in the Senate, decried religious opposition to vaccines as a sham: "The matter of fact is the religious exemption in New York State is made up. It's fake. Because there is no religion that objects to vaccines. Not Islam, not Catholicism, not Judaism. There is no organized religion that condemns immunization."[14] As he explained after voting to repeal the religious exemption, he "would have voted for [it] whether there was a measles outbreak or not."[15]

Assemblyman Dinowitz, the bill's primary sponsor in the Assembly, expressed a similar sentiment: "There's nothing, nothing in the Jewish religion, the Christian religion, in the Muslim religion … that suggests that you can't

---

13 Morgan Gstalter, *New York Lawmakers Introduce Bill to End Religious Vaccine Exemptions Amid Measles Outbreak*, The Hill (Apr. 6, 2019), https://perma.cc/47DE-ZJCA.

14 Senate Record at 5443.

15 @JamesSkoufis, Twitter (July 25, 2019, 4:14 PM), https://perma.cc/2F9Z-PZL9.

get vaccinated…. It is just utter garbage."[16] He indicated that vaccination exemptions should not be made available to "anti-science people who know nothing," likening those who invoke the religious exemption to those who "tried [Galileo] as a heretic."[17] He explained that the "reason for the bill" went "beyond" the recent measles outbreak.[18]

While expressing hostility toward religious exercise, the Legislature carefully preserved its longstanding medical exemption to the school vaccine mandate. That exemption permits students to forego vaccination where a "physician … certifies … [it] may be detrimental to [their] health." N.Y. Pub. Health Law § 2164(8). The process of obtaining a medical exemption involves significant subjective discretion. It begins with a determination and certification by a licensed physician "that a child has a medical contraindication or precaution to a specific immunization consistent with [Advisory

---

16 *Assembly Update* at 3:11 (Mar. 19, 2019), https://www.facebook.com/watch/?v=441644779709395; *see also* Assembly Record at 68 (Dinowitz, A.) ("I'm not aware of anything in the Tora, the Bible, the Koran or anything else that would suggest that you should not get vaccinated.").

17 Assembly Record at 102.

18 *Id.* at 46.

Committee on Immunization Practices] guidance or other nationally recognized evidence-based standard of care." 10 N.Y. Comp. Codes R. & Regs. § 66-1.1(l). This certification is then presented to the relevant school official, who has additional discretion to "require additional information supporting the exemption," *id.* § 66-1.3(c), and to decide whether to "grant a medical exemption from the State's school immunization requirements," *Goe*, 43 F. 4th at 33.

Historical application of the medical exemption confirms its broad and discretionary sweep. For instance, "for the 2021-22 school year, medical exemptions were granted" to children attending some schools at rates of 50%, 30%, and 17%. A-18, 31. But for other schools in the same communities in the same school year, zero medical exemptions were granted. A-18.

## III. Procedural History

### A. Nearly three years after eliminating religious exemptions, New York issues its first notice of violation against Appellants.

In March 2022, nearly three years after the State eliminated PHL 2164's religious exemption, the Commissioner of Health charged Appellant schools

with violation of PHL 2164. A-19; *see also* A-52 to 71. The State charged each school with allowing students to attend without proof of vaccination. A-19 to 20; *see also* A-56 to 57, 63 to 64, 69 to 70. The charges notified Appellant schools that a hearing would be held on May 2, 2022, and that civil penalties of up to $2,000 per violation could be imposed. A-20; *see also* A-52 to 55, 59 to 62, 65 to 68. This meant a possible $52,000 penalty for the Dygert Road School (based on 26 noncompliant students for one day), a possible $46,000 penalty for the Twin Mountains School (based on 23 noncompliant students for one day), and a possible $20,000 penalty for the Shady Lane School (based on the assumption that at least one student was noncompliant for ten days). A-26.

At the hearing before the administrative law judge ("ALJ"), Mr. Wengerd on behalf of Appellants "articulated his community's religious beliefs that preclude them from vaccinating their children." A-21. While he explained that he had no desire to "caus[e] the state a prob[lem]," he emphasized that, due to their sincerely held religious beliefs, a "large percentage of

the Amish + Mennonite famil[ies] [in New York] will choose other consequences before going against [their] religious convictions." A-22.

The ALJ ultimately determined that all three schools had violated PHL 2164. A-89; *see also* A-26. But she determined that penalties should not be imposed because they did not have adequate pre-enforcement notice of the repeal of the religious exemption. A-90 to 97; *see also* A-26. The DOH guidance regarding the repeal "was only made available online and thus inaccessible to [Appellants]." A-90; *see also* A-93 ("[DOH] failed to offer reasonable accommodations for [Appellants'] distinct religious and cultural differences throughout the audit process.").

The then-Commissioner of Health "adopt[ed] the ALJ's recommendation to sustain the charges against each of the … schools" but "reject[ed] her recommendation to impose no civil penalty." A-126; *see also* A-28. She determined that Appellants "were aware of the legal requirements" but did "not … comply because of an irreconcilable conflict between their religious beliefs and PHL § 2164." A-126. DOH characterized this conflict as "a promise to continue violating the law of 'man'" and "recommendation for

administrative nullification of a duly enacted law, in violation of the separation of powers doctrine inherent in the State Constitution." A-100; *see also* A-103 ("constitutionally impermissible circumvention of the Legislature"). The then-Commissioner of Health imposed the full extent of penalties sought by the State—totaling $118,000 in ruinous penalties for these entirely Amish-funded schools. A-127 to 128; *see also* A-28.

### B. Appellants bring this claim under Section 1983.

In June 2023, Appellants timely filed a verified complaint in federal court. *See generally* A-10 to 50. That complaint asserts a single, as-applied claim under Section 1983 for violation of Appellants' First and Fourteenth Amendment rights. A-29 to 44. Appellants allege that PHL 2164 fails *Smith*'s "general applicability and neutrality tests, and violates [Appellants'] rights to free exercise … and to regulate their children's upbringing." A-30.

Appellants named as Defendant, Dr. James V. McDonald in his official capacity as the Commissioner of Health of New York. A-13. In that role, Dr. McDonald is responsible for implementing and enforcing PHL 2164. A-13. Appellants sought a permanent injunction "prohibiting Defendant[] … from

implementing and enforcing [PHL] 2164 against [them]" and a declaration "that [PHL] 2164 is unconstitutional as applied to" them. A-46.[19]

Appellants moved for a preliminary injunction barring enforcement of PHL 2164 against them. A-130 to 132. In support, Appellants presented evidence that established that most of the required vaccines do not prevent infection and transmission of the target pathogen, substantiated the discretionary nature of the medical exemption scheme, and demonstrated better health among Amish children as compared to the general public. A-288 to 292, 692 to 898. The State moved to dismiss for failure to state a claim. A-323 to 324. After a hearing on both motions, the district court granted the motion to dismiss and denied the preliminary injunction motion as moot. SPA-35.

The district court explained that "[h]owever colorable [Appellants]' claims may have been at the outset," it was "bound by the Second Circuit's intervening decision in *We the Patriots*" to dismiss this case. SPA-3. The court

---

[19] Appellants' also named Dr. Betty A. Rosa as a Defendant, in her official capacity as Commissioner of Education of New York. A-13 to 14. The district court dismissed Appellants' claim against Dr. Rosa without prejudice under Rule 12(b)(1) for lack of standing. SPA-12 to 15. Appellants do not contest that portion of the district court's decision.

invoked *We the Patriots* in subjecting PHL 2164 to rational basis review, believing PHL 2164 to be "neutral and generally applicable" under *Smith*. SPA-17 (quoting *We the Patriots*, 76 F.4th at 144). The district court concluded that PHL 2164 was neutral because it was not motivated by "hostility to religion" or "religious animus." SPA-19, 23. And it concluded that PHL 2164 was generally applicable because its medical exemption "is phrased in mandatory terms and applies to an objectively defined group of people." SPA-25. The district court also found general applicability on the ground that the secular conduct favored by PHL 2164's medical exemption is not "comparable" to the religious conduct PHL 2164 prohibits. SPA-29 to 33. The district court determined that PHL 2164 satisfied rational basis review and accordingly dismissed the case. SPA-34 to 35. Because that dismissal "eliminate[d] any possibility" of injunctive relief, the Court denied the preliminary injunction motion as moot. SPA-35.

Appellants timely appealed. A-974 to 975. On April 8, 2024, this Court notified the parties that this appeal would be placed on its Expedited Appeals Calendar under Local Rule 31.2(b).

## SUMMARY OF THE ARGUMENT

**I.** Appellants have plausibly stated a claim under Section 1983 that PHL 2164, as applied to them, unconstitutionally infringes their First and Fourteenth Amendment rights. The district court erred when it relied on *Smith* and *We the Patriots* to conclude otherwise. Properly understood, PHL 2164 "falls outside *Smith*." *Fulton*, 593 U.S. at 533.[20] The judgment below should be reversed.

**A.** PHL 2164 is not generally applicable. It treats at least some "comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. PHL 2164 categorically bars nonvaccination for religious reasons but allows nonvaccination for other reasons—including as a result of a medical exemption or widespread noncompliance. PHL 2164 also allows for nonvaccination in all contexts outside of school and for all people aside from

[20] Appellants have argued and continue to argue that *Smith* does not apply. Appellants also believe *Smith* was wrongly decided. But because this Court cannot overrule the Supreme Court, Appellants cannot ask this Court to overrule *Smith*. *See United States v. Santiago*, 268 F.3d 151, 155 (2d Cir. 2001). Should this Court reject Appellants' arguments and find *Smith* controlling, Appellants preserve the right to ask the Supreme Court to overrule *Smith*.

students. PHL 2164 also is not "generally applicable" because "it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (citation omitted). In particular, PHL 2164 allows for individualized, case-by-case medical exemptions. *See supra* pp.19-20. These exemptions are discretionary and categorically unavailable for religious reasons.

**B.** PHL 2164 is not neutral because the State eliminated the religious exemption "at least in part because of [its] religious character." *Kennedy*, 597 U.S. at 508 (citation omitted). This is evident on the face of the bill that was ultimately enacted to end the religious exemption. That bill expressly and with surgical precision excised only religiously motivated exemptions while continuing to provide legal protection for the only other (secular) exemption. "[C]ontemporaneous statements" made by the bill's sponsors reveal hostility to religion and "distrust of [religious] practices." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 540, 547 (1993). The bill's sponsors denigrated sincere religious opposition to vaccinations as "anti-science," "anti-vax," "fake," and "garbage." DPH's imposition of ruinous penalties on

Appellants precisely because of their religious motivation compounds the lack of neutrality here.

**C.** To the extent *Smith* applies, it only does so in recognizing that Appellants' hybrid-rights claim warrants strict scrutiny under *Yoder*. The Supreme Court in *Yoder* recognized Amish parents' right to exercise their religion in controlling the religious upbringing of their children. *See Yoder*, 406 U.S. at 233. While this Court has declined to extend this hybrid-rights theory beyond the particular Amish context presented in *Yoder*, that is the very context in which this case arises. Like the Amish in *Yoder*, the Amish Appellants here sincerely believe that PHL 2164 would "endanger their own salvation and that of their children" based on their Amish faith. *Id.* at 209.

**D.** *Smith* is inapplicable for the additional reason that PHL 2164 is amenable to workable religious exemptions. The *Smith* framework grew out of a concern that allowing religious exemptions to certain neutral and generally applicable laws "would be courting anarchy," *Smith*, 494 U.S. at 888, because such laws "could not function" in the face of religious exemptions, *United States v. Lee*, 455 U.S. 252, 260 (1982). But experience demonstrates that this

is not the case with PHL 2164. New York itself successfully offered religious exemptions to PHL 2164 for more than 50 years, as did and does virtually every other state. Indeed, 45 states presently offer religious exemptions to their school vaccination requirements. New York could easily have continued to do the same.

**II.** For all these reasons, strict scrutiny applies. And according to the plausible and well-pleaded allegations in Appellants' verified complaint, PHL 2164 neither serves a compelling state interest, nor is narrowly tailored to serve any such interest.

**A.** New York lacks a sufficiently compelling interest in requiring these "*particular* [Amish] claimants" to vaccinate their children. *Fulton*, 593 U.S. at 541 (emphasis added) (citation omitted). They live in isolated communities removed from the modern world, and they have plausibly alleged that most of the required vaccines do not operate to prevent infection and transmission. That the State delayed enforcement of PHL 2164—by nearly three years—further undercuts its asserted interest.

**B.** PHL 2164 is also fatally under- and overinclusive. It is underinclusive because it applies to only one place where transmission may occur (schools), covers only one group who may transmit (students), and still permits students who claim medical exemptions to remain unvaccinated. Notably, PHL 2164 does not require vaccinations for teachers, who (like the students themselves) congregate and work with students in schools on a daily basis. It is overinclusive because the State could have prevented transmission while retaining a religious exemption: PHL 2164 requires vaccines that Appellants plausibly allege do not operate to prevent transmission, and there is no evidence Appellants have caused any transmission in the first place.

## STANDARD OF REVIEW

This Court "review[s] the grant of a motion to dismiss *de novo,* accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). In doing so, this Court "construe[s] the complaint liberally." *Cap. Mgmt. Select Fund Ltd. v. Bennett*, 680 F.3d 214, 219 (2d Cir. 2012).

Furthermore, because the preliminary injunction decision below rested on an erroneous legal conclusion, it is also subject to *de novo* review. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).

## ARGUMENT

### I. The District Court Erred In Applying The *Smith* Framework Here.

This case falls outside *Smith* for four independent reasons: (1) PHL 2164 is not "generally applicable," (2) PHL 2164 is not "neutral," (3) this case involves the "Free Exercise Clause in conjunction with other constitutional protections," and (4) and religious exemptions to PHL 2164 would not "court[] anarchy." *Smith*, 494 U.S. at 880-81, 888.

#### A. PHL 2164 is not generally applicable.

This case falls outside *Smith* because New York's practice of broadly granting medical exemptions means that PHL 2164 is not generally applicable. A law is not generally applicable "if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy*, 597 U.S. at 526 (citation omitted). The district court

was wrong to hold that PHL 2164 is generally applicable in reliance on this Court's divided opinion in *We the Patriots*. SPA-24 to 33; *cf. M.A.*, 53 F.4th at 38-39 (factual issues regarding comparability between religious and medical exemptions precluded summary judgment).

**1. PHL 2164 treats comparable secular activity more favorably than religious exercise.**

A law is not generally applicable if "it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it." *Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014). The Supreme Court was crystal clear in *Tandon* that government actions lack neutrality and "trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." 593 U.S. at 62 (emphasis in original). When assessing whether religious and secular conduct is comparable, courts are "concerned with the risks [the] activities pose, not the reasons why" the activities are carried out. *Id.*; *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (per curiam) (asking whether secular activities either "have

contributed to the spread of COVID–19" or "could" have presented similar risks). Thus, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62; *see also Does 1-11 v. Bd. of Regents of Univ. of Colorado*, No. 21-1414, 2024 WL 2012317, at *19-*20 (10th Cir. May 7, 2024).[21]

As the bill's sponsor memos explained, the State's purported interest in eliminating the religious exemption to PHL 2164 was to "prevent[] … disease outbreaks." A2371A Sponsor Memo; *see* S2994A Sponsor Memo (expressing the aim of "dealing with this [measles] epidemic"). These sponsor memos are entitled to "considerable weight in discerning legislative intent." *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 263 (2d Cir. 2009) (citation omitted). The bill's sponsors also underscored the bill's interest in

---

21 Just last week, the Tenth Circuit considered a challenge to the University of Colorado's refusal to grant religious exemptions to its vaccine mandate. *Does*, 2024 WL 2012317, at *1. That court explained: "[A] government policy that grants an exemption for medical reasons but denies the same exemption for religious reasons is not generally applicable, as it devalues religious reasons by judging them to be of lesser import than nonreligious reasons." *Id*. at *19 (cleaned up).

preventing transmission during legislative debate. *See, e.g.*, Assembly Record at 41 (Dinowitz, A.) (describing the bill as a "precaution to protect our children" from "future" outbreaks); Senate Record at 5417 (Hoylman, S.) ("The point of this bill … is to protect children from infecting other children and immunocompromised individuals.").

Despite claiming an interest in preventing transmission, the State continues to permit *secularly motivated* nonvaccination of students while barring solely *religiously motivated* nonvaccination of students. This plainly treats at least some "comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. In fact, it treats the *very same* activity—nonvaccination—more favorably when engaged in for secular rather than religious reasons.

The riskiness of nonvaccination does not differ depending on its motivation. A student who is not vaccinated for secular reasons does not "pose a lesser risk of transmission than [*Appellants*'] proposed religious exercise." *Id.* at 63. Nor does medical nonvaccination of Amish students in the "aggregate" pose a greater risk of transmission than medical nonvaccination in the

"aggregate." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 287 (2d Cir. 2021). The Amish communities here have a "tiny number" of children. A-41; *see* A-32 n.4 ("[T]he total Amish population in New York … is estimated at 21,000 souls, including children and adults."). These children live in isolated, remote communities "separate and apart from the world." *Yoder*, 406 U.S. at 210; *see supra* pp.6-8. The risk of transmission posed by this small group of Amish children pales in comparison to the theoretical risk of transmission posed by the sum total of medically unvaccinated children statewide. *See, e.g.*, Senate Record at 5389 (Hoylman, S.) (expressing concern about the risk in Rockland County and Brooklyn).

The district court suggested that the State had asserted a granular interest in "the health of children while they are physically present in the school environment," and that medical exemptions promote health in a way religious exemptions do not. SPA-30. But that was not an interest the State expressed at the time. *See supra* p.15. To the extent the State has devised new justifications during the course of this litigation, such justifications are nothing more than "post hoc rationalizations" the State cannot rely upon now.

*See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) ("The government's justification 'must be genuine, not hypothesized or invented *post hoc* in response to litigation.'" (citation omitted)). Indeed, preventing transmission *only* for children and *only* during school hours is not genuine and is non-sensical.

But even if the State had asserted such an interest at the time, medical and religious nonvaccination would still be comparably risky. As noted, the free-exercise analysis is concerned with "the *risks* various activities pose, not the *reasons* why people [undertake them]." *Tandon*, 593 U.S. at 62 (emphasis added). That a student may claim a medical exemption for *reasons* of health is beside the point. What matters—and what makes *Smith* inapplicable—is that the *risks* posed by both medical nonvaccination and religious nonvaccination are the same. The State cannot meet its burden to show that nonvaccination for either reason carries different risks.

Medical nonvaccination is not the only comparably risky secular activity that PHL 2164 permits. The State has also allowed for noncompliant nonvaccination through DOH's lax enforcement efforts. These lax enforcement

efforts resulted in the nonvaccination of at least 66,000 students who have not claimed any medical exemption. A-32 to 33.[22] In New York City alone, as of February 7, 2024, there are 35,406 students attending school without the required vaccines and without any exemption.[23] Either number is substantially larger than the number of children at issue here. *See* A-32 n.4 ("[T]he total Amish population in New York … is estimated at 21,000 souls, including children and adults."). The noncompliant nonvaccination allowed by the State thus cannot be said to pose a "lesser risk of transmission than [Appellants'] proposed religious exercise." *Tandon*, 593 U.S. at 63. Targeting a small group of Amish students rather than the willfully noncompliant bespeaks the sort of religious hostility the First Amendment prohibits.

---

[22] In opposing Appellants' preliminary injunction motion, the State presented evidence showing that the number may in fact be as high as 97,900 students. *See* A-574. The District Court rejected the comparator, arguing that the State could not be expected to achieve "perfect compliance," but that reasoning permits the targeting of religious communities while turning a blind eye to religious discrimination, something decades of free exercise jurisprudence forbids.

[23] New York City Department of Education, Freedom of Information Law Request Response (Mar. 8, 2024), https://perma.cc/6WQ9-8FUQ.

Moreover, PHL also freely allows for nonvaccination of children who congregate outside of schools, children who are homeschooled, adults who work in schools, and adults who congregate in any other context. A-32. Notably, PHL 2164 does not require vaccinations for teachers in schools, who congregate and work with students on a daily basis. Nonvaccination in each of these contexts—including for secular reasons—is permitted even though it also presents a risk of transmission at least as high as that posed by religious nonvaccination of students (without even taking into account the reality that most of the vaccines at issue do not prevent infection and transmission). *See* A-34, 40 to 42. Yet only students must "endanger their own salvation." *Yoder*, 406 U.S. at 209.

All told, Appellants plausibly alleged numerous comparable secular behaviors that PHL 2164 treats more favorably than religious exercise. The State is free to contest the comparability of these behaviors later in the litigation. But at this stage, under Rule 12(b)(6), Appellants' allegations must be accepted as true. *See Hochul*, 17 F.4th at 287 ("With a record as undeveloped on the issue of comparability as that presented here, we cannot conclude that

the above vaccination requirements are *per se* not generally applicable."); *cf. Cent. Rabbinical Cong.*, 763 F.3d at 197 ("In light of the sparse record at this preliminary [injunction] stage, [the Court] cannot conclude that [the law] is generally applicable.").

**2. PHL 2164's medical exemption precludes a finding of general applicability.**

"A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 593 U.S. at 533 (citation omitted). Where the government has such a mechanism in place, it "may not refuse to extend [it] to cases of 'religious hardship' without compelling reason." *Id.* at 535 (quoting *Smith*, 494 U.S. at 884); *see id*. at 544 (Barrett, J., concurring) ("A longstanding tenet of our free exercise jurisprudence—one that both pre-dates and survives *Smith*—is that a law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions.").

The State has done precisely that here. PHL 2164 "incorporates a system of individual exemptions" in cases of medical hardship but categorically

refuses to extend this exemption to cases of religious hardship. *Id.* at 535. A child may receive a medical exemption if "any physician licensed to practice medicine in [New York] certifies that such immunization *may be* detrimental to [the] child's health." N.Y. Pub. Health L. § 2164(8) (emphasis added); *see also* 10 N.Y. Comp. Codes R. & Regs. § 66-1.1. This determination is performed on a case-by-case basis and is up to the discretion of the certifying physician. Even after a physician has certified that a medical exemption ought to be granted, school officials still have broad discretion to override that certification. *See* 10 N.Y. Comp. Codes R. & Regs. § 66-1.3; *see also Goe*, 43 F. 4th at 33; Assembly Record at 32 ("MR. RAIA: Okay. Under the current law, does a school have the ability to reject a medical exemption? MR. DINOWITZ: Yes.").

The way the medical exemption functions in practice confirms its highly discretionary nature. As Appellants alleged, children in different schools—even in the same communities—are granted the exemption at wildly different rates. "[F]or the 2021-22 school year, medical exemptions were granted" to children attending some schools at rates of 50%, 30%, and 17%. A-18, 31.

But for other schools in the same communities in the same school year, zero medical exemptions were granted. A-18, 31. And as legislators noted during debate on the repeal of the religious exemption, health professionals disagree on whether the exemption should be granted even in particular cases. *See, e.g.*, Assembly Record at 35 (Raia, A.) ("I've seen case after case after case of legitimate doctors' findings that are overruled by another doctor.").

Declarations submitted in support of Appellants' preliminary injunction motion confirm the medical exemption's discretionary nature. The parent of one child who had sought a medical exemption testified that, after a physician recommended the child receive the exemption, the State denied the exemption but a school official later granted it. A-703 to 706. Another parent testified that her son—based on the same medical condition—was granted a medical exemption in some years but denied it in another year based on the same medical condition. A-697 to 701. As Appellants appeal the district court's denial of a preliminary injunction under 28 U.S.C. § 1292(a), these unrebutted declarations are properly before the Court.

This discretionary system for granting secular—but not religious—exemptions permits the State to "decide which reasons for not complying with the policy are worthy of solicitude" and which are not. *Fulton*, 593 U.S. at 537 (citation omitted). But the government is not free to "assume the worst when people [exercise their religion] but assume the best when people [engage in secular activities]." *Tandon*, 593 U.S. at 64 (citation omitted). The State's categorical "refus[al] to extend" its exemption "system to cases of 'religious hardship'" cannot be justified "without compelling reason." *Fulton*, 593 U.S. at 534 (citation omitted).

**3. The district court erred in relying on *We the Patriots* to reach a contrary conclusion.**

The district court reflexively dismissed these "clear" First Amendment "principles," *Tandon*, 593 U.S. at 62-63, on the ground that this Court's recent decision about a Connecticut law in *We the Patriots* "compels dismissal of [Appellants'] … claims on the merits." SPA-3. The court explained that "[h]owever colorable [Appellants]' claims may have been at the outset of this action, [it was] bound by the Second Circuit's intervening decision in *We the Patriots*" to dismiss this case. SPA-3; *cf.* A-936 ("I'll be very up front, when

the lawsuit was first filed, I thought, these are complex, interesting, challenging issues."). The district court's reliance on *We the Patriots* was misguided for multiple reasons.

*First*, this as-applied challenge to PHL 2164 entails a fundamentally different claim than did the facial challenge in *We the Patriots*. Appellants have been clear throughout the course of this litigation that they are challenging the constitutionality of PHL 2164 only "as applied to [them] and their schools." A-46 (requesting that the court "[d]eclare that N.Y. Public Health Law § 2164 is unconstitutional as applied to [Appellants] and their schools"); A-640 ("[T]his case involves a challenge to [PHL 2164] 'as applied' specifically to the Amish [Appellants]."); *see* A-41 (They live in small communities with a "tiny number of healthy Amish children."). This stands in stark contrast to the challengers in *We the Patriots*, who argued that Connecticut's school vaccination law—on its face, in all of its applications—violates free exercise. *See We the Patriots*, 76 F.4th at 135-36; *see also Kane v. De Blasio*, 19 F.4th 152, 174-75 (2d Cir. 2021) (explaining the difference between as-applied

and facial challenges and explaining that plaintiffs were likely to succeed on the former but not the latter because of those differences).

The district court waved away this difference, asserting with little explanation that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." SPA-18 n.3 (citation omitted). But when it comes to the free-exercise analysis, that difference matters. As explained above, courts evaluating a law's general applicability are concerned with the particular religious exercise at issue, and how it is treated relative to "comparable secular activit[ies]" that carry similar "risks." *Tandon*, 593 U.S. at 62. The particular religious exercise at issue here—nonvaccination of the Amish specifically—is different from the religious exercise at issue in *We the Patriots*—nonvaccination for religious reasons statewide. Indeed, while the government may have a compelling interest in the abstract, that does not mean that it has one "in each marginal percentage point by which" it achieves its general goals. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011).

*Second*, New York permits significantly more comparable activity under *Tandon* than was at issue (or was raised) in *We the Patriots*. That includes permitting all forms of gatherings of children irrespective of vaccination status outside of school, permitting nonvaccinated adults to be present in schools, permitting medical exemptions, and permitting significant percentages of students and schools to remain in noncompliance with PHL 2164 without any action by the State. *See supra* p.12. This Court in *We the Patriots* did not grapple with all of this comparable activity.

*Third*, the plain language and design of PHL 2164 is fundamentally different from—and more discretionary than—the language of the Connecticut statute at issue in *We the Patriots*. In *We the Patriots*, the Connecticut statute at issue allowed for a medical exemption when vaccination "*is* medically contraindicated." 76 F.4th at 150 (emphasis added) (citation omitted). This Court was careful to underscore that this language was "more certain than what at least one other State requires." *Id.* at 150 n.19 (citing *Does 1-3 v. Mills*, 142 S. Ct. 17, 19 (2021) (Gorsuch, J., dissenting from the denial of application

for injunctive relief) (interpreting a Maine law providing for a medical exemption where immunization "may be" inapposite)).

PHL 2164, like the Maine statute this Court distinguished in *We the Patriots*, provides for a less "certain" and more "discretionary" medical exemption. It allows for such an exemption whenever the vaccination "*may be* detrimental to a child's health." N.Y. Pub. Health L. § 2164(8) (emphasis added). And its enforcement scheme further "delegates to school officials" the discretionary "authority to grant a medical exemption." *Goe*, 43 F.4th at 33. The law at issue in *We the Patriots* did not bear these hallmarks of discretion, which are key in the general applicability analysis. *See Fulton*, 593 U.S. at 536.

The district court suggested that an individualized medical exception can still satisfy *Fulton*'s "generally applicable" requirement so long as it specifies "objective" criteria to be considered in applying it. SPA-25. But in *Fulton* itself, an exemption precluded a finding of general applicability even though it was based on specific "statutory criteria." 593 U.S. at 530 (observing that criteria included "the family's 'ability to provide care, nurturing and supervision to children,' '[e]xisting family relationships,' and ability 'to work in

partnership' with a foster agency" (citation omitted)). Whether these criteria were "objective" was not relevant to the Court. What matters under the Court's precedents, in Justice Alito's words, is "the prospect of the government's deciding that secular motivations are more important than religious motivations." *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999). If anything, that concern is heightened where—as here—the government makes a "categorical" determination that religious exercise is not worthy of solicitude. *Id.*; *see Fulton*, 593 U.S. at 537 (expressing concern that "the government [would] decide which reasons for not complying with the policy are worthy of solicitude"). When "the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny." *Fraternal Ord. of Police*, 170 F.3d at 366.

### B. PHL 2164 is not neutral.

In addition to being not generally applicable, PHL 2164 also is not neutral toward religion because it disfavors religious practice compared to other secular practices. A government action is not neutral if it is "specifically

directed at … religious practice." *Kennedy*, 597 U.S. at 526 (citation omitted).[24] Governments "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018). The First Amendment forbids even "subtle departures from neutrality." *Gillette v. United States*, 401 U.S. 437, 452 (1971); *see Lukumi*, 508 U.S. at 534 (First Amendment prohibits "covert suppression of particular religious beliefs" (citation omitted)). Where there is so much as a "slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Lukumi*, 508 U.S. at 547.

[24] To the extent the district court held that a lack of religious neutrality requires a showing of "religious hostility" or "religious animus," that is contrary to Supreme Court precedent. *See, e.g.*, *Lukumi*, 508 U.S. at 534 (law not neutral where it "target[s] religious conduct for distinctive treatment"); *see also, e.g.*, *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006) (McConnell, J.) ("[T]he Free Exercise Clause is not confined to actions based on animus." (citations omitted)).

**1. The bill amending PHL 2164 was facially discriminatory, and its sponsors denigrated sincere religious opposition to vaccines as "fake" "garbage."**

PHL 2164 "violate[s] 'the minimum requirement of neutrality' to religion." *Roman Cath. Diocese*, 592 U.S. at 16. The bill amending PHL 2164 to eliminate the religious exemption on its face singled out religious exercise for disfavored treatment. Its title specifies (twice) that it relates solely to "exemption from vaccination due to *religious beliefs*." A2371A (emphasis added); S2994A (same); *see Bell v. Reno*, 218 F.3d 86, 91 (2d Cir. 2000) ("It is well established that the title of a statute or section is an indication of its meaning."). And, true to its title, it surgically removes only the religious exemption from PHL 2164—leaving the one other exemption (a secular one) untouched. *See* A2371A § 1; S2994A § 1.

The district court determined that "the legislative history related to the repeal of the non-medical exemption contains no evidence of hostility towards religious belief." SPA-19. But a closer examination of the legislative history suggests otherwise. This case involves precisely the type of "specific expressions of animus" that this Court found lacking in *We the Patriots*, 76

F.4th at 148, and that both the Supreme Court and this Court have recognized exhibit a lack of religious neutrality.

Those who sponsored the religious exemption's repeal were frank that the bill's purpose was to "target religious conduct for distinctive treatment." *Lukumi*, 508 U.S. at 534. Assemblyman Dinowitz—the lead sponsor of the bill in the Assembly—explained that the goal of the bill was to take "misconception[s]" about religion "out of the puzzle."[25] And a sponsor of the bill in the Senate stated that "[t]he goal should be to take religion out of the equation…. We can't put our public health officials or our school officials into that position of deciding if a religious belief is sincere or not. That is why we need to remove it altogether." A-16.

Other sponsor comments sent a clear "signal of official disapproval of [Appellants'] religious beliefs." *Masterpiece*, 584 U.S. at 638. Perhaps most glaringly, Assemblyman Dinowitz likened those claiming religious exemptions to those who "tried [Galileo] as a heretic." Assembly Record at 102. Both groups were composed of "anti-science people who know nothing"

---

25 Gstalter, *supra* n.13.

and "thought that [someone] was violating their religious beliefs." *Id.* Senator David Carlucci—the bill's lead sponsor in the Senate—similarly vilified those who had invoked the religious exemption, proclaiming them "selfish and misguided" because they had "decided their ideological beliefs are more important than public health."[26] These statements call to mind those in *Masterpiece*, where members of Colorado's Civil Rights Commission "went so far as to compare [an individual's] invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust." 584 U.S. at 635. The Supreme Court explained that to suggest that "'religion has been used to justify discrimination'" and historical intolerance "is to disparage religion." *Id*.

The Court was also clear in *Masterpiece* that it is disparaging to religion to characterize it "as merely rhetorical—something insubstantial and even insincere." *Id.* at 635. The legislative history here is full of such remarks. In the words of Senator Hoylman, "We do not want to give credence to those who would use a religious exemption as a guise."[27] Senator Skoufis—a

[26] Hoylman-Sigal, *supra* n.12.

[27] Senate Record at 5381.

sponsor of the bill in the Senate—boldly proclaimed that any invocation of the religious exemption must be "fake" because "there is no religion that objects to vaccines. Not Islam, not Catholicism, not Judaism."[28] And Assemblyman Dinowitz similarly stated that "[t]here's nothing, nothing in the Jewish religion, the Christian religion, in the Muslim religion … that suggests that you can't get vaccinated…. It is just utter garbage."[29] This Court has already recognized that statements just like these can indicate hostility to religion. *See M.A.*, 53 F.4th at 37 (reasonable juror could find hostility based on statement "[t]here's no such thing as a religious exception").[30]

This Court has also determined that statements calling those claiming a religious exemption "anti-vaxxers" or "loud, very vocal, also very ignorant"

---

28 *Id.* at 5443.

29 *Assembly Update* at 3:11, *supra* n.16.

30 *F.F. v. State*, 194 A.D.3d 80 (App. Div. 2021), is beside the point. That non-binding, state-court opinion predated this Court's decision in *M.A.*, 53 F.4th at 37-38, which recognized that statements of the sort in the legislative history here can be evidence of hostility to religion. *F.F.* is likewise inapplicable to the general applicability analysis, as it did not involve an as-applied challenge by the Amish and predates the Supreme Court's intervening decision in *Fulton*.

can "support a finding of discriminatory intent." *M.A.*, 53 F.4th at 34, 37-38. Once again, the legislative history here is replete with such statements. *See, e.g.*, Senate Record at 5381 (Hoylman, S.) ("[W]e do not want to give credence to the anti-vaxxers."); *id.* at 5400-01 (Hoylman, S.) (urging a need to "disabuse … parents of … anti-vaxx, suspicious anti-science, non-evidence-based decision making"); Assembly Record at 47 (Dinowitz, A.) ("anti-science people"); *id.* at 102 (Dinowitz, A.) ("anti-science people who know nothing"); *id.* at 102-03 (Dinowitz, A.) ("There are probably people who don't believe anything other than that the earth is flat. There are people who believe evolution is not real.").

The State fell short of its duty to ensure that "the sole reasons for imposing the burdens of law and regulation are secular." *Lukumi*, 508 U.S. at 547. Assemblyman Dinowitz explained that the "reason for the bill" plainly went "beyond" the recent measles outbreak, as he had "introduced the bill before this [recent] outbreak."[31] And Senator Skoufis explained to members of the

[31] Assembly Record at 46.

public that he "would have voted for [the bill] whether there was a measles outbreak or not."[32]

These public statements—by those who designed, proposed, and championed the repeal of PHL's religious exemption—are plainly relevant to understanding the motivation behind that action. *See Lukumi*, 508 U.S. at 541-42 (evaluating a city ordinance's neutrality by looking to statements by city council members and local proponents of the ordinance); *M.A.*, 53 F.4th at 37 (finding fact dispute on neutrality based on contemporaneous statements made by policy's proponent); *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020) ("[T]he pleadings give rise to a sufficient 'suspicion' of religious animosity to warrant 'pause' for discovery before dismissing [the] claim as implausible.")

#### 2. The DOH applied PHL 2164 to impose severe penalties on Appellants because of their religious motivations.

The DOH's imposition of penalties was also motivated "at least in part because of" Appellants' religious beliefs. *Kennedy*, 597 U.S. at 526 (citation

[32] @JamesSkoufis, *supra* n.15.

omitted). In recommending penalties to the tune of $118,000, DOH uncharitably characterized Appellants' beliefs as a "recommendation for administrative nullification of a duly enacted law, in violation of the separation of powers." A-100; *see also* A-103 (characterizing Appellants' beliefs as "constitutionally impermissible circumvention of the Legislature"). Failure to impose sanctions, DOH asserted, would "constitute a revival of the religious exemption to PHL § 2164." A-102 (formatting altered); *see* A-104 (Appellants' "position can be viewed as another 'end-run' around the Legislature['s]" elimination of religious exemptions.).

The then-Commissioner of Health followed DOH's recommendations, imposing penalties because "it would be contrary to public policy, the Department's mission, and the clear intent of the State legislature" not to do so on account of the "irreconcilable conflict between [Appellants'] religious beliefs and PHL § 2164." A-126. Not imposing penalties would "encourage other schools to … assert a religious exemption." A-127. These clear statements show that it was the religious nature of the exemption Appellants requested which drove DOH to impose ruinous penalties. That the State

singled out the Amish, yet tolerates at least 66,000 other noncompliant students, further underscores its non-neutrality and further distinguishes this case from *We the Patriots*, raising obvious "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular [group]." *Brown*, 564 U.S. at 802; *see also New Hope*, 966 F.3d at 168 ("[A]nother matter bearing in religious hostility and making dismissal premature is the severity of OCFS's actions in ordering New Hope's closure.").

### C. Appellants have plausibly pleaded a hybrid-rights claim under *Yoder*.

Even if PHL 2164 were both generally applicable and neutral, it would nonetheless be subject to strict scrutiny because Appellants' claim fits squarely within the hybrid-rights framework the Supreme Court applied in *Yoder*. The Court there held that Wisconsin's mandatory secondary education law "impinge[d]" on both the rights "specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children." 406 U.S. at 214. And it explained that "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than

merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment." *Id.* at 233 (citation omitted).

The Supreme Court since *Yoder* has reaffirmed that there is a particular class of free-exercise claims that fall outside the *Smith* framework and are subject to strict scrutiny. *See City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) (*Yoder* "implicated not only the right to the free exercise of religion but also the right of parents to control their children's education."); *Smith*, 494 U.S. at 881-82 (recognizing "hybrid situation[s]" where "the First Amendment bars application of a neutral, generally applicable law" that involves "the Free Exercise Clause in conjunction with other constitutional protections").

This Court has held that the discussion of hybrid rights in *Smith* is "dictum because the plaintiffs in *Smith* presented no such claim." *We the Patriots*, 76 F.4th at 159 (citing *Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003)).[33]

[33] Appellants respectfully believe that this language in *Smith* is not dicta but understand that one panel of this Court generally cannot overrule another. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014). Should this Court reject Appellants' arguments and affirm,

But the individuals in *Yoder* presented that very claim, and the Court's holding in *Yoder* is not dictum. *See Yoder*, 406 U.S. at 233 ("[T]he interests of parenthood are combined with a free exercise claim."); *State v. Yoder*, 182 N.W.2d 539, 542 (Wis. 1971) ("We view this case as involving solely a parent's right of religious freedom to bring up his children as he believes God dictates.").

This Court has also noted that the hybrid-rights theory applied in *Yoder* is "one that probably few other religious groups or sects could" claim. *Leebaert*, 332 F.3d at 144 (citation omitted); *see We the Patriots*, 76 F.4th at 159 (declining to extend the hybrid-rights theory to Greek Orthodox, Roman Catholic, and Muslim plaintiffs). But this case involves the *same* religious group and the *same* kind of claim as in *Yoder*. Appellants, just like the individuals in *Yoder*, are Amish. *Compare* A-12 to 13, *with Yoder*, 406 U.S. at 207. Appellants, just like the individuals in *Yoder*, argue that application of the law will

---

Appellants preserve the right to argue before the en banc court or the Supreme Court that such cases were wrongly decided. *See, e.g.*, *Henderson v. McMurray*, 987 F.3d 997, 1006 (11th Cir. 2021) (William Pryor, J.) ("Inferior courts owe more fidelity to the opinions of the Supreme Court than the Second Circuit showed in *Leebaert*.").

burden their right to free exercise in parenting their children. *Compare* A-34 to 35, *with Yoder*, 406 U.S. at 233. And Appellants, just like the individuals in *Yoder*, face an "irreconcilable … clash between the essence of [their] religious culture and the mandatory [law] that [they] challenge[]." *Leebaert*, 332 F.3d at 144; *compare* A-14 ("The Compulsory Vaccination Law is in sharp conflict with [Appellants'] religious beliefs and their way of life."), *with Yoder*, 406 U.S. at 209 ("[R]espondents believed … that their children's attendance at high school, public or private, was contrary to the Amish religion and way of life.").

The district court concluded that Appellants' hybrid-rights theory fails because it is "coextensive with their free exercise claim." SPA-34. But that misapplies *Yoder*. The point in *Yoder* was that a claim that implicates free exercise rights triggers strict scrutiny when it implicates the right of Amish parents to specifically direct the religious upbringing of their children. Where such rights are implicated, even if by the same conduct, strict scrutiny trumps the *Smith* rational basis framework. *Yoder*, 406 U.S. at 233; *see Smith*, 494 U.S. at 882 (rational basis applied because there was "no contention that

Oregon's drug law represents an attempt to regulate … the raising of one's children in [religious] beliefs"). Such a hybrid claim (evaluated under strict scrutiny) does not necessarily rise or fall with a conventional free-exercise claim (evaluated for a rational basis under *Smith*).

For these reasons, Appellants plausibly alleged a *Yoder* hybrid-rights claim sufficient to trigger strict scrutiny and specifically plead such a claim in their verified complaint. A-34 to 37.

### D. PHL 2164 is amenable to exemptions.

PHL 2164 does not implicate *Smith* for the additional reason that it is readily amenable to workable religious exemptions. In prescribing rational basis review for neutral laws of general applicability in *Smith*, the Supreme Court emphasized that the criminal drug law at issue in that case was not amenable to workable exemptions. To permit such exemptions would be "to permit every citizen to become a law unto himself." *Smith*, 494 U.S. at 879 (citation omitted). Such a state of affairs would be unworkable and "would be courting anarchy." *Id.* at 888.

The Court in *Smith* relied in large part on its prior opinion in *United States v. Lee*, 455 U.S. 252 (1982), where it had denied an Amish "exemption from collection and payment of Social Security taxes." *Smith*, 494 U.S. at 880. As the Court explained in *Lee*, "the tax system could not function" if religious exemptions of the sort the Amish claimant sought were permitted. *Lee*, 455 U.S. at 260. Such religious exemptions to "the comprehensive social security system" would "be difficult to accommodate." *Id.* at 259-60.

That is not true of PHL 2164. Unlike the Court's view of the workability of exemptions to the criminal drug law in *Smith* and the social security tax law in *Lee*, religious exemptions to PHL 2164 are readily workable. Indeed, New York itself accommodated religious exemptions to PHL 2164 for more than 50 years. *See supra* pp.12-13. Those exemptions did not prevent the school vaccination requirement from "function[ing]." *Lee*, 455 U.S. at 260.

The experience of virtually every other state in the country confirms that school vaccination laws are readily amenable to exemptions. Until recently, Mississippi and West Virginia were the only states that refused to offer a religious exemption to their school vaccination laws. *See supra* pp.13-14 &

n.5. In this way, PHL 2164 parallels the compulsory secondary education law in *Yoder*. There, the Court emphasized that such laws were a "relatively recent development." 406 U.S. at 226. Just 60 years prior, "the educational requirements of almost all of the States were satisfied by completion of the elementary grades." *Id.* Because the Amish had successfully functioned against this backdrop "for a period approaching almost three centuries," the Court required "a more particularized showing from the State … to justify the severe interference with religious freedom" that refusal of an exemption would cause. *Id.* at 226–27.

* * *

For all of these reasons, the district court erred in applying the rational basis framework from *Smith* and *We the Patriots* in this case.

## II. PHL 2164 Fails Strict Scrutiny.

Because PHL 2164 triggers strict scrutiny, the State may enforce PHL 2164 against Appellants only if it demonstrates that the law (1) "advances 'interests of the highest order'" and (2) "is narrowly tailored to achieve those

interests." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546). The State has demonstrated neither.

### A. The State has no compelling interest in requiring these particular Amish Appellants to vaccinate their children.

When it comes to evaluating the State's asserted interests, strict scrutiny demands a "precise analysis." *Fulton*, 593 U.S. at 541. The State may not "rely on 'broadly formulated interests,'" but rather must "'scrutinize[] the asserted harm of granting *specific* exemptions to *particular* religious claimants.'" *Id.* (emphasis added) (citation omitted). The relevant question "is not whether the [State] has a compelling interest in enforcing [PHL 2164] *generally*, but whether it has such an interest in denying an exception" to the Amish *specifically*. *Id.* (emphasis added); *see Yoder*, 406 U.S. at 221 ("[W]e must searchingly examine the interests that the State seeks to promote … and the impediment to those objectives that would flow from recognizing the claimed Amish exemption.").

The State here has asserted no such Amish-specific interests. As explained, in repealing the religious exemption, the State asserted only a general interest in preventing transmission. *See supra* pp.15, 33-34. Whatever the

State's *general* interest in preventing transmission might be, the verified complaint plausibly alleged that the State has no credible—much less compelling—reason to insist that these *specific* Amish Appellants receive vaccines over their sincere religious objection. A-37 to 40; *cf.* Nir & Gold, *An Outbreak Spreads Fear* ("Hasidic leaders said they feared not only a rise in anti-Semitism but an invasion of their cloistered community by the authorities under the guise of public health.").

Appellants allege that they live in remote communities that are "separate[] from the modern world." A-11 (citation omitted). These remote communities include just a "tiny number" of Amish children who the record reflects are "healthy." A-41. To be sure, these communities are far removed from the New York City areas where a measles outbreak occurred over five years ago. *See supra* pp.15-16; *cf. Yoder*, 406 U.S. at 228-29 (recognizing that the State's interest in compelling secondary education for the Amish was "somewhat less substantial than … for children generally").

Appellants also allege—drawing support from the CDC and medical scholarship—that most of the vaccines PHL 2164 requires in fact "do not

prevent transmission or infection of the diseases they target." A-42. These allegations—which, at this stage, must be taken as true—severely undermine the State's purported interest. Appellants allege, for example, that the vaccines for "pertussis, tetanus, diphtheria and … polio … do not prevent transmission" but rather operate to "provide a level of personal protection by preventing recipients from experiencing the symptoms of these infections." A-42. With respect to Hepatitis B, the CDC "does not have a single documented case of Hepatitis B being transmitted in a school setting"—let alone in an Amish school setting. A-42. And as for measles, mumps, rubella, and chicken pox, Appellants allege that "there is no health imperative to give these vaccines since the peer reviewed studies roundly show significantly lower rates of cancer and cardiovascular deaths if one contracts these childhood diseases." A-42. Appellants also alleged, and then supported in their motion for a preliminary injunction, that "Plaintiffs' children, like most Amish children … do not suffer from many of the medical conditions that

plague children in non-Amish communities." A-25.[34] Simply put, Appellants have plausibly alleged that PHL 2164 does little to advance even the State's asserted generalized interest in preventing transmission. The State was welcome to contest these factual allegations in response to the motion for a preliminary injunction but, despite a lengthy declaration from the Medical Director of the Bureau of Immunization, N.Y.S. Department of Health, failed to do so. In any event, for now, at the motion to dismiss stage, these allegations are to be "liberally" construed, *Bennett*, 680 F.3d at 219, and "accept[ed] as true," *Fink*, 714 F.3d at 740-41.

That the State waited "over two and a half years" to enforce PHL 2164 against Appellants, and continues not to enforce PHL 2164 against at least

---

[34] *See* A-694 ("There are 26 families that have children in the Dygert Road School, Pleasant View School, or the Shady Lane School. Among these 26 families, there are 168 unvaccinated children (some in and some out of school) and none of these 168 children have any diagnosed medical condition or any other health condition that arose or occurred after they were born."); A-734 ("[A]mong 168 children outside of the Amish community, on average and based on the above background rates in the U.S., one would expect that at least 9 of these 168 Amish children would have food allergies, 31 would have environmental allergies, 10 would have asthma, … [and] 15 would have ADHD.").

66,000 students, further underscores the point. A-19, 32 to 33; *see supra* pp.20-21, 36-37, 29. This substantially delayed enforcement undercuts any assertion by the State that the interest involved here is compelling. As in *Yoder*, "[t]he independence and successful social functioning of the Amish community" with religious exemptions for a lengthy "period" of time is "strong evidence that there is at best a speculative gain" to be had by overriding their religious beliefs. 406 U.S. at 226-27; *see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 433 (2006) ("If [peyote] use is permitted in the face of the congressional findings [underlying the Controlled Substances Act] for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the [O Centro Espírita Beneficente Uniã do Vegetal] who want to practice theirs.").

### B. PHL 2164 is not narrowly tailored because it is both underinclusive and overbroad.

The State's purported interest lies in preventing transmission, *see supra* pp.15, 33-34., but PHL 2164 is nowhere close to narrowly tailored to achieve

that objective. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon*, 593 U.S. at 63. A law can fail narrow tailoring if it is underinclusive, overinclusive, or both. *See Lukumi*, 508 U.S. at 546. For several reasons, PHL 2164 fails narrow tailoring because it is both underinclusive and overinclusive.

PHL 2164 is underinclusive for three primary reasons. *First*, PHL 2164 applies in only one of many settings where transmission may occur: schools. PHL 2164 does not require vaccination for children (or anyone else, for that matter) to participate in any number of other gatherings in other places where they may congregate or interact—such as barn raisings, church services, community festivals, and other Amish gatherings. A-32. This limited coverage of PL 2164 undercuts any interest the State may assert in preventing transmission, as "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (citation omitted).

*Second*, PHL 2164 applies only to one group of people who may transmit in schools: children. PHL 2164 does not require vaccination for any of the other people who congregate and interact with children in schools every day—such as teachers, administrators, aides, and lunch ladies. A-32. Because of their Amish beliefs, all of these school officials are likely to be unvaccinated. A-40 to 41. But PHL 2164 is unconcerned with their vaccination status. Only students must "endanger their own salvation" through forced vaccination. *Yoder*, 406 U.S. at 209. This limited coverage compounds the underinclusivity problem, further undercutting any interest the State may claim in preventing transmission.

*Third*, PHL 2164 still allows for a broad medical exemption to its vaccination requirements. This exemption sweeps in any child for whom a licensed physician determines that "immunization *may be* detrimental to [the] child's health." N.Y. Pub. Health L. § 2164(8) (emphasis added). It is broad and discretionary, and it has historically been granted to as many as 50% of students in some schools. *See* A-18, 31; *supra* p.20. Much like in *Fulton*, "[t]he creation

of a system of exceptions … undermines the [State's] contention that its [vaccination] policies can brook no departures." *Fulton*, 593 U.S. at 542.

PHL 2164 is similarly overinclusive for three primary reasons. *First*, less burdensome means of preventing transmission are plainly available. Forty-five other states operate with some form of religious exemption to their school vaccination laws without routine outbreaks of the diseases listed in PHL 2164. *See* A-16; *supra* p.13 & n.4. And transmission can be prevented through means short of exclusion from all schools. For example, the State could have crafted a system in which nonvaccinated students are removed from schools for a limited time in the case of an outbreak. Several nearby states have religious exemptions that work in this way.[35]

Furthermore, if the State truly were concerned with the genuineness of claimed religious exemptions, it could have established a system for verifying religious exemptions rather than categorically prohibiting them. It could, for example, have "institute[ed] a standardized method for reviewing

[35] *See, e.g.*, 28 Pa. Code § 27.77(e); Oh. Rev. Code § 3313.671(C); N.J. Admin. Code § 8:57-4.4(d); Vt. Dep't of Health, *School Year 2023-24 Religious Immunization Exemption Child Care and Schools*, https://perma.cc/Y48L-PMDC.

applications for religious exemptions to ensure they are granted only to those who, like [Appellants], plainly have sincere religious beliefs." A-41 to 42; *see Lukumi*, 508 U.S. at 539 (A law is suspect "if First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation.").

*Second*, as discussed above, "many of the vaccines required" by PHL 2164 "do not prevent transmission or infection of the diseases they target." A-42. By including vaccines that do not prevent transmission, PHL 2164 is not narrowly tailored to preventing transmission. Appellants have plausibly alleged that "the state has made no attempt to differentiate between vaccine requirements" or "to show why specific vaccines were necessary." A-43. Once again, the State is free to dispute these allegations, and the CDC and medical literature citations reflecting the same, as litigation progresses. But, at this juncture, they must be taken as true.

*Third*, there is no evidence that sweeping Amish students within PHL 2164's coverage will further any goal of preventing transmission. As Appellants allege, the measles outbreak the State has cited did not occur in Amish

communities. A-41; *see Roman Cath. Diocese*, 592 U.S. at 18 (regulation not narrowly tailored where "there [was] no evidence that the applicants have contributed to the spread of COVID-19"). Rather, it occurred in the faraway New York City area. *See supra* pp.15-16. Several legislators also noted that there was scant evidence that the religious exemption caused the measles outbreak five years ago—as opposed to the medical exemption, noncompliance, or non-students not subject to a mandate. *See supra* pp.16-17. At this stage in the litigation, it is at least plausible—based on the allegations in Appellants' verified complaint—that PHL 2164 could be more narrowly tailored and still achieve its stated interest. There is no reason "why religion alone must bear the burden" of the State's push to prevent transmission. *Lukumi*, 508 U.S. at 544.

* * *

In sum, Appellants have plausibly alleged that the denial of an exemption for the Amish under PHL 2164 does not serve a compelling interest and is not narrowly tailored. Strict scrutiny is therefore unsatisfied at this stage, and the State's motion to dismiss under Rule 12(b)(6) should have been

denied and the preliminary injunction considered using the correct legal standard.

## CONCLUSION

The judgment and decisions below should be reversed.

Dated: May 13, 2024

Respectfully submitted.

*/s/ Kyle D. Hawkins*

Kyle D. Hawkins
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701
(512) 693-8350

Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW
Washington, DC 20001
(512) 693-8350

Hiram S. Sasser, III
Justin Butterfield
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Suite 1600
Plano, TX 75075
(972) 941-4444

Elizabeth A. Brehm
Walker D. Moller
SIRI & GLIMSTAD LLP
745 Fifth Ave., Suite 500
New York, NY 10151
(212) 532-1091

Christopher Wiest
50 E. Rivercenter Blvd., Suite 1280
Covington, KY 41017
(513) 257-1895

*Counsel for Appellants*

## Certificate of Service

On May 13, 2024, this brief was served via ACMS on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,671 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins

# SPECIAL APPENDIX

**TABLE OF CONTENTS**

**Page**

Decision and Order, dated March 11, 2024 ............... SPA-1

Judgment, dated March 11, 2024 ............................... SPA-36

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSEPH MILLER, *individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school*, EZRA WENGERD, *as representative of all Amish schools in the State of New York,* JONAS SMUCKER, *individually and on behalf of his minor children*, DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL *a/k/a Twin Mountains School*, and SHADY LANE SCHOOL,

Plaintiffs,

v.

DR. JAMES V. MCDONALD, *in his official capacity as Commissioner of Health of the State of New York*, and DR. BETTY A. ROSA, *in her official capacity as Commissioner of Education of the State of New York*,

Defendants.

---

**DECISION AND ORDER**

1:23-CV-00484 EAW

## INTRODUCTION

New York, like every other state in the nation, requires that schoolchildren be vaccinated against various contagious diseases, including measles, polio, varicella (chicken pox), and pertussis (whooping cough). *See* N.Y. Pub. Health Law ("PHL") § 2164(1), (7). Prior to amendments made in 2019, PHL § 2164 "provided two statutory exemptions from its school immunization requirements"—a medical exemption and a religious exemption. *Goe v. Zucker*, 43 F.4th 19, 25 (2d Cir. 2022), *cert. denied sub nom. Goe v. McDonald*, 143 S. Ct. 1020, 215 L. Ed. 2d 188 (2023). Under the now-repealed religious exemption,

"a child was not required to be immunized if that child had a parent or guardian who held 'genuine and sincere religious beliefs' against immunization." *Id.* (quoting PHL § 2164(9) (repealed 2019)).

In 2018 and 2019, the United States experienced a nationwide measles outbreak, with New York "as an epicenter." (*Id.*). In response, and recognizing that measles outbreaks within New York were "largely concentrated in communities with low immunization rates," the New York legislature repealed the religious exemption. *Id.*; *see also* Act of June 13, 2019, ch. 35, 2019 N.Y. Laws 153, 153-54. As such, an exemption is now available only "[i]f any physician licensed to practice medicine in [New York] certifies that . . . immunization may be detrimental to a child's health[.]" PHL § 2164(8).

Plaintiffs are three individual adherents of the Amish faith and three private Amish schools. (Dkt. 1 at ¶ 2). The individual plaintiffs have sincere religious objections to vaccines and run the plaintiff schools, where they "do not require proof of vaccination from students to attend school." (*Id.*). In March of 2022, the New York State Department of Health ("NYSDOH") charged the plaintiff schools with non-compliance with PHL § 2164. (*Id.* at ¶ 32). Following administrative proceedings (*see id.* at ¶¶ 36-53), NYSDOH issued an order sustaining the charges and imposing penalties of $52,000 against plaintiff Dygert Road School, $46,000 against plaintiff Pleasant View School a/k/a Twin Mountains School, and $20,000 against plaintiff Shady Lane School. (*Id.* at ¶¶ 54-56).

Plaintiffs thereafter commenced the instant action, asserting that PHL § 2164 violates their First Amendment right to freely exercise their religion and seeking injunctive

and declaratory relief. (*Id.* at ¶¶ 59-108).[1] Plaintiffs further move for a preliminary injunction, asking the Court to enjoin defendants from "implementing and enforcing" PHL § 2164 "unless they provide the option for a religious exemption." (Dkt. 9 at 1-2). Defendants—Dr. James V. McDonald, in his official capacity as Commissioner of Health of the State of New York ("Dr. McDonald") and Dr. Betty A. Rosa, in her official capacity as Commissioner of Education of the State of New York ("Dr. Rosa")—oppose Plaintiffs' motion and have made their own request that the matter be dismissed on the merits. (Dkt. 25). Defendants have further argued that Plaintiffs' claims against Dr. Rosa must be dismissed for lack of standing and for lack of subject matter jurisdiction. (*Id.*).

For the reasons that follow, the Court agrees with Defendants that Plaintiffs lack standing to assert their claims against Dr. Rosa. Further, the Court finds that *We the Patriots USA Inc. v. Connecticut Office of Early Childhood Development,* 76 F.4th 130 (2d Cir. 2023), *petition for cert. filed* (U.S. Dec. 14, 2023) (No. 23-643), which was issued after the instant motions were filed but before briefing was complete, compels dismissal of Plaintiffs' remaining claims on the merits. In *We the Patriots*, the Second Circuit affirmed the dismissal of a free exercise claim attacking Connecticut's mandatory school vaccination regime, which is not materially different from New York's. However colorable Plaintiffs' claims may have been at the outset of this action, this Court is bound by the Second Circuit's intervening decision in *We the Patriots*. Accordingly, the Court

---

[1] As discussed below, Plaintiffs also allege that PHL § 2164 "implicates" their rights "to free speech, to associate, and to regulate the up bringing and education of their children." (Dkt. 1 at ¶ 74).

grants Defendants' motion to dismiss and denies Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I. Factual Background

#### A. New York's Mandatory Vaccination Laws

New York became the second state in the nation to impose vaccination requirements on schoolchildren in 1860, when it enacted a law allowing local school boards to deny admission to any child not vaccinated against smallpox. *See* Ch. 438, § 1, 1860 N.Y. Laws 761, 761. New York's vaccine mandate has evolved over time, and today schoolchildren in New York are required to be vaccinated against "poliomyelitis, mumps, measles, diphtheria, rubella, varicella, Haemophilus influenzae type b (Hib), pertussis, tetanus, pneumococcal disease, and hepatitis B[.]" PHL § 2164(2)(a). "No principal, teacher, owner or person in charge of a school shall permit any child to be admitted to such school, or to attend such school, in excess of fourteen days," unless the child presents acceptable evidence of vaccination. *Id*. § 2164(7)(a). "School" is defined in this context to "mean[] and include[] any public, private or parochial child caring center, day nursery, day care agency, nursery school, kindergarten, elementary, intermediate or secondary school." *Id*. § 2164(1)(a).

Prior to being repealed, PHL § 2164(9) provided: "This section shall not apply to children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school."

As discussed above, PHL § 2164(9) was repealed effective June 13, 2019, in response to a nationwide measles outbreak. *See* Act of June 13, 2019, ch. 35, 2019 N.Y. Laws 153, 153-54; *see also* New York Bill Jacket, 2019 A.B. 2371, Ch. 35 ("According to the Centers for Disease Control, sustaining a high vaccination rate among school children is vital to the prevention of disease outbreaks, including the reestablishment of diseases that have been largely eradicated in the United States, such as measles. According to State data from 2013-2014, there are at least 285 schools in New York with an immunization rate below 85%, including 170 schools below 70%, far below the CDC's goal of at least a 95% vaccination rate to maintain herd immunity.").

The current version of PHL § 2164 contains a single exemption: "If any physician licensed to practice medicine in [New York] certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health." PHL § 2164(8). Regulations adopted by the NYSDOH further provide: "**May be detrimental to the child's health** means that a physician has determined that a child has a medical contraindication or precaution to a specific immunization consistent with ACIP [Advisory Committee on Immunization Practices] guidance or other nationally recognized evidence-based standard of care." 10 N.Y. Comp. Codes R. & Regs. ("NYCRR") § 66-1.1 (emphasis in original).

NYSDOH's regulations additionally provide:

> A principal or person in charge of a school shall not admit a child to school unless a person in parental relation to the child has furnished the school with one of the following:

> (a) A certificate of immunization, as described in section 66-1.6 of this Subpart, from a health care practitioner or from NYSIIS or the CIR, documenting that the child has been fully immunized according to the requirements of section 66-1.1(f) of this Subpart.
>
> (b) Documentation that the child is in process of receiving immunizations as defined in section 66-1.1(j) of this Subpart. A principal or person in charge of a school shall not refuse to admit a child to school, based on immunization requirements, if that child is in process.
>
> (c) A signed, completed medical exemption form approved by the NYSDOH or NYC Department of Education from a physician licensed to practice medicine in New York State certifying that immunization may be detrimental to the child's health, containing sufficient information to identify a medical contraindication to a specific immunization and specifying the length of time the immunization is medically contraindicated. The medical exemption must be reissued annually. The principal or person in charge of the school may require additional information supporting the exemption.

*Id*. § 66-1.3.

### B. Amish Education and Opposition to Vaccines

"Members of the Amish faith are religiously committed to living separately from the modern world." (Dkt. 1 at ¶ 1 (quotation omitted)). That commitment requires them to grow their own food, make their own clothing, and use pre-industrial equipment in farming. (*Id*.). The Amish also educate their children "in the Amish way, with Amish teachers, in Amish schools, on Amish owned property." (*Id*. at ¶ 2). The plaintiff schools—Dygert Road School, Pleasant View School a/k/a Twin Mountain School, and Shady Lane School—are "Amish community schools that do not receive any public funding [and] are located within their respective Amish communities." (*Id*. at ¶ 8).

Plaintiffs Jonas Smucker ("Smucker") and Joe Miller ("Miller") are "fathers of children who attend different Amish schools, and they are also both board members of their

children's respective schools." (*Id*. at ¶ 9). Specifically, Miller's children "attend an Amish-run school in Chautauqua County." (*Id*.).[2] Plaintiff Ezra Wengerd ("Wengerd") "was elected by the Amish community as a representative of all Amish schools in [New York] State to deal with issues with the State[.]" (*Id*.). "[M]any Amish"—including the individual plaintiffs—"maintain profound religious objections to vaccines." (*Id*. at ¶¶ 2, 9, 13).

### C. State Administrative Proceedings Against the Plaintiff Schools

In November and December of 2021, NYSDOH audited the records of the plaintiff schools. (*Id*. at ¶ 31). On March 11, 2022, NYSDOH mailed a Statement of Charges and Notice of Hearing to the plaintiff schools, charging them with non-compliance with PHL § 2164. (*Id*. at ¶¶ 32-33). The Notice of Hearing advised that a hearing would be held on May 2, 2022, and that civil penalties of up to $2,000 per violation, as well as additional action authorized by the PHL, could be imposed. (*Id*. at ¶ 34).

A hearing was held before administrative law judge ("ALJ") Natalie J. Bordeaux on May 2, 2022. (*Id*. at ¶¶ 36-37, Ex. C). Wengerd represented the plaintiff schools at the hearing. (*Id*. at ¶ 38). He read a statement into the record indicating that the plaintiff schools were not in compliance with PHL § 2164 due to their sincere religious opposition to vaccination. (*Id*. at ¶¶ 38-39). Wengerd also advanced the argument that the plaintiff schools were operating as "home schools" under New York law, but indicated that individual homeschooling was "not an option" because "we believe in working together

---

2 The complaint is silent on the location of the school that Smucker's children attend.

and having our children together in a happy social life in our schools." (*Id*. at ¶¶ 44-45). Wengerd asked for a religious exemption from PHL § 2164. (*Id*. at ¶ 42). NYSDOH responded that there is no provision in PHL § 2164 allowing for a nonmedical exemption. (*Id*. at ¶ 43).

NYSDOH sought: a $52,000 penalty against Dygert Road School, representing the $2,000 maximum civil penalty for 26 students who were found to be non-compliant with PHL § 2164 for one day; a $46,000 penalty against Twin Mountains School, representing the $2,000 maximum civil penalty for 23 students who were found to be non-compliant with PHL § 2164 for one day; and a $20,000 penalty against Shady Lane School on the grounds it was more probable than not that at least one student in attendance violated PHL § 2164 and would have attended the school for more than ten days, with each day of attendance constituting a separate violation. (*Id*. at ¶ 46). On May 25, 2022, the ALJ issued a report and recommendation concluding that all three of the plaintiff schools had violated PHL § 2164 and recommending that the charges be sustained, but further recommending that no penalties be imposed due to a lack of adequate notice. (*Id*. at ¶ 47, Ex. D).

NYSDOH issued exceptions to the ALJ's report and recommendation on June 21, 2022. (*Id*. at ¶ 49, Ex. E). Specifically, NYSDOH objected to the ALJ's recommendation that no penalties be assessed, contending that in light of "Respondents' admission that they violated the statute and their promise to continue violating the law of man, the failure to impose a penalty would amount to administrative nullification of a duly enacted law, in violation of the separation of powers doctrine inherent in the State Constitution." (*Id*. at ¶ 50 (internal citation and quotations omitted)). NYSDOH further contended that

"Respondents testified that they were aware of the requirements placed on them and made it clear that the matter could not be resolved with the Department because they have no intention of complying with the requirements," and that failing to impose a penalty would accordingly "send a clear message to the Respondents and every school in the State that violations of this type will not result in Department sanctions." (*Id*. at ¶ 51 (internal quotations omitted)).

In an order dated December 15, 2022, NYSDOH adopted the ALJ's recommendation that the charges be sustained, but rejected her recommendation that no penalties be imposed. (*Id*. at ¶ 54). The order explained that "Respondents testified that they were aware of the legal requirements but intend not to comply because of an irreconcilable conflict between their religious beliefs and PHL §2164" and that while there was no dispute about the genuineness of the religious objections, "the Legislature amended PHL § 2164 to remove the religious exemption, leaving medical exemptions as the only exception to the school immunization requirements in the statute." (*Id*. at ¶ 55 (citations omitted)). The order imposed a $52,000 penalty against Dygert Road School, a $46,000 penalty against Twin Mountains School, and a $20,000 penalty against Shady Lane School. (*Id*. at ¶ 56).

## II. <u>Procedural Background</u>

Plaintiffs filed the instant action on June 2, 2023. (Dkt. 1). Shortly after commencing this litigation, Plaintiffs filed their motion for a preliminary injunction. (Dkt. 9). The parties thereafter entered into a stipulation providing that Defendants would not "seek, collect upon, or enforce" the December 15, 2022 order, or "issue any additional

violations concerning, or otherwise enforce, Public Health Law 2164 against Plaintiffs and any of the schools they represent" pending this Court's resolution of the preliminary injunction motion. (*See* Dkt. 19).

Defendants then filed their opposition to the preliminary injunction motion, as well as their competing motion to dismiss. (Dkt. 25). After Defendants filed their dismissal motion, but while briefing in this matter was still ongoing, the Second Circuit issued its decision in *We the Patriots*, which the parties addressed in their responses and replies. (*See* Dkt. 28; Dkt. 29). The Court heard oral argument on October 27, 2023, and reserved decision. (Dkt. 32).

## DISCUSSION

### I. Defendants' Motion to Dismiss

The Court must resolve Defendants' pending motion to dismiss before turning to Plaintiffs' motion seeking to preliminarily enjoin enforcement of PHL § 2164. In other words, if Plaintiffs' lawsuit does not survive Defendants' motion to dismiss, then they are not entitled to any relief—injunctive or otherwise.

Defendants have moved for dismissal of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), arguing that: (1) Plaintiffs lack standing to bring claims against Dr. Rosa; (2) Plaintiffs' claims against Dr. Rosa are barred by sovereign immunity; and (3) Plaintiffs' First Amendment claim is foreclosed by binding Supreme Court and Second Circuit precedent. (*See* Dkt. 25-1). For the reasons discussed below, the Court agrees that Plaintiffs lack standing to assert their claims against Dr. Rosa. The Court

further finds that Plaintiffs' claims against Dr. McDonald fail as a matter of law, and that dismissal of the complaint is accordingly required.

### A. Legal Standard—Subject Matter Jurisdiction

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms, S.á.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quotation and citation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss for lack of subject matter jurisdiction . . ., a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). In addition, a court is not limited to the allegations in the complaint and can "refer to evidence outside the pleadings," *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002), but it "may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004). "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003) (quotation omitted), *aff'd*, 403 F.3d 76 (2d Cir. 2005). "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the

complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (quotation omitted).

**B. <u>Plaintiffs Lack Standing as to the Claims Against Dr. Rosa.</u>**

Defendants argue that the Court lacks subject matter jurisdiction over Plaintiffs' claims against Dr. Rosa, in her official capacity as Commissioner of Education of the State of New York, because "Plaintiffs do not allege any facts to show that the [New York State Department of Education ("NYSDOE")] had any part in auditing, notifying, conducting the hearing, or assessing charges." (Dkt. 25-1 at 20). According to Defendants, Dr. Rosa is therefore an inappropriate defendant, because: (1) Plaintiffs have not alleged harm traceable to NYSDOE; and (2) "Plaintiffs do not, nor can they, allege that Commissioner Rosa had some connection with enforcing PHL § 2614 against them, much less demonstrated a willingness to exercise that duty here." (*Id*. at 22-24). For the reasons discussed below, the Court agrees that Plaintiffs lack standing with respect to their claims against Dr. Rosa. Accordingly, the Court need not and does not reach Defendants' sovereign immunity argument.

"[T]he doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). The Second Circuit has explained:

> To satisfy the requirements of Article III standing, plaintiffs must demonstrate "(1) [an] injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged

actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

*Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (quoting *Selevan v. New York Thruway Auth*., 711 F.3d 253, 257 (2d Cir. 2013)). "These elements are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id*. (quotation and alteration omitted).

At the pleading stage, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) based on lack of standing, a plaintiff must "allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quotation omitted).

Here, Plaintiffs' sole factual allegation about Dr. Rosa is that she "is empowered to adjudicate parental requests or appeals following exclusion from schools under N.Y. Educ. Law § 310, and is tasked with implementing and enforcing, and does implement and enforce, the mandatory educational instruction and supervision of school requirements pursuant to the authority granted to her in N.Y. Educational Law § 305(1) and (2)." (Dkt. 1 at ¶ 11). The Court agrees with Defendants that this vague allegation is insufficient to plausibly suggest standing. In particular, Plaintiffs have not alleged Dr. Rosa, or NYSDOE, took or threatened to take any action against them with respect to PHL § 2164. "Nor are there allegations that [Dr. Rosa or the NYSDOE] forbade any of the Amish

students from pursuing an education because he/she/they were not vaccinated or that she threatened or will threaten to shut down the schools." (Dkt. 25-1 at 23).

Plaintiffs argue in opposition that "if Plaintiffs' children are denied the ability to attend their own Amish schools, because administrators are fearful of further fines, the appeal of such denials may need to run to Dr. Rosa." (Dkt. 28 at 23-24). This speculative contention is insufficient to establish standing. *See, e.g., Butler v. Obama*, 814 F. Supp. 2d 230, 240 (E.D.N.Y. 2011) ("As the jurisprudence of the Supreme Court and Second Circuit has clearly articulated, . . . speculation is insufficient to confer Article III standing."). Only two of the plaintiffs are even alleged to have children attending Amish schools, and it is not alleged that those schools (which are not identified in the complaint with any specificity and of which Smucker and Miller are board members) have any intention of denying Smucker's or Miller's children the ability to attend school based on PHL § 2164. To the contrary, and as discussed below, Plaintiffs affirmatively allege that the Amish community will never comply with PHL § 2164. As such, while PHL § 2164(7)(b) provides that "[a] parent, a guardian or any other person in parental relationship to a child denied school entrance or attendance may appeal by petition to the commissioner of education in accordance with the provisions of section three hundred ten of the education law," Plaintiffs have not alleged a non-speculative scenario where such an appeal would occur.

Because Plaintiffs have not plausibly alleged that Dr. Rosa has played or will play in the future any role in the actions of which they complain—namely, the enforcement of PHL § 2164 against them via the imposition of fines—injunctive relief against Dr. Rosa

would not redress their alleged injury. Accordingly, they lack standing to pursue their claims against her. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). The Court dismisses those claims without prejudice for lack of subject matter jurisdiction.

**C. Legal Standard—Failure to State a Claim**

Defendants do not dispute that the Court has subject matter jurisdiction over Plaintiffs' claims against Dr. McDonald. Accordingly, the Court turns to their merits-based arguments, made under Rule 12(b)(6).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

In considering a motion to dismiss, "as a fundamental matter, courts may take judicial notice of legislative history." *Goe*, 43 F.4th at 29. "The same is true for administrative record filings[.]" *Id.*

### D. Plaintiffs' Claims Against Dr. McDonald Fail as a Matter of Law

#### 1. PHL § 2164 is Subject to Rational Basis Review

Plaintiffs' claim in this action is that PHL § 2164, as applied to them, violates their First Amendment rights. (*See* Dkt. 1 at 37 (asking the Court to "[d]eclare that N.Y. Public Health Law § 2164 is unconstitutional as applied to Plaintiffs and their schools, including against any principal, teacher or person in charge, for the students they enroll whose parents have a sincerely held religious belief against administering one or more vaccines required by N.Y. Public Health Law § 2164" and to enjoin enforcement of the law against Plaintiffs); Dkt. 28 at 34 ("[T]he complaint in this action *only* sought relief against [PHL § 2164] specifically 'as applied' to Plaintiffs and hence relief is limited thereby." (emphasis in original))).

The primary constitutional right that Plaintiffs claim has been violated by PHL § 2164 is the right to freely exercise one's religion. "A law that incidentally burdens religious exercise is constitutional when it (1) is neutral and generally applicable and (2) satisfies rational basis review." *We the Patriots*, 76 F.4th at 144 (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)). If the law at issue "is not neutral or not generally applicable, it is subject to strict scrutiny, and the burden shifts to the government to establish that the law is narrowly tailored to advance a compelling government interest." *Id.*

Initially, the Court notes that the Second Circuit held in *Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015), that "mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause" and that New York had—at that point in time—"go[ne] beyond what the Constitution requires by allowing an exemption for parents with genuine and sincere religious beliefs." *Id.* at 543; *see also We the Patriots,* 76 F.4th at 150 ("[T]he government may constitutionally elect to accommodate religious believers but is not constitutionally *required* to do so." (emphasis in original)). *Phillips*, like all Second Circuit precedent, is binding on this Court. Accordingly, the crux of the matter before the Court is whether the *repeal* of the religious exemption, while leaving in place the medical exemption, violated the Free Exercise Clause. The Court's analysis of that question is dictated by the decision in *We the Patriots*, wherein the Second Circuit was called upon to determine whether Connecticut's mandatory vaccination statute—which, like PHL § 2164, had been recently amended to repeal an exemption based on religious

objections, but continued to allow for medical exemptions—violated the First Amendment's Free Exercise Clause. *See* 76 F.4th at 144-57.[3]

**a. Neutrality**

In *We the Patriots*, the Second Circuit first considered whether the Connecticut statute was neutral. *Id*. at 148. The *We the Patriots* court explained that a law is not neutral if the enacting authority "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id*. at 145 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). In order to be found non-neutral, "it is not enough for a law to simply *affect* religious practice; the law or the process of its enactment must demonstrate 'hostility' to religion." *Id*. The Connecticut statute was determined to be neutral because its legislative history was devoid of any "evidence of hostility to religious believers, even when read with an eye toward 'subtle departures from neutrality' or 'slight suspicion of religion or distrust of its practices.'" *Id*. at 148 (quoting *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018)). The Second Circuit

[3] Plaintiffs suggest that the as-applied nature of their claim "materially distinguishes this case from *We the Patriots*." (Dkt. 28 at 34). However, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, <u>not what must be pleaded in a complaint</u>." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (emphasis added). Accordingly, and contrary to Plaintiffs' argument, *We the Patriots* provides the appropriate framework for the Court's analysis.

Plaintiffs also contended at oral argument that *We the Patriots* is inconsistent with the Supreme Court's decision in *Fulton*. However, this Court is not free to disregard binding Second Circuit precedent based on a competing interpretation of the relevant legal standard.

affirmatively rejected the argument that "repealing any existing religious exemption is hostile to religion per se." *Id*. at 149.

In the complaint, Plaintiffs allege that PHL § 2164 is not neutral because "the State targeted religious adherents by eliminating [the] long-standing religious exemption while leaving the medical exemption process in place." (Dkt. 1 at ¶ 70). This allegation fails to establish non-neutrality. Nothing in the text of PHL § 2164 as amended demonstrates any hostility to religion. To the contrary, PHL § 2164 is neutral on its face, neither targeting religious belief nor singling it out for particularly harsh treatment. And, as previously noted, *We the Patriots* affirmatively held that the repeal of a previously existing religious exemption is not, of itself, hostile to religion. *See* 76 F.4th at 149; *cf. Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014) ("Surely the granting of a religious accommodation to some in the past doesn't bind the government to provide that accommodation to all in the future, especially if experience teaches the accommodation brings with it genuine safety problems that can't be addressed at a reasonable price. If the rule were otherwise, it would only invite the unwelcome side effect of discouraging . . . officials from granting the accommodation in the first place[.]").

Moreover, the legislative history related to the repeal of the non-medical exemption contains no evidence of hostility towards religious belief. Those sponsoring the relevant legislation in both the New York State Senate and the New York State Assembly made clear that their concern was public health. *See, e.g.,* Sponsor Memo, 2019 N.Y. Senate Bill S2994A; Memorandum in Support of Legislation, 2019 N.Y. Assembly Bill A2371. In addition, rather than evidencing hostility to religious belief, the state legislature was

concerned about individuals who were claiming a nonmedical exemption despite not having a religious belief regarding vaccination. N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5400-01 (June 13, 2019).

The state legislature considered the available scientific data, which showed that in the areas of the state most impacted by the measles outbreak, infections were primarily in unvaccinated children. *See* N.Y. Assembly, Tr. of Floor Proceedings, 242d Sess., at 58-59 (June 13, 2019). It noted that the New York City Department of Health had reported a case in which one infected child with a religious exemption resulted in 44 additional cases of measles, 26 of which were also in fellow students with religious exemptions. *See* N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5385 (June 13, 2019). The state legislature also considered data showing the number and percentage of religious exemptions in nonpublic schools had tripled or quadrupled in certain geographic areas in recent years, potentially causing the loss of herd immunity in those communities. *Id*. at 5388-89.

The state legislature considered alternatives, such as eliminating the religious exemption only with respect to the measles vaccine or otherwise narrowing the religious exemption, but ultimately determined such alternatives would not be effective in protecting New York's schoolchildren from all vaccine-preventable illnesses. *Id*. at 5402, 5408. The state legislature also "acknowledged the impact [repealing the nonmedical exemption] would have on children and families who hold religious objections to vaccination but balanced that impact against the risks to public health." *We the Patriots*, 76 F.4th at 148; *see also F.F. v. State*, 194 A.D.3d 80, 85-87 (3d Dep't 2021) (discussing the legislative history of the repeal of the religious exemption and concluding that it was neutral).

Plaintiffs further allege that the enforcement of PHL § 2164 is not neutral, because of statements made and actions taken by NYSDOH during the administrative proceedings against the plaintiff schools. (Dkt. 1 at ¶ 71). In particular, Plaintiffs take issue with NYSDOH's characterization of their actions as "willful non-compliance" with PHL § 2164. (Dkt. 10 at 21 ("The DOH was clear about its animus towards Plaintiffs and their religious beliefs, characterizing such beliefs as willful non-compliance. It also pushed for a significant penalty because, 'Respondents' admission that they violated the statute and their promise to continue violating the law of "man" is in essence a recommendation for administrative nullification of a duly enacted law.' And DOH's final order reflected this animus in assessing ruinous fines[.]" (internal citations omitted)).

The statements pointed to by Plaintiffs are not indicative of religious animus by NYSDOH. Indeed, Plaintiffs have failed to explain precisely what it is they object to in the identified statements, which are fully consistent with the positions they took before the ALJ and the positions they have taken in this Court. The statement that Wengerd read at the hearing stated: "It is our utmost desire to live a quiet peaceful undesturbed [sic] life and obey those in authority over us. But once those laws are in conflict with what the bible teaches then we are commanded to obey God rather than man." (Dkt. 1 at ¶ 39). The statement also asked the ALJ to grant the plaintiff schools "an exemption of immunization for our children on religious and ethical grounds," (*id.*), despite the fact the PHL § 2164 does not allow for any such exemption. In the instant action, Plaintiffs have asserted that they will "choose prison time or a martyr's death before going against their convictions." (Dkt. 1 at ¶ 41). They have alleged: "For the avoidance of all doubt, Plaintiffs do not, will

not, and cannot comply with" PHL § 2164. (*Id*. at ¶ 58). In other words, Plaintiffs' own complaint confirms that their noncompliance with PHL § 2164 is willful, and not the result of inadvertence or misunderstanding of what the law requires. *See Merriam-Webster Dictionary*, Willful, https://www.merriam-webster.com/dictionary/willful ("done deliberately **:** intentional | *willful* disobedience") (last accessed Mar. 10, 2024). This distinction was plainly relevant in the context in which it was raised, which was whether NYSDOH should adopt the ALJ's recommendation that no penalty be assessed due to a lack of notice. NYSDOH's characterization of Plaintiff's position towards PHL § 2164, which is grounded in fact, cannot plausibly be interpreted as demonstrating animus.

Nor does the imposition of substantial penalties reflect hostility to religion. "Apart from the text, the effect of a law in its real operation is strong evidence of its object." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). However, "adverse impact will not always lead to a finding of impermissible targeting." *Id*. NYSDOH explained in its order that imposition of no penalty despite plaintiff schools' undenied violation of PHL § 2164 "would be contrary to public policy, [NYSDOH's] mission, and the clear intent of the state legislature[.]" (Dkt. 1-6 at 5). Further, NYSDOH concluded that allowing the plaintiff schools to deliberately violate PHL § 2164 without consequence would "encourage other schools to ignore the law's requirements and assert a religious exemption," thereby putting NYSDOH "in the position of nullifying a duly enacted statute, . . . and failing to carry out its vital purpose of protecting the health of all New Yorkers." (*Id.* at 5-6). NYSDOH's refusal to functionally recognize a religious exemption that is statutorily unavailable does not constitute hostility to religion.

Moreover, while Plaintiffs allege before this Court that "[b]ecause the schools are not publicly funded and have no reserve cash, they are unable to pay the penalties" (Dkt. 1 at ¶ 58), they do not allege that they ever made this argument to NYSDOH. To the contrary, NYSDOH's order states that "Respondents have not argued that they cannot afford" the penalties sought. (Dkt. 1-6 at 6).[4] The allegedly financial ruinous nature of the imposed penalties cannot plausibly demonstrate religious animus where NYSDOH was not on notice thereof.

Plaintiffs' complaint further alleges that "there are comparable secular activities (from a risk perspective) that are permitted, while religious exemptions are forbidden, which also undermines neutrality." (Dkt. 1 at ¶ 71; *see also* Dkt. 10 at 23 ("New York's purported concern for public safety is only urgent when it seeks to eradicate religious observance related to mandatory vaccination for school. In contrast, in all other contexts, the State is disinterested in the purported threats posed by those unvaccinated in virtually every other area of life, including the over 66,000 children enrolled in school without required vaccination and without a medical exemption.")). The alleged underinclusivity of PHL § 2164 is properly assessed under the general applicability analysis. *See Fulton*, 593 U.S. at 534 ("A law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."). The Court performs that analysis below and concludes that PHL § 2164

---

[4] To be clear, the Court is making no determination about the financial impact of the penalties imposed on the plaintiff schools. Instead, the Court has cited NYSDOH's order "to explain the decision-making of state authorities." *Goe*, 43 F.4th at 29.

does not permit comparable secular activities. Accordingly, this argument also necessarily fails with respect to neutrality.

For these reasons, the Court finds as a matter of law that PHL § 2164, as amended in 2019, is neutral. Strict scrutiny does not apply on this basis.

**b. General Applicability**

The Court also finds that PHL is generally applicable. A law is not generally applicable if it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (alteration and quotations omitted). "A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*. at 534. Plaintiffs allege that both of these conditions are satisfied here.[5]

With respect to the matter of individualized exemptions, Plaintiffs allege that PHL § 2164 "fails the general applicability test because it allows discretionary medical exemptions, but prohibits a similar exemption process for those who, like Plaintiffs, possess sincerely held religious reasons for declining compulsory vaccination." (Dkt. 1 at ¶ 62). The Court disagrees. The Connecticut statute at issue in *We the Patriots*, like

[5] Plaintiffs also argue that "[i]n repealing its religious exemption but leaving the medical exemption intact, the state made a conscious choice that non-vaccination for secular reasons was 'worthy of solicitude,' but that non-vaccination for religious reasons must be eliminated. Thus, the statute fails the general applicability test from the outset." (Dkt. 28 at 26 (citations omitted)). This argument must fail in light of *We the Patriots*, where Connecticut had also repealed its religious exemption but left a medical exemption in place.

PHL § 2164, contains a medical exemption. Specifically, it provides that a student "shall be exempt" from the mandatory vaccination requirement "if, for instance, the student 'presents a certificate . . . from a physician, physician assistant or advanced practice registered nurse stating that in the opinion of such physician, physician assistant or advanced practice registered nurse such immunization is medically contraindicated because of the physical condition of such child.'" 76 F.4th at 150 (quoting Conn. Public Act 21-6 § 1(a)(2)). The *We the Patriots* court explained that "where a law provides for an objectively defined category of people to whom the vaccination requirement does not apply, including a category defined by medical providers' use of their professional judgment, such an exemption affords no meaningful discretion to the State" and thus does not render the law not generally applicable. *Id*. at 151 (quotation omitted).

PHL § 2164(8) provides: "If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health." (emphasis added). This exemption, like the exemption at issue in *We the Patriots*, is phrased in mandatory terms and applies to an objectively defined group of people.[6] Accordingly, it is not—under binding Second Circuit case law—an individualized exemption triggering strict scrutiny.

---

[6] As previously explained, New York regulations define "may be detrimental to the child's health" in objective terms as meaning that "a physician has determined that a child has a medically contraindication or precaution to a specific immunization consistent with ACIP guidance or other nationally recognized evidence-based standard of care." 10 NYCRR § 66-1.1(m).

Plaintiffs attempt to distinguish PHL § 2164 from the Connecticut statute at issue in *We the Patriots* by pointing to the last sentence of 10 NYCRR § 66-1.3, which allows the principal or person in charge of a school to "require additional information supporting the exemption." (*See* Dkt. 28 at 28-29). According to Plaintiffs, under this regulation, "school officials are delegated enormous independent and personalized discretion to override a physician's medical recommendation, including the ability to require additional information and ultimately make the final discretionary decision to grant or deny a medical exemption." (*Id*. at 28). This argument lacks merit. Nothing in the language of 10 NYCRR § 66-1.3 suggests that school officials may request information other than that necessary to confirm that the requirements of PHL § 2164(8) have been satisfied, or that a school official has any discretion to deny an exemption that complies with the statutory requirements. And, even were there some ambiguity in 10 NYCRRR § 66-1.3, under New York law, "in the event of a conflict between a statute and a regulation, the statute controls." *Sciara v. Surgical Assocs. of W. New York, P.C.*, 104 A.D.3d 1256, 1257 (4th Dep't 2013). Here, the statute is clear and mandatory.

Plaintiffs make much of the Second Circuit's statement in *Goe* that "New York State law . . . delegates to school officials the authority to grant a medical exemption from the State's school immunization requirements." 43 F.4th 19. But non-discretionary duties and discretionary duties are both capable of delegation. That school officials are the state employees ultimately charged with determining whether PHL § 2164(8) has been satisfied does not mean that they are free to "decide which reasons for not complying with the policy are worthy of solicitude." *We the Patriots*, 76 F.4th at 151 (quotation omitted and

concluding that the Connecticut statute's "requirement that specified documents supporting requests for medical exemptions be acknowledged by, *inter alia*, state and local officials" did not "afford[] such officials the discretion to approve or deny exemptions on a case-by-case basis.").[7]

Plaintiffs argue that "New York has administratively granted over 97,900 non-medical exceptions by not enforcing [PHL § 2164] for students not vaccinated for secular reasons." (Dkt. 28 at 29). This argument lacks merit for multiple reasons. Plaintiffs base this claim on a statement by Dr. Debra Blog, the medical director of NYSDOH's Bureau of Immunization, that "[a]fter the religious exemption was repealed in New York, the average percentage of school-aged children completely immunized in the State steadily grew, from 93% of children in the 2017-2018 school year (pre-repeal) to 96% in the 2021-2022 school year." (Dkt. 25-3 at ¶ 19; *see* Dkt. 28 at 14)[8]. Plaintiffs have taken the 96% number provided by Dr. Blog and extrapolated therefrom that "[t]he [remaining] 4%

---

7 Plaintiffs have also argued that variances in medical exemption rates between schools are evidence of discretionary action by school officials. (*See* Dkt. 1 at ¶ 65). This is pure speculation. There are any number of reasons why one school would have more requests for medical exemptions than another. Moreover, even if some school officials in New York are not complying with their duties under PHL § 2164(8), that does not mean the statute is not mandatory—it means those school officials are not performing their statutory duties. New York law provides mechanisms to address any such issues.

8 The Court notes that this increase brought the number above the 95% recognized as necessary for herd immunity, as was the state legislature's stated goal.

amounts to over 97,900 students who are permitted to attend school in New York without mandated school vaccines." (Dkt. 28 at 14).[9]

The flaws in Plaintiffs' logic are apparent. First, there is nothing in Dr. Blog's statement to suggest that the 4% of school-aged children who are not completely immunized are attending schools, as opposed to being homeschooled. Second, there is nothing in Dr. Blog's statement to support Plaintiffs' conclusion that these students are unvaccinated for secular as opposed to religious reasons. Third, 10 NYCRR §§ 66-1.1(j) and 66-1.3(b) permit schools to admit children who are in the process of receiving the immunizations required by PHL § 2164. In other words, a child could be in the process of obtaining his or her immunizations, and thus lawfully permitted to attend school in New York, but not yet completely immunized.

Fourth, and perhaps most importantly, the fact that NYSDOH has not achieved perfect compliance with PHL § 2164 does not mean that it is not generally applicable. That is a standard that virtually no law could meet. Plaintiffs have not alleged that NYSDOH has declined to take steps to enforce PHL in any similarly situated secular school, and the Court finds their assertion that New York has granted "functional exemptions" to 97,000 school-age children unsupported by factual allegations. *See First Nationwide Bank v. Gelt*

---

[9] In their complaint, Plaintiffs estimated the number of "unvaccinated children that attend schools in New York without a medical exemption" as "approximately 66,000." (Dkt. 1 at ¶ 67). They revised this number upward in their subsequent briefing based on Dr. Blog's statement. (*See* Dkt. 28 at 14 (concluding based on Dr. Blog's statement that "the 66,000-student estimate was well *below* the actual number" (emphasis in original))). The 66,000 estimate was also based on guesswork. (*See* Dkt. 1 at ¶ 67 n.4).

*Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) ("Under Rule 12(b)(6), the well-pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of fact are not admitted." (quotation omitted)).

For the reasons set forth above, the Court rejects Plaintiffs' contention that PHL § 2164 allows for individualized exemptions and is therefore subject to strict scrutiny. The Court accordingly turns to Plaintiffs' argument that PHL § 2164 treats comparable secular activity more favorably than religious exercise. As an initial matter, the Court notes that Plaintiffs rely heavily on the fact that they are making an as-applied challenge, contending that the general applicability inquiry should thus focus on the extent to which granting "an Amish-specific religious exemption" would undermine New York's interests. (Dkt. 28 at 34). Plaintiffs are incorrect. They cite *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), but *Gonzales* involved application of the "strict scrutiny test" required by the Religious Freedom Restoration Act. *Id*. at 430-31. It says nothing about determining whether a law is generally applicable under the governing legal framework.

Similarly, the portion of *Fulton* cited by Plaintiffs involved the application of strict scrutiny *after* the Court had already determined that the ordinance at issue was not generally applicable. *See* 593 U.S. at 541. At that stage of the inquiry, the focus is indeed on whether the state has "an interest in denying an exception to" the particular claimant. *Id*. However, in determining in the first instance whether a statute is generally applicable, the focus is not so narrow. The general applicability standard looks, as the Supreme Court has stated, at whether the government has "in a selective manner impose[d] burdens only

on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Accordingly, the general applicability analysis does not turn on whether the secular activity identified by Plaintiffs is comparable in terms of risk to allowing only them to be exempt from PHL § 2164 for religious reasons. It turns on whether it is comparable in terms of risk to allowing a religious exemption for all who would potentially claim it.[10]

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). "Therefore, [the Court] must first determine what interest [New York] has asserted justifies [PHL § 2164], then decide whether permitting medical exemptions and repealing religious exemptions promote the State's interest." *We the Patriots*, 76 F.4th at 151.

New York's asserted interest in PHL § 2164 is twofold. "First, it aims to protect the health of children while they are physically present in the school environment. Second, it aims to protect the health of the public in general against disease outbreaks both in and outside of school; it does this by serving as the apparatus that ensures that, the vast majority of children—who will quickly grow into the vast majority of adults—are vaccinated."

---

10 Plaintiffs also cite *Central Rabbinical Cong. of the U.S. v. N.Y.C. Dep't of Hlth. & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014) and assert that it held that a "law intended to counteract infectious disease failed general applicability test on under-inclusivity grounds as it pertained to the Orthodox Jewish community." (Dkt. 33 at 42-43). This is an inaccurate statement of the holding in *Central Rabbinical*. The Second Circuit in that case was "unable to conclude" that the law at issue was generally applicable because it "applie[d] exclusively to religious conduct implicating fewer than 10% of the cases of neonatal HSV infection," while failing to regulate at all the non-religious conduct "accounting for all other cases." *Id*. at 196-97.

(Dkt. 25-1 at 40-41). Plaintiffs contend that these interests are "*post-hoc* asserted interests" that are "at war with each other." (Dkt. 28 at 32-33). The Court disagrees. The interests asserted by Defendants in this litigation are the same as those asserted by the state legislature at the time the religious exemption was repealed. In the record before it, the Court does not "find any sign that the State has offered for litigation purposes a *post hoc* rationalization of a decision originally made for different reasons." *We the Patriots*, 76 F.4th at 152.

As to whether these interests are served by repealing the religious exemption while keeping the medical exemption in place, *We the Patriots* is on point. There, Connecticut asserted that its interest was to protect the health and safety of its schoolchildren. *Id*. The Second Circuit determined that maintaining the medical exemption served this interest, while "maintaining the repealed religious exemption would not." *Id*. The Second Circuit rejected the plaintiffs' argument that it "should cabin [its] analysis to the risk an individual child who is unvaccinated—whether for medical or religious reasons—might pose to the health and safety of Connecticut students." *Id*. at 153. The Second Circuit explained that "exempting a student from the vaccination requirement because of a medical condition and exempting a student who declines to be vaccinated for religious reasons are not comparable in relation to the State's interest," because the Connecticut statute seeks to "promote[] the health and safety of *vaccinated* students by decreasing, to the greatest extent medically possible, the number of unvaccinated students (and, thus, the risk of acquiring vaccine-preventable diseases) in school." *Id*. (emphasis in original). The Connecticut statute "also promotes the health and safety of *unvaccinated* students. Not only does the absence of a

religious exemption decrease the risk that unvaccinated students will acquire a vaccine-preventable disease by lowering the number of unvaccinated peers they will encounter at school, but the medical exemption also allows the small proportion of students who cannot be vaccinated for medical reasons to avoid the harms that taking a particular vaccine would inflict on them." *Id*. (emphasis in original). This analysis applies with full force to PHL § 2164, and forecloses the argument that the medical exemption and the repealed religious exemption are comparable for free exercise purposes.

Plaintiffs have identified additional alleged "comparable secular activities" allowed by New York: " 1) granting functional exemptions, due to lax enforcement, to an estimated 97,900 [PHL § 2164] non-compliant schoolchildren who have not claimed any exemption; (2) allowing unvaccinated adults to work in the school system; (3) permitting homeschooled children to congregate in unlimited numbers in educational settings without vaccination requirements; (4) permitting children who have not been vaccinated against Covid, flu, and numerous other diseases for which vaccines exist, or the around 1,400 pathogens for which no vaccine exists, to attend school; [and] (5) allowing citizens to congregate *en masse* for every activity imaginable without any vaccine mandate[.]" (Dkt. 28 at 35-36). The Court has already discussed at length why Plaintiffs' argument regarding so called "functional exemptions" lacks merit. The remaining alleged "comparable secular activities" were equally present in *We the Patriots*,[11] yet did not cause the Second Circuit

[11] Connecticut, like New York, requires vaccinations for measles, rubella, poliomyelitis, mumps, diphtheria, tetanus, pertussis, hepatitis B, Hib, varicella, pneumococcal disease, and meningococcal disease, and additionally requires vaccination for hepatitis A and influenza. *Compare* PHL § 2164(a)(2) *with* CT ADC § 10-204a-2a.

to conclude that the Connecticut statute was not generally applicable. The Court finds no basis in the record before it to reach a different conclusion here.

PHL § 2164, like the Connecticut statute at issue in *We the Patriots*, is generally applicable for free exercise purposes. Strict scrutiny does not apply on this basis.

**c. <u>Implication of Other Constitutional Rights</u>**

Finally, Plaintiffs argue that strict scrutiny applies because this case involves "hybrid rights"—that is, in addition to their free exercise rights, they allege that PHL § 2164 impacts their rights to freedom of speech, to freedom of association, and to regulate the upbringing and education of their children. (Dkt. 28 at 43-44; *see* Dkt. 1 at ¶ 74). However, courts in the Second Circuit "do not apply heightened scrutiny to 'hybrid rights' claims." *We the Patriots*, 76 F.4th at 159. In particular, the fact that Plaintiff's free exercise claim is "connected with a communicative activity or parental right" does not trigger heightened scrutiny under Second Circuit precedent. *Id*. (quotation omitted and finding that the district court "correctly held that plaintiffs' claim that the Act violates their liberty interest in childrearing was coextensive with their Free Exercise Clause claim"). While the Court understands that Plaintiffs disagree with that holding (*see* Dkt. 28 at 44 ("Plaintiffs maintain *Smith*'s hybrid rights analysis stands as settled law, and that the hybrid rights presented here are subject to strict scrutiny.")), this Court is not free to disregard Second Circuit precedent. The Court will not apply strict scrutiny on this basis.

---

The Connecticut statute at issue in *We the Patriots* also does not regulate unvaccinated adults working in schools, unvaccinated homeschooled children, or unvaccinated children and adults in non-school settings.

The Court also does not view the complaint as asserting freestanding claims for violation of the rights to freedom of speech, assembly, or to regulate the upbringing of one's children, distinct from the free exercise claim. The complaint contains a single count, which is denominated "VIOLATION OF PLAINTIFFS' FIRST AMENDMENT FREE EXERCISE RIGHTS." (Dkt. 1 at 20). The Court concludes that Plaintiffs' claims for infringement of their other constitutional rights are coextensive with their free exercise claim and rise or fall therewith.

**2. <u>PHL § 2164 Satisfies Rational Basis Review</u>**

For all the reasons set forth above, the Court concludes that PHL § 2164 is subject to rational basis review. To survive such review, it is necessary only that the challenged law be "reasonably related to a legitimate state objective." *Goe*, 43 F.4th at 32.

Plaintiffs have not argued that PHL § 2164 cannot satisfy rational basis review—to the contrary, Plaintiffs' counsel conceded at oral argument that it could. This is plainly correct. As the Second Circuit held in *We the Patriots*, "protecting public health is a compelling government interest." 76 F.4th at 156. Further, repealing the religious exemption was "rationally related to that interest because it seeks to maximize the number of students . . . who are vaccinated against vaccine-preventable diseases." *Id*. Further, the requirement that children be vaccinated to attend school, as opposed to participate in other types of social gatherings, "is rational because only at school is attendance mandated by law[.]" *Id*. Accordingly, Plaintiffs have not plausibly alleged that PHL § 2164 violates the Free Exercise Clause, and their claims against Dr. McDonald must be dismissed.

## II. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs have asked the Court for a preliminary injunction. (Dkt. 9). The Court's determination that Plaintiffs' claims must be dismissed eliminates any possibility that the Court could grant their request for preliminary injunctive relief. Accordingly, Plaintiffs' motion for a preliminary injunction is denied as moot.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss (Dkt. 25) and denies Plaintiff's motion for a preliminary injunction (Dkt. 9) as moot. More particularly, Plaintiffs' claims against Dr. Rosa are dismissed without prejudice for lack of subject matter jurisdiction, while Plaintiffs' claims against Dr. McDonald are dismissed with prejudice for failure to state a claim. The Clerk of Court is instructed to enter judgment in favor of Defendants and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: March 11, 2024
Rochester, New York

United States District Court
WESTERN DISTRICT OF NEW YORK

JOSEPH MILLER,
Individually and on behalf of
His minor children attending an Amish school
In Clymer and as a board member of that school, ET AL.

**JUDGMENT IN A CIVIL CASE**
CASE NUMBER: 23-CV-484

v.

DR. JAMES V. MCDONALD, ET AL.

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: that Defendants' Motion to Dismiss is Granted and Plaintiff's Motion for a Preliminary Injunction is Denied as moot.

Date: March 11, 2024

MARY C. LOEWENGUTH
CLERK OF COURT

By: s/ Jennifer V.
Deputy Clerk