# 24-681

## United States Court of Appeals for the Second Circuit

JOSEPH MILLER, individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school, SHADY LANE SCHOOL, EZRA WENGERD, as representative of all Amish schools in the State of New York, JONAS SMUCKER, individually and on behalf of his minor children, DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL,

*Plaintiffs-Appellants*,

v.

DR. JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the State of New York, DR. BETTY A. ROSA, in her official capacity as Commissioner of Education of the State of New York,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Western District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
 *Solicitor General*
ANDREA OSER
 *Deputy Solicitor General*
MARK S. GRUBE
 *Senior Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-8028

Dated: July 17, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ............................................................... 1

ISSUE PRESENTED ................................................................................ 2

STATEMENT OF THE CASE ................................................................. 3

    A.   New York's Long and Successful History of Vaccine
        Requirements for Schoolchildren ............................................ 3

    B.   The 2019 Measles Outbreak and the New York State
        Legislature's Repeal of the Religious Exemption .................... 6

    C.   This Action ............................................................................. 14

        1.   The allegations in plaintiffs' complaint .......................... 14

        2.   The district court's dismissal of plaintiffs' complaint ..... 16

STANDARD OF REVIEW ...................................................................... 19

SUMMARY OF ARGUMENT ............................................................... 20

ARGUMENT

    THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS'
    FREE EXERCISE CHALLENGE TO NEW YORK'S STATUTORY
    VACCINATION REQUIREMENT FOR SCHOOLCHILDREN ........................... 22

    A.   The Vaccine Requirement Is Subject to Rational-Basis
        Review Because It Is Neutral and Generally Applicable ....... 25

        1.   The vaccine requirement is neutral. ............................... 25

            a.   The vaccine requirement is facially neutral. ........... 26

**Page**

        b.    The history and administration of the vaccine requirement do not reflect departures from neutrality. ...................................................... 28

    2.    The vaccine requirement is generally applicable. .......... 35

        a.    The vaccine requirement is not substantially underinclusive. ........................................................ 36

        b.    The vaccine requirement does not provide for discretionary, individualized exemptions. ............... 47

B.    Plaintiffs' Alternative Theories for Invoking Heightened Scrutiny Are Meritless. ............................................................ 52

C.    The Vaccine Requirement Is a Rational Response to the Spread of Infectious Diseases in Schools and Would Survive Heightened Scrutiny in Any Event. .......................... 55

    1.    The vaccine requirement satisfies rational-basis review. .................................................................................. 55

    2.    The vaccine requirement satisfies heightened scrutiny in any event. ..................................................... 56

CONCLUSION ..................................................................................... 60

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................. 19

*Blackhawk v. Pennsylvania,*
381 F.3d 202 (3d Cir. 2004) .................................. 40-41, 47

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021) ................................................................. 31

*Bruesewitz v. Wyeth LLC,*
562 U.S. 223 (2011) ................................................................... 3

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
750 F.3d 227 (2d Cir. 2014) ............................................... 19

*Central Rabbinical Cong. of the U.S. & Can. v. New York City*
*Dep't of Health & Mental Hygiene,*
763 F.3d 183 (2d Cir. 2014) .................................. 35, 37, 44

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ................................................................. 31

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ......................................................... 28, 46

*Employment Div., Dep't of Hum. Res. of Or. v. Smith,*
494 U.S. 872 (1990) .................................. 23, 25, 39, 46, 48

*Expressions Hair Design v. Schneiderman,*
32 N.Y.3d 382 (2018) ............................................................. 29

*F.F. ex rel. Y.F. v. State,*
66 Misc. 3d 467 (Sup. Ct. Albany Cnty. 2019) ................. 57

*F.F. v. State,*
194 A.D.3d 80 (3d Dep't 2021) ................................... passim

**Cases**                                          **Page(s)**

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*,
170 F.3d 359 (3d Cir. 1999) ................................................. 39

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .............................. 25, 35, 48, 56, 58

*Gillette v. United States*,
401 U.S. 437 (1971) ...................................................... 42, 60

*Goe v. Zucker*,
43 F.4th 19 (2d Cir. 2022) ............................................. 7, 55

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905) ........................................................ 23, 56

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
412 F.3d 418 (2d Cir. 2005) ............................................. 17

*Larson v. Valente*,
456 U.S. 228 (1982) ...................................................... 42, 60

*Leebaert v. Harrington*,
332 F.3d 134 (2d Cir. 2003) ......................................... 52, 55

*M.A. ex rel. H.R. v. Rockland Cnty. Dep't of Health*,
53 F.4th 29 (2d Cir. 2022) ................................................. 45

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
584 U.S. 617 (2018) ..................................................... 33-34

*Matter of Delmar Box Co.*,
309 N.Y. 60 (1955) ............................................................ 32

*Matter of Kerri W.S. v. Zucker*,
202 A.D.3d 143 (4th Dep't 2021) ..................................... 51

*Matter of Viemeister v. White*,
179 N.Y. 235 (1904) .......................................................... 23

**Cases**                                                          **Page(s)**

*Mermigis v. Cuomo*,
 Index No. 608729/2019 (Sup. Ct. Nassau Cnty. June 28, 2019) ........ 13

*Murphy v. Empire of Am., FSA*,
 746 F.2d 931 (2d Cir. 1984) ................................................................ 31

*New Hope Fam. Servs., Inc. v. Poole*,
 966 F.3d 145 (2d Cir. 2020) ............................................................... 28

*Phillips v. City of New York*,
 775 F.3d 538 (2d Cir. 2015) ............................................................... 24

*Prince v. Massachusetts*,
 321 U.S. 158 (1944) ............................................................................ 23

*Roman Cath. Diocese of Albany v. Vullo*,
 2024 N.Y. Slip Op. 02764 (N.Y. May 21, 2024) ................................ 48

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
 592 U.S. 14 (2020) ................................................................ 26, 44, 56

*Sherbert v. Verner*,
 374 U.S. 398 (1963) ............................................................................ 48

*Stoltzfus v. Cuomo*,
 Index No. 20190311 (Sup. Ct. Seneca Cnty. Nov. 4, 2019) ............... 13

*Sullivan-Knapp v. Cuomo*,
 Index No. E2019-1338CV (Sup. Ct. Steuben Cnty. Oct. 9, 2019) ...... 13

*Tandon v. Newsom*,
 593 U.S. 61 (2021) ................................................................. 37, 41, 44

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
 582 U.S. 449 (2017) ............................................................................ 27

*United States v. O'Brien*,
 391 U.S. 367 (1968) ............................................................................ 31

**Cases**                                                 **Page(s)**

*V.D. v. New York,*
403 F. Supp. 3d 76 (E.D.N.Y. 2019) ................................... 13

*We The Patriots USA, Inc. v. Connecticut Off. of Early*
*Childhood Dev.,*
76 F.4th 130 (2d Cir. 2023) ....................................... passim

*We The Patriots USA, Inc. v. Hochul,*
17 F.4th 266 (2d Cir. 2021) ....................................... passim

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ..................................................52-53

*Workman v. Mingo Cnty. Bd. of Educ.,*
419 F. App'x 348 (4th Cir. 2011) ................................56-57

*Zucht v. King,*
260 U.S. 174 (1922) ..................................................... 23

**Laws**

*Federal*

8 U.S.C. § 1182 ............................................................. 41

*New York*

Ch. 438, 1860 N.Y. Laws 761 ......................................3-4

Ch. 994, 1966 N.Y. Laws 3331 ...................................... 6

Ch. 1094, 1968 N.Y. Laws 3095 ...............................4, 38

Ch. 538, 1989 N.Y. Laws 2785 ...................................... 6

Ch. 35, 2019 McKinney's N.Y. Laws 153 ...................... 6

Public Health Law § 2164 .............................5-6, 26, 36, 44

vi

**Regulations**                                             **Page(s)**

10 N.Y.C.R.R.
    § 66-1.1 ......................................................... 5-6, 36, 42, 49-50
    § 66-1.3 .......................................................... 5-6, 36, 43-44

**Miscellaneous Authorities**

A. 2371-A, 242d Sess. (N.Y. 2019) ............................................. 6

Amer Imdad et al., *Religious Exemptions for Immunization and Risk of Pertussis in New York State, 2000-2011*, 132 Pediatrics 37 (2013) ................................................. 43

James G. Hodge, Jr. & Lawrence O. Gostin, *School Vaccination Requirements: Historical, Social, and Legal Perspectives*, 90 Ky. L.J. 831 (2002) ............................................. 4

Kevin M. Malone & Alan R. Hinman, *Vaccination Mandates: The Public Health Imperative and Individual Rights, in Law in Public Health Practice* (Richard A. Goodman et al., eds., 2003), https://stacks.cdc.gov/view/cdc/142959/cdc_142959_DS1.pdf ............................................... 4

Manish Patel et al., *National Update on Measles Cases and Outbreaks - United States, January 1-October 1, 2019*, 68 Morbidity & Mortality Wkly. Rep. 893 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6840e2-H.pdf ...... 7

N.Y. Assembly Sponsor's Mem. in Supp. of Bill A. 2371-A, *in* Bill Jacket for ch. 35 (2019) ................................... 8-9, 29-30

N.Y. Assembly, Tr. of Floor Proceedings, 242d Sess. (June 13, 2019), https://nystateassembly.granicus.com/MinutesViewer.php?view_id=6&clip_id=5168&doc_id=27003 ffb-aa5e-11e9-b703-0050569183fa ...................... 8, 10-11, 29-30, 42-43

**Miscellaneous Authorities**                                **Page(s)**

N.Y. Senate Introducer's Mem. in Supp. of Bill S. S2994-A,
   242d Sess. (May 21, 2019), https://www.nysenate.gov/
   legislation/bills/2019/S2994 ..................7, 9-10, 13, 29-30, 37

N.Y. Senate, Tr. of Floor Proceedings, 242d Sess.
   (June 13, 2019), https://legislation.nysenate.gov/pdf/
   transcripts/2019-06-13T14:43/ ................................. 7-12, 29-30, 32, 43

N.Y. State Bar Ass'n, Mem. in Supp. of S. 2994-A/A. 2371
   (May 20, 2019), https://nysba.org/app/uploads/2020/03/19-
   20Children8.pdf .........................................................8-9, 30

Press Release, New York State Senator David Carlucci,
   *As New York Faces Worst Measles Outbreak in Decades,*
   *Hoylman, Dinowitz, Carlucci, Childhood Cancer Survivors,*
   *and Transplant Recipients Urge End to Non-Medical*
   *Exemptions for Vaccination* (June 1, 2019),
   https://www.nysenate.gov/newsroom/press-releases/
   2019/david-carlucci/new-york-faces-worst-measles-outbreak-
   decades-hoylman.................................................................. 12

Press Release, Governor's Office, *Governor Cuomo Signs*
   *Legislation Removing Non-Medical Exemptions from School*
   *Vaccination Requirements* (June 13, 2019) ........................ 11

S. 2994-A, 242d Sess. (N.Y. 2019)............................................ 6

Saad B. Omer et al., *Geographic Clustering of Nonmedical*
   *Exemptions to School Immunization Requirements and*
   *Associations with Geographic Clustering of Pertussis,*
   168 Am. J. Epidemiology 1389 (2008) ................................. 43

U.S. Centers for Disease Control and Prevention, *About Polio in*
   *the United States* (May 9, 2024),
   https://www.cdc.gov/polio/about/index.html........................ 59

**Miscellaneous Authorities** **Page(s)**

U.S. Centers for Disease Control and Prevention, *Achievements in Public Health, 1900-1999: Impact of Vaccines Universally Recommended for Children -- United States, 1990-1998* (Apr. 2, 1999), https://www.cdc.gov/mmwr/preview/ mmwrhtml/00056803.htm ............................................................... 3, 5

U.S. Centers for Disease Control and Prevention, Center for State, Tribal, Local, and Territorial Support, *State School Immunization Requirements and Vaccine Exemption Laws* (Feb. 2022), https://www.cdc.gov/phlp/docs/school- vaccinations.pdf ..................................................................... 5

U.S. Citizenship & Immigr. Servs., *Vaccination Requirements* (last updated Dec. 21, 2022), https://www.uscis.gov/tools/ designated-civil-surgeons/vaccination-requirements ........................ 41

## PRELIMINARY STATEMENT

New York requires that children aged two months to eighteen years attending school in the State be immunized against certain vaccine-preventable diseases to protect the health of all children in school and to protect the health of the public in general against disease outbreaks both in and outside the school environment. New York amended its mandatory vaccination law in 2019 in response to the Nation's worst measles outbreak in a quarter-century, with its epicenter in New York. The Legislature concluded that immunization rates had fallen dangerously low in certain schools and repealed the religious exemption to achieve higher immunization rates and prevent future outbreaks. Plaintiffs in this action—Amish individuals and Amish community schools—allege that New York's vaccination requirement, as amended, violates their rights under the Free Exercise Clause.

This appeal thus raises the same question this Court recently decided in *We The Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2d Cir. 2023) (*COECD*), *cert. denied*, No. 23-643, 2024 WL 3089546 (U.S. June 24, 2024): whether a State that has for years exempted religious objectors from its vaccination requirements

for school children violated the Free Exercise Clause by repealing that exemption to protect the public health and safety. In *COECD*, this Court held that Connecticut's repeal was consistent with the First Amendment.

Here, the U.S. District Court for the Western District of New York (Wolford, C.J.) concluded that New York's vaccination requirement was materially indistinguishable from Connecticut's requirement and dismissed plaintiffs' complaint based on *COECD*. This Court should affirm for the same reason.

## ISSUE PRESENTED

Whether plaintiffs failed to state a claim that New York's vaccination requirement for schoolchildren violates the Free Exercise Clause, as this Court recently held in a challenge to Connecticut's materially indistinguishable vaccination requirement.

## STATEMENT OF THE CASE

A.  **New York's Long and Successful History of Vaccine Requirements for Schoolchildren**

"[T]he elimination of communicable diseases through vaccination [is] one of the greatest achievements of public health in the 20th century." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 226 (2011) (quotation marks omitted). Previously, "infectious diseases were widely prevalent in the United States and exacted an enormous toll on the population," but morbidity from vaccine-preventable diseases and their complications has significantly declined over the past century.[1]

New York was a leader in these efforts. In 1860, New York became the second State, following close behind Massachusetts, to enact vaccination requirements for schoolchildren. Ch. 438, § 1, 1860 N.Y. Laws 761,

---

[1] U.S. Centers for Disease Control and Prevention, *Achievements in Public Health, 1900-1999: Impact of Vaccines Universally Recommended for Children -- United States, 1990-1998* (Apr. 2, 1999). (For sources available on the internet, full URLs appear in the Table of Authorities. All URLs were last visited on July 17, 2024.)

761.[2] That law "directed and empowered" local school boards to refuse to admit any child who was not vaccinated against smallpox. *Id.*

In 1968, the New York State Legislature amended the statute to add the requirement of vaccination for measles. Ch. 1094, 1968 N.Y. Laws 3095, 3095. At the time of that amendment, the Legislature found that vaccination "is effective and safe" and a proven method "of reducing the incidence of smallpox and measles, the once great cripplers." *Id.* The Legislature further found that children "must be immunized and protected in their own self-interest as well as for the health and economic well-being of the community." *Id.* Over time, more States adopted mandatory school vaccination laws, which, by 1981, were universal throughout the United States.[3] Measles incidence and deaths declined and continued

––––––––––––––––––

[2] *See* James G. Hodge, Jr. & Lawrence O. Gostin, *School Vaccination Requirements: Historical, Social, and Legal Perspectives*, 90 Ky. L.J. 831, 851 (2002).

[3] *See* Kevin M. Malone & Alan R. Hinman, *Vaccination Mandates: The Public Health Imperative and Individual Rights, in Law in Public Health Practice* 262, 270 (Richard A. Goodman et al., eds., 2003).

4

a downward trend across the United States during the latter part of the 20th century.[4]

Today, New York's school vaccination law, like that of every other State, mandates vaccinations against several contagious diseases, including measles, polio, varicella (chicken pox), and pertussis (whooping cough).[5] New York's law provides that any child who is not immune to any of the enumerated diseases based on past exposure must be vaccinated against that disease to enter or attend any public or nonpublic childcare center, nursery school, or elementary, intermediate, or secondary school. N.Y. Pub. Health Law (PHL) § 2164(1), (7); 10 N.Y.C.R.R. §§ 66-1.1(f)-(g), 66-1.3(a).

The law contains only a single, narrow exception to its vaccination requirements: a medical exemption that is limited in duration and scope. PHL § 2164(8); 10 N.Y.C.R.R. § 66-1.3(c). As to scope, the exemption applies only when consistent with a "nationally recognized evidence-

---

[4] U.S. Centers for Disease Control and Prevention, *Achievements in Public Health*, *supra.*

[5] U.S. Centers for Disease Control and Prevention, Center for State, Tribal, Local, and Territorial Support, <u>*State School Immunization Requirements and Vaccine Exemption Laws*</u> 8 (Feb. 2022).

5

based standard of care," such as the guidance issued by the U.S. Centers for Disease Control and Prevention's (CDC) Advisory Committee on Immunization Practices, 10 N.Y.C.R.R. § 66-1.1(*l*), and only as to the specific immunization that is medically contraindicated, *id.* § 66-1.3(c). As to duration, the exemption applies only until the "immunization is found no longer to be detrimental to the child's health," PHL § 2164(8), and that duration must be specified in the child's medical records, 10 N.Y.C.R.R. § 66-1.3(c).

## B.  The 2019 Measles Outbreak and the New York State Legislature's Repeal of the Religious Exemption

Starting in 1966, New York allowed a religious exemption to the vaccine requirement, Ch. 994, § 2, 1966 N.Y. Laws 3331, 3333, which, as later clarified, exempted children whose parents or guardians objected to vaccination on religious grounds, Ch. 538, § 3, 1989 N.Y. Laws 2785, 2787 (codified at PHL § 2164(9) (1989)). In early 2019, a bill was introduced in both houses of the Legislature to amend the school vaccination law by repealing the religious exemption. *See* S. 2994-A, 242d Sess. (N.Y. 2019); A. 2371-A, 242d Sess. (N.Y. 2019). In June 2019, the Legislature enacted that bill into law. Ch. 35, 2019 McKinney's N.Y. Laws 153, 153-54.

6

The repeal bill was prompted by the Nation's worst measles outbreak in a quarter-century. The Legislature determined that New York was the epicenter of the outbreak, with the virus primarily spreading in areas "with precipitously low immunization rates." N.Y. Senate Introducer's Mem. in Supp. of Bill S. S2994-A, 242d Sess. (May 21, 2019) ("Senate Mem.").[6] The Legislature's finding was supported by CDC research that found that more than 75% of measles cases in 2019 were linked to outbreaks in New York State, with the majority of cases occurring in communities with pockets of unvaccinated individuals.[7] The outbreak was so severe that the Nation was at risk of losing its status as a country that had eradicated measles. *See* Senate Mem., *supra*; N.Y. Senate, Tr. of Floor Proceedings, 242d Sess., at 5387 (June 13, 2019) ("Senate Tr."). Indeed, acknowledging that the CDC advises that a 95% vaccination rate is needed to achieve what is known as "herd immunity,"[8]

---

[6] This Court may take judicial notice of legislative history. *Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022).

[7] Manish Patel et al., *National Update on Measles Cases and Outbreaks – United States, January 1-October 1, 2019*, 68 Morbidity & Mortality Wkly. Rep. 893, 893 (2019).

[8] "Herd immunity" refers to the threshold percentage of individuals immunized against a vaccine-preventable disease necessary to prevent

(*continued on the next page*)

which keeps the disease at bay, the Legislature found that vaccination rates in over 280 schools in New York had fallen below 85%, and rates in 170 of those schools had fallen below 70%. N.Y. Assembly Sponsor's Mem. in Supp. of Bill A. 2371-A ("Assembly Mem."), *in* Bill Jacket for ch. 35 (2019), at 4A.

In considering the bill, the Legislature weighed extensive data and scientific evidence. That data showed that, over the preceding several years, reliance on religious exemptions had increased statewide by 54%. *See* Senate Tr. at 5388-89. Consequently, at least five times as many children had religious exemptions as had medical ones. *See* N.Y. Assembly, Tr. of Floor Proceedings, 242d Sess., at 70-71 (June 13, 2019) ("Assembly Tr."). (*See* J.A. 570-571.) And some schools had granted religious exemptions to more than 20% of their students. *See* Assembly Tr. at 58-59; Senate Tr. at 5384-85, 5389, 5399.

Indeed, in the jurisdictions hardest hit by the measles outbreak, the vast majority of those infected were unvaccinated children. *See* Assembly Tr. at 106; N.Y. State Bar Ass'n, Mem. in Supp. of S. 2994-A/A. 2371, at

––––––––––––––––––

that disease from readily spreading through the community. (*See* Joint Appendix (J.A.) 584-585.)

2-3 (May 20, 2019) ("NYSBA Mem.") (cited in 2019 *N.Y.S. Legislative Annual* 40 n.38). One local health department reported that one child with a religious exemption who had contracted measles had caused forty-four new cases, twenty-six of which involved schoolchildren with religious exemptions. Senate Tr. at 5385. The legislative record thus made clear that the repeal bill would increase vaccination rates and thereby "protect the health of all New Yorkers, particularly our children." Senate Mem., *supra*; *see also* Assembly Mem., *in* Bill Jacket at 4A, *supra* (emphasizing importance of "high vaccination rate" among schoolchildren to prevent outbreaks).

The Legislature modeled the bill after legislation that States like California had recently adopted. After a 2014 measles outbreak, California had removed nonmedical exemptions (exemptions for religious and personal reasons) from its school vaccination law. *See* Senate Mem., *supra*. Thereafter, its vaccination rates "improved demonstrably, particularly in schools with the lowest rates of compliance." *Id.*; *see also* Senate Tr. at 5385. Specifically, the vaccination rate in California increased from approximately 90% (below the threshold for herd immunity) to approxi-

9

mately 95% (at the threshold for herd immunity). Assembly Tr. at 47; see *supra* at 7.

Medical and public health organizations, including the American Medical Association and the American Academy of Pediatrics, uniformly supported the repeal of the religious exemption as an important public health measure. *See* Senate Tr. at 5445-46; Assembly Tr. at 64-65, 101. So too did numerous educational organizations, including the New York State PTA and the New York State School Boards Association. *See* Senate Tr. at 5435.

When considering the bill, the State made clear its respect for religious practices while also finding that public health concerns necessitated the measure. One legislative memorandum accompanying the bill noted that "freedom of religious expression is a founding tenet of this nation" while also observing that, under "longstanding" legal precedent, the Legislature could pass laws to protect the public health, including through compulsory vaccination. *See* Senate Mem., *supra*. The Governor of New York stated upon signing the bill: "While I understand and respect

freedom of religion, our first job is to protect the public health and by sign-ing this measure into law, we will help prevent further transmissions."[9]

Similar sentiments animated the floor debate over the repeal bill. One senator quoted a letter from the New York State Council of School Superintendents submitted in support of the bill that "get[s] the tone right":

> We do not take this stance with ease or with any lack of respect for individuals with a sincerely held religious belief against vaccinations. Nor have we arrived at this conclusion lightly or without debate. However, school districts are now struggling to deal with an illness that was effectively eliminated from the country two decades ago. This is unacceptable.

Senate Tr. at 5436; *see also, e.g.*, *id.* at 5448-49 (explaining decision to vote in favor of repeal despite initial reservations). Other legislators who supported the bill likewise admitted that it was "a difficult vote." Assembly Tr. at 61; *see also id.* at 112 ("This has not been an easy task."); *id.* at 118 ("I've been torn, and I think many of us are torn."). Still other legislators applauded the respect the Legislature had shown to those with religious

---

[9] Press Release, Governor's Office, *Governor Cuomo Signs Legislation Removing Non-Medical Exemptions from School Vaccination Require-ments* (June 13, 2019) (see appended).

beliefs opposing vaccination when considering the bill. *See* Senate Tr. at 5451-53. One senator who opposed the bill nonetheless acknowledged, "I do appreciate the debate and the respectfulness with which this issue was approached." *Id.* at 5451. He continued: "I'm proud of this body. We balanced everybody's interests." *Id.* at 5452.

There were a handful of outlier statements, including intemperate ones, that reflected the tension between promoting public health and respecting religious beliefs. For example, in a statement to constituents, rather than as part of the legislative debate, one legislator said that cancer patients and other medically vulnerable individuals were "put at risk because a group of people has decided their ideological beliefs are more important than public health."[10] Another noted his belief that some individuals were misusing the religious exemption to improperly obtain exemptions for secular personal beliefs. He explained that he was unaware of a basis for objecting to vaccination in Islam, Catholicism, or Judaism. *See* Senate Tr. at 5443.

---

[10] Press Release, New York State Senator David Carlucci, *As New York Faces Worst Measles Outbreak in Decades, Hoylman, Dinowitz, Carlucci, Childhood Cancer Survivors, and Transplant Recipients Urge End to Non-Medical Exemptions for Vaccination* (June 1, 2019).

On balance, however, the legislative history establishes that the Legislature, guided by scientific data, crafted a sensible measure to confront the pressing public health threat posed by insufficient vaccination rates and thereby "protect the health of all New Yorkers, particularly our children." Senate Mem., *supra*.

Following the repeal's enactment, numerous legal challenges ensued, none of which succeeded in obtaining relief. *See F.F. v. State*, 194 A.D.3d 80 (3d Dep't), *appeal dismissed and lv. denied,* 37 N.Y.3d 1040 (2021), *cert. denied*, 142 S. Ct. 2738 (2022) (mem.); *V.D. v. New York*, 403 F. Supp. 3d 76 (E.D.N.Y. 2019); Decision & Order, *Stoltzfus v. Cuomo*, Index No. 20190311, NYSCEF No. 56 (Sup. Ct. Seneca Cnty. Nov. 4, 2019); Decision, *Sullivan-Knapp v. Cuomo*, Index No. E2019-1338CV, NYSCEF No. 41 (Sup. Ct. Steuben Cnty. Oct. 9, 2019); Tr. of Proceedings, *Mermigis v. Cuomo*, Index No. 608729/2019, NYSCEF No. 15 (Sup. Ct. Nassau Cnty. June 28, 2019).

### C. This Action

### 1. The allegations in plaintiffs' complaint

Plaintiffs are three Amish community schools (Dygert Road School, Pleasant View School a/k/a Twin Mountain School, and Shady Lane School), two individuals who are parents of children that attend Amish community schools (Jonas Smucker and Joseph Miller), and an individual representative of Amish community schools (Ezra Wengerd). (J.A. 12-13.) Plaintiffs allege that they are sincere adherents to the Amish belief system and that "many Amish" have religious objections to vaccines. (J.A. 11; *see* J.A. 12, 14.) In accordance with these beliefs, the Amish community school plaintiffs do not require proof of vaccination from students to attend school. (J.A. 11.) Plaintiffs admit that they thereby violate PHL § 2164. (J.A. 29.)

In November and December 2021, the New York State Department of Health (DOH) audited the vaccination records of the Amish community school plaintiffs and subsequently charged them with failure to comply with PHL § 2164 and its implementing regulations. (J.A. 19-20, 52-71.) At a May 2022 administrative hearing on the charges, plaintiff Wengerd argued that the Amish community school plaintiffs did not comply with

PHL § 2164 because of their religious objections to vaccination. (J.A. 21-23.)

Later that month, an administrative law judge issued a report and recommendation concluding that the schools had violated PHL § 2164 but recommending no imposition of penalties due to a supposed lack of notice. (J.A. 26, 80-97.) DOH objected to the recommendation that no penalties be imposed in light of Wengerd's concession that the Amish community schools knew they were violating the law and planned on continuing to do so. (J.A. 27, 99-121.)

In a December 2022 order, then-Commissioner of DOH Mary T. Bassett adopted the recommendation that the charges be sustained against the community schools, but rejected the recommendation not to impose penalties in light of the concession by those schools that they knew they were violating the law. The order imposed a $52,000 penalty against Dygert Road School, a $46,000 penalty against Twin Mountains School, and a $20,000 penalty against Shady Lane School. (J.A. 28, 125-128.) Commissioner Bassett noted the absence of any claim by the community schools that they could not afford the penalties. (J.A. 127.)

In June 2023, plaintiffs commenced this federal action, and they filed a motion for a preliminary injunction shortly thereafter. (J.A. 10-50, 130-132.) The complaint names as defendants the Commissioner of DOH, Dr. James V. McDonald, and the Commissioner of the New York State Department of Education, Dr. Betty A. Rosa. (J.A. 13-14.) The complaint asserts one cause of action under 42 U.S.C. § 1983 for an alleged violation of plaintiffs' rights under the Free Exercise Clause of the First Amendment. (J.A. 29-43.) Plaintiffs seek injunctive relief barring defendants from enforcing PHL § 2164 against plaintiffs and a declaration that PHL § 2164 is unconstitutional as applied to plaintiffs. (J.A. 46.) Defendants moved to dismiss the complaint. (J.A. 323-324.)

### 2. The district court's dismissal of plaintiffs' complaint

In May 2024, the U.S. District Court for the Western District of New York (Wolford, C.J.) dismissed the complaint. (*See* Special Appendix (SPA) 1-35.) As a threshold matter, the court concluded that plaintiffs

lacked Article III standing to assert claims against the Commissioner of the New York State Department of Education, Dr. Rosa.[11] (SPA 12-15.)

Turning to the merits, the court held that this Court's decision in *COECD* compelled the dismissal of plaintiffs' remaining claim against DOH Commissioner McDonald. The court explained that the Connecticut school vaccination regime upheld in *COECD* was materially indistinguishable for First Amendment purposes from New York's regime. (SPA 3.) Accordingly, PHL § 2164, like the Connecticut statute at issue in *COECD*, was subject to rational-basis review as a neutral law of general applicability. (SPA 16-33.)

As to neutrality, the court concluded that *COECD* foreclosed plaintiffs' argument that the mere repeal of a religious exemption is sufficient to trigger strict scrutiny. The court concluded that the legislative history surrounding New York's repeal of the religious exemption did not contain "evidence of hostility towards religious belief." (SPA 19.) Rather,

---

[11] On appeal, plaintiffs do not challenge the district court's dismissal of their claims against Dr. Rosa. *See* Br. for Pls.-Appellants (Br.) at 24 n.19. Plaintiffs thereby waive any such challenge. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005). Accordingly, we do not discuss the issue further here.

the legislative history showed that the Legislature was motivated by public health concerns. (SPA 19-20.) And the court rejected plaintiffs' assertion that the DOH administrative proceedings reflected animus towards religious beliefs. (SPA 21-23.)

As to general applicability, the court concluded that *COECD* controlled. The court held that New York's reliance on the professional judgment of physicians to document medical exemptions did not afford the State meaningful discretion to disfavor religious beliefs. As with the exemption scheme at issue in *COECD*, New York's medical exemption therefore did not create a system of discretionary, individualized exemptions that would render the statute not generally applicable and trigger strict scrutiny. (SPA 24-29.) The court also concluded that the presence of a medical exemption did not render the vaccine requirement substantially underinclusive and thus not generally applicable on that ground. (SPA 29-33.) For this purpose, the court once again concluded that *COECD* dictated the answer. Like the exemptions at issue in *COECD*, New York's medical exemption was not comparable to the repealed religious exemption because the medical exemption furthered the State's

interest in the health and safety of schoolchildren, while the religious exemption did not. (SPA 31-32.)

Finally, the court concluded that PHL § 2164 satisfies rational-basis review for the same reasons that *COECD* held that Connecticut's vaccine requirement was rational. Protecting public health is a compelling governmental interest and the repeal of the religious exemption was rationally related to the State's compelling interest in maximizing the number of schoolchildren safely immunized against vaccine-preventable diseases. (SPA 34.)

The court entered judgment in favor of defendants (SPA 36), and plaintiffs filed this appeal (J.A. 974-975).

## STANDARD OF REVIEW

This Court reviews de novo a district court's order granting a motion to dismiss a complaint. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

19

## SUMMARY OF ARGUMENT

This Court should affirm the district court's decision dismissing the complaint. Courts have long upheld mandatory vaccination requirements, including those that lack a religious exemption, as does Connecticut's analogous statutory vaccination requirement. New York's requirement is a neutral, generally applicable law, and therefore is subject to rational-basis review under the First Amendment. The requirement is neutral on its face because it does not expressly target religious activity for less favorable treatment. And the requirement is neutral in its history and administration because the legislative history and underlying administrative proceeding show that the vaccination requirement was intended to further the State's compelling interest in public health rather than being the product of religious hostility. The requirement is also generally applicable because it extends to all children ages two to eighteen attending school in the State.

The presence of a narrow medical exemption does not defeat the statute's general applicability for purposes of a free exercise claim. A law's provision of a secular but not religious exemption triggers heightened scrutiny only when (a) the secular exemption would undermine the pur-

pose of the underlying law to at least the same degree as any religious exemption, or (b) a government decisionmaker has broad discretion to extend an individualized exemption to claims of religious hardship but chooses not to do so.

Neither circumstance applies here. The medical exemption does not undermine the purpose of the underlying law. To the contrary, it advances the statute's objective of protecting children in schools generally and the community more broadly from the harms of infectious disease. The medical exemption is also not comparable to the repealed religious exemption because the medical exemption is tightly constrained in both scope and duration. Contrary to plaintiffs' argument, the First Amendment would not countenance a religious exemption limited to their faith alone, and therefore a religious exemption would necessarily be much broader in scope and duration than the existing medical exemption. And the medical exemption does not confer broad discretion on any decisionmaker to consider individual circumstances. The statute's provision of a medical exemption thus does not compel the State to grant a religious exemption that is very different in scope and effect.

21

The statute satisfies rational-basis review because it reasonably serves the objective of protecting communities from serious, vaccine-preventable diseases through immunization. Even if some form of heightened scrutiny did apply here—and it does not—the statute would satisfy that review. It has long been recognized that protecting public safety and health are essential and compelling governmental interests. Given the data presented to the Legislature concerning declining immunization rates and increasing numbers of religious exemptions in New York, the Legislature could reasonably conclude that repeal of the religious exemption was necessary to protect public health and prevent future outbreaks.

## ARGUMENT

### THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' FREE EXERCISE CHALLENGE TO NEW YORK'S STATUTORY VACCINATION REQUIREMENT FOR SCHOOLCHILDREN

Courts have long held that mandatory vaccination laws represent a valid exercise of the States' police powers, and such laws have withstood challenges on various constitutional grounds for more than a century. In 1905, the Supreme Court held that mandatory vaccination laws do not offend "any right given or secured by the Constitution," and that the States' police powers allow imposition of "restraints to which every person

22

is necessarily subject for the common good."[12] *Jacobson v. Massachusetts*, 197 U.S. 11, 25-27 (1905); *see Zucht v. King*, 260 U.S. 174, 176 (1922). The Supreme Court has also recognized that generally applicable vaccination requirements do not infringe on religious liberties. As the Court explained eighty years ago, "[t]he right to practice [one's] religion freely does not include liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944). More recently, the Court identified "compulsory vaccination laws" as among the neutral, generally applicable laws that do not require religious exemptions under the First Amendment. *See Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 888-89 (1990).

Consistent with these precedents, this Court has recently issued several decisions upholding vaccination requirements in the face of First Amendment challenges. Just last year, this Court held that Connecticut could repeal a religious exemption from its school vaccination requirement

_____

[12] Around the same time, the New York Court of Appeals similarly upheld compulsory vaccination as a precondition for school attendance, holding that "[w]hen the sole object and general tendency of legislation is to promote the public health, there is no invasion of the Constitution, even if the enforcement of the law interferes to some extent with liberty or property." *Matter of Viemeister v. White*, 179 N.Y. 235, 238 (1904).

consistent with the Free Exercise Clause, notwithstanding the availability of a medical exemption. *See COECD*, 76 F.4th at 147-48. In 2021, this Court reversed a preliminary injunction and allowed a DOH regulation to go into effect that required certain healthcare workers to be vaccinated against COVID-19 unless they satisfied a medical exemption. *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 273-74 (2d Cir.) (per curiam) ("*Hochul*"), *clarified by* 17 F.4th 368 (2d Cir. 2021), *cert. denied sub nom. Dr. A. v. Hochul*, 142 S. Ct. 2569 (2022). And in 2015, this Court explained that mandatory vaccination for schoolchildren "does not violate the Free Exercise Clause." *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015).

And during this same time period, relying on the precedents of the Supreme Court and this Court, New York state courts rejected a free exercise challenge to the New York Legislature's decision to repeal the religious exemption to the State's mandatory school vaccination requirement. *See F.F. v. State*, 194 A.D.3d 80 (3d Dep't), *appeal dismissed and lv. denied,* 37 N.Y.3d 1040 (2021), *cert. denied*, 142 S. Ct. 2738 (2022) (mem.).

Given this settled law, and as further explained below, the district court correctly concluded that plaintiffs failed to state a claim for relief.

24

**A.**    **The Vaccine Requirement Is Subject to Rational-Basis Review Because It Is Neutral and Generally Applicable.**

"[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). The Supreme Court has specifically identified "compulsory vaccination laws" as among the neutral, generally applicable laws that do not require religious exemptions under the First Amendment. *See Smith*, 494 U.S. at 888-89.

Here, and as the district court correctly held (SPA 16-34), plaintiffs' free exercise claim fails because the vaccination requirement is a neutral law of general applicability that is subject to rational-basis review—a bar that it readily clears. Even if heightened scrutiny applied, the vaccination requirement would pass constitutional muster.

**1.    The vaccine requirement is neutral.**

A law is not neutral if the government "proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533. "A law may fail the neutrality prong either facially, that is, if it explicitly singles out a religious practice,

or on account of improper legislative intent, that is, if it targets religious conduct for distinctive treatment." *COECD*, 76 F.4th at 145 (quotation marks omitted). Plaintiffs do not—and cannot—plausibly allege that PHL § 2164 fails the neutrality prong on either ground.

### a. The vaccine requirement is facially neutral.

PHL § 2164 is neutral on its face. The text of the statute does not mention religious activity at all. *See Hochul*, 17 F.4th at 281. Rather, it applies to every child in the State entering school between the ages of two months and eighteen years, unless the child falls under the exemption for cases in which a physician determines that a vaccine would be detrimental to the child's health. PHL §§ 2164(1), (8). By contrast, the COVID-19 executive order reviewed by the Supreme Court in *Roman Catholic Diocese of Brooklyn v. Cuomo* was not neutral because it expressly "single[d] out houses of worship" for distinctive treatment. 592 U.S. 14, 17 (2020).

Plaintiffs argue that the repeal of a religious exemption in and of itself renders the law facially discriminatory (*see* Br. at 49), but this Court squarely rejected that argument in *COECD*. There, the Court held that Connecticut's repeal of a religious exemption to its school vaccina-

26

tion requirement was not per se hostile to religion. 76 F.4th at 149. In so holding, the Court followed the "common-sense approach of the New York state courts" that viewed PHL § 2164 "as a whole." *Id.* (quoting *F.F. ex rel. Y.F. v. State*, 66 Misc. 3d 467, 478 (Sup. Ct. Albany Cnty. 2019), *aff'd sub nom.*, *F.F. v. State*, 194 A.D.3d 80 (3d Dep't 2021)). Accordingly, New York's repeal of the religious exemption "does not in and of itself transmute the law into a non-neutral law that targets religious beliefs." *Id.* (quoting *F.F.*, 66 Misc. 3d at 478)). And this Court applied the same reasoning in *Hochul*, holding that the absence "of a religious exception to a law does not, on its own, establish non-neutrality such that a religious exception is constitutionally required." 17 F.4th at 282.

In sum, a policy lacks neutrality when it "single[s] out the religious for disfavored treatment." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017). PHL § 2164 does no such thing. Instead, it treats requests for religious exemptions the same as any other claim for an exemption—with the sole exception of the narrow medical exemption, which is unique, as explained below.

### b. The history and administration of the vaccine requirement do not reflect departures from neutrality.

Preliminarily, plaintiffs failed to preserve their argument (Br. at 49-54) that the legislative history of the 2019 amendment to the mandatory vaccination law establishes religious animus. They raised no such argument below when they opposed defendants' motion to dismiss. (J.A. 674; *see* J.A. 275-276 (preliminary injunction motion).)

In any event, plaintiffs' religious animus argument lacks merit. In assessing whether animus motivated a government action, courts look to "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision making body." *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020) (quotation marks omitted). The history of PHL § 2164 and its 2019 amendment reveals no "subtle departures from neutrality" reflecting hostility or animus towards religion. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) (quotation marks omitted).

28

To the contrary, the legislative history establishes that the repeal of the religious exemption was the product of legitimate public health concerns, not religious animosity. *See F.F.*, 194 A.D.3d at 85-86. The legislative memoranda accompanying the repeal bill—which New York courts deem highly probative of legislative intent, *see, e.g.*, *Expressions Hair Design v. Schneiderman*, 32 N.Y.3d 382, 391-92 (2018)—focused exclusively on the need to increase vaccination rates to protect the public health. *See* Senate Mem., *supra*; Assembly Mem., *in* Bill Jacket at 4A, *supra*. Medical and public health organizations uniformly advocated for the bill in the interest of public health. *See, e.g.*, Assembly Tr. at 101; Senate Tr. at 5445.

The Legislature also gathered extensive data and scientific evidence in support of the bill. That evidence demonstrated that the rate at which religious exemptions were being asserted was rising statewide—a trend that was compounded by the fact that the exemptions tended to cluster geographically. *See* Senate Tr. at 5388-89. Consequently, in some schools, over 20% of students had religious exemptions. *Id.* at 5389, 5399; Assembly Tr. at 58-59. While the CDC advises that herd immunity requires a 95% vaccination rate, over 280 schools in New York had vacci-

nation rates below 85%, with 170 schools reporting rates below 70%. Assembly Mem., *in* Bill Jacket at 4A, *supra*. And the overwhelming majority of measles cases in the hardest hit jurisdictions involved unvaccinated children. *See* Assembly Tr. at 58-59, 106; NYSBA Mem., *supra*. Indeed, one local health department reported that one child with a religious exemption had spread measles to forty-four people, including twenty-six children who also had religious exemptions. Senate Tr. at 5385.

The Legislature also considered California's response to the spread of infectious disease. After California repealed its law's nonmedical exemption in response to a 2014 measles outbreak, its "vaccination rates improved demonstrably, particularly in schools with the lowest rates of compliance." Senate Mem., *supra*; *see* Senate Tr. at 5385, 5394-95; Assembly Tr. at 47. In fact, the vaccination rate rebounded to approximately 95%, the threshold for herd immunity. *See* Assembly Tr. at 47.

The legislative history thus establishes that the Legislature, guided by scientific data, crafted a sensible measure to confront a pressing public health threat: insufficient vaccination rates driven in large part by increased reliance on the religious exemption.

In arguing that the amendment was the product of religious hostility, plaintiffs rest exclusively on statements of just a few legislators, some of whom sponsored the bill. *See* Br. at 49-54. This argument squarely contravenes the Supreme Court's warning against invalidating a statute based solely on what a small number of legislators have said about it. *United States v. O'Brien*, 391 U.S. 367, 384 (1968). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [this Court] to eschew guesswork." *Id.* "[S]uch isolated remarks are entitled to little or no weight, particularly when they are unclear or conflict with one another." *Murphy v. Empire of Am., FSA*, 746 F.2d 931, 935 (2d Cir. 1984). This principle applies equally when evaluating remarks made by a bill's sponsor. As the Supreme Court recently confirmed, "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689-90 (2021); *see also, e.g.*, *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979)

31

("The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history.").

In this case, comments by a few legislators that New York's Appellate Division found to be, at most, "insensitive," *F.F.*, 194 A.D.3d at 87, fail plausibly to suggest that the Legislature as a whole was motivated by religious hostility, *see id.* at 86. Even a senator who opposed the bill nonetheless emphasized that he "appreciate[d] the debate and the respectfulness with which this issue was approached." Senate Tr. at 5451. Moreover, many of the statements relied on by plaintiffs were made to members of the public, rather than to other legislators during the floor debate accompanying the repeal bill. Such statements do not "serve as a reliable index to the intention of the legislators who passed the bill." *See Matter of Delmar Box Co.*, 309 N.Y. 60, 67 (1955). At most, the statements—like those made during the debate of Connecticut's repeal—reflect the "tension between public health and socio-religious beliefs" that

the Legislature had to balance in the face of a severe measles outbreak.[13] *COECD*, 76 F.4th at 148 (quoting *F.F.*, 194 A.D.3d at 87).

Because the legislative history of the 2019 amendment provides no basis to infer religious animus, plaintiffs' reliance on *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018) (Br. at 50-52), is misplaced. In *Masterpiece Cakeshop*, the Supreme Court rejected an administrative body's determination because the administrative record exhibited "clear and impermissible hostility toward the sincere religious beliefs" of a litigant and disparate treatment of that litigant's case. 584 U.S. at 634; *see id.* at 639. *Masterpiece Cakeshop* does not deal with a legislative body making policy decisions; it only addresses an adjudicatory body deciding the facts of the case before it. As *Masterpiece Cakeshop* specifically explained, this distinction drove the decision. A party appearing before an adjudicatory body is entitled to "fairness and impartiality" on the part of those adjudicators who control his fate. *See*

---

[13] Some comments cited by plaintiffs merely express concern that the religious exemption was being misused by parents who did not hold a sincere religious objection to vaccinations but nonetheless used the exemption to evade the vaccination requirements. Such concern also does not evince hostility to sincere religious objections. *See F.F.*, 194 A.D.3d at 87.

*id.* at 636. In addition, for the reasons described above (at 31-33), the statements made here bear little resemblance to the religion-based comments in *Masterpiece Cakeshop*, and they do not reflect any disparate treatment of plaintiffs.

Plaintiffs make a cursory argument (*see* Br. at 54-56) that the DOH administrative process departed from neutrality, but that argument also fails. The statements referenced by plaintiffs merely show that DOH sought a modest penalty—an amount equivalent to only one day's worth of statutory violations—because plaintiffs were knowingly violating the law and claiming a right to a statutory exemption that no longer existed. (*See* J.A. 115-117.) Then-Commissioner Bassett was clear that DOH "does not doubt the genuineness of" plaintiffs' religious beliefs, but that to impose no penalty in a case involving knowing violations of the law would undermine respect for the law. (J.A. 126-127.) While plaintiffs contend that purported noncompliance elsewhere shows a lack of neutrality, plaintiffs point to no facts suggesting that DOH would tolerate noncompliance from schools invoking secular rather than religious reasons. Contrary to plaintiffs' suggestion (Br. at 55-56), the allegations that DOH has so far been unable to eradicate noncompliance does not in any

way suggest that DOH is tolerating or condoning it. See *infra* at 46-47.
Finally, plaintiffs are further mistaken to suggest (Br. at 55) that the
amount of the penalties demonstrates religious animus. As then-Commissioner Bassett observed, plaintiffs never argued that they could not
afford the penalties, which are "principled and conservative." (J.A. 127.)

### 2. The vaccine requirement is generally applicable.

"A law is generally applicable when it treats similar conduct
similarly, without regard to whether the conduct is religiously motivated."
*COECD*, 76 F.4th at 145. The courts have identified two circumstances
under which a law can fail to be generally applicable. *See Fulton*, 593
U.S. at 533-34. The first is if the policy is substantially underinclusive
such that it regulates religious conduct while failing to regulate secular
conduct that is at least as harmful to the legitimate government interests
purportedly justifying it. *Central Rabbinical Cong. of the U.S. & Can. v.
New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d
Cir. 2014). The second is if the policy "invites the government to consider
the particular reasons for a person's conduct by providing a mechanism
for individualized exemptions." *Fulton*, 593 U.S. at 533 (quotation and

alteration marks omitted). The district court correctly concluded that neither circumstance applies here. (SPA 24-33.)

### a. The vaccine requirement is not substantially underinclusive.

On its face, PHL § 2164 is generally applicable because it applies to every child in the State entering school between the ages of two months and eighteen years. The only exception to this requirement is a narrow medical exemption for students who would currently suffer specific contra-indications if they were to receive a particular vaccine or are otherwise subject to specific "precaution[s]" pursuant to nationally recognized evidence-based standards of care. 10 N.Y.C.R.R. §§ 66-1.1(*l*), 66-1.3(c); *see* PHL § 2164(8). Relying on *COECD*, the district court correctly held that PHL § 2164 is generally applicable, notwithstanding this limited medical exemption. (*See* SPA 29-33.)

This Court has explained that the mere availability of a nonreligious exemption does not necessarily require the availability of a religious exemption. *See Hochul*, 17 F.4th at 282. Instead, the Free Exercise Clause subjects a law to strict scrutiny only when the law denies a religious exemption while offering a nonreligious exemption that is "at least as

harmful" to the objectives of the underlying policy. *Central Rabbinical Cong.*, 763 F.3d at 197. Thus, what the Free Exercise Clause bars is favorable treatment of *comparable* secular activity. *See Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). In *COECD*, this Court looked to the State's asserted interest in repealing a religious exemption to a vaccine requirement and assessed whether permitting medical exemptions undermined that asserted interest. *COECD*, 76 F.4th at 151.

Applying that analysis here, the medical exemption in PHL § 2164 is not comparable to the repealed religious exemption for the reasons the Court identified in *COECD*. First, like Connecticut, New York has been consistent in its asserted interest and has not offered "post hoc rationalization" for litigation purposes. *COECD*, 76 F.4th at 152. As explained in the proceedings below, New York's interest is to protect the health of children while they are physically present in the school environment and to protect the health of the public in general against disease outbreaks both in and outside the school. (SPA 30.) This explanation is consistent with the Senate Sponsor's memorandum, which stated that the repeal bill would increase vaccination rates and thereby "protect the health of all New Yorkers, particularly our children." Senate Mem., *supra*. And

those interests are the same as the interests that animated the addition of the measles vaccine to New York's mandatory vaccination law in 1968: to protect children "in their own self-interest as well as for the health and economic will-being of the community." Ch. 1094, § 1, 1968 N.Y. Laws at 3095. New York's consistent interest is no different from that of Connecticut: "protect[ing] the health and safety of Connecticut students and the broader public." *COECD*, 76 F.4th at 151 (quotation marks omitted).

Second, as in *COECD*, the "medical but not religious exemptions serve this interest." *Id.* Exempting students for whom vaccination is medically contraindicated advances the State's interest in health and safety by protecting those students from potential medical harms. Providing exemptions to students with religious objections to be vaccinated contravenes that interest. *Id.* at 153. The 2019 amendment thus promotes the health and safety of vaccinated students "by decreasing, to the greatest extent medically possible, the number of unvaccinated students (and, thus, the risk of acquiring vaccine-preventable diseases) in school." *Id.* The amendment also promotes the health and safety of unvaccinated students with medical exemptions by lowering their exposure to other unvaccinated students and preventing the health harms they would face

38

from vaccination. *Id.* Allowing religious exemptions, on the other hand, "would only detract from the State's interest in promoting public health by increasing the risk of transmission of vaccine-preventable diseases among vaccinated and unvaccinated students alike." *Id.* Accordingly, the medical exemption and the religious exemption "are not comparable in relation to the State's interest" for purposes of the Free Exercise Clause. *Id.*

The medical exemption in PHL § 2164 is thus unlike the secular exemptions criticized by the Supreme Court in *Roman Catholic Diocese* and *Tandon*, but rather is more similar to an Oregon law exemption that the Supreme Court found to be generally applicable in *Smith*. The Oregon law prohibited possession of peyote "unless the substance has been prescribed by a medical practitioner." *Smith*, 494 U.S. at 874. This "prescription exception" did not preclude the Oregon law from being generally applicable for purposes of a free exercise claim because it did "not necessarily undermine Oregon's interest in curbing the unregulated use of dangerous drugs." *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.). To the contrary, the prescription exception was consistent with the underlying

39

drug law's objective of "protect[ing] public health and welfare" because "when a doctor prescribes a drug, the doctor presumably does so to serve the patient's health and in the belief that the overall public welfare will be served." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 211 (3d Cir. 2004) (Alito, J.). The medical exemption here similarly serves rather than undercuts a primary purpose of the vaccine requirement.

Plaintiffs fail to allege any facts to substantiate their contention (Br. at 38) that the potential presence of unvaccinated adults in schools and the congregation of unvaccinated children outside of schools undermine the State's interest in the same or a similar way as do religious exemptions for children in school. PHL § 2164 operates to further the health and safety of the public more generally by "ensur[ing] that the vast majority of children—who will quickly grow into the vast majority of adults—are vaccinated." *F.F.*, 194 A.D.3d at 89. And plaintiffs make no allegations suggesting that the law's inapplicability to adults contributed at all, let alone to the extent that the religious exemption did, to the declining vaccination rates that made communities susceptible to outbreaks. Indeed, plaintiffs fail to allege any facts to suggest that there is an appreciable number of unvaccinated adults in the State's schools,

much less an appreciable number who are unvaccinated for secular reasons rather than religious ones. *See Tandon*, 593 U.S. at 62 (general applicability looks to whether the law treats "comparable secular activity more favorably than religious exercise").[14] Nor could they likely do so, given the ubiquity of established vaccination requirements. Nearly every adult present in a New York school who grew up in the United States lived somewhere with a mandatory school vaccination law. See *supra* at 3-6. And, for over two decades, any adult who has immigrated to the United States has been subject to the federal law that generally requires adults, for admissibility to the United States, to be vaccinated against several diseases, including measles. *See* 8 U.S.C. § 1182(a)(1)(A); U.S. Citizenship & Immigr. Servs., *Vaccination Requirements* (last updated Dec. 21, 2022).

The medical exemption's narrow scope and limited duration also assures that it will not risk harm "to *at least the same degree*" as would a religious exemption. *See Blackhawk*, 381 F.3d at 209 (emphasis added).

---

[14] This Court has noted that *Tandon* looked not to risks posed by "individual behaviors but instead [to] aggregations of individual behavior." *COECD*, 76 F.4th at 152.

As to scope, the medical exemption is available only when a student can demonstrate a small number of specific contraindications or certain "precaution[s]" recognized by CDC and DOH guidance. *See* 10 N.Y.C.R.R. § 66-1.1(*l*). The number of medical exemptions is thus necessarily limited. By contrast, a religious exemption would necessarily be broad because it could not be limited to the Amish, despite plaintiffs' suggestion that it could (*e.g.*, Br. at 43-44). The First Amendment reflects our country's respect for diverse religious views, including individualized beliefs that may not reflect any institutionalized creed. *See Gillette v. United States*, 401 U.S. 437, 457 (1971). Plaintiffs' suggestion that an exemption can be limited to their faith and their faith alone, on the other hand, runs against the bedrock First Amendment principle that "one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

The legislative record confirms that the scope of the medical exemption is narrower than the scope of the religious exemption. *See COECD*, 76 F.4th at 154. In the school year before the repeal, the number of religious exemptions was over five times greater than the number of medical exemptions. *See* Assembly Tr. at 70-71. (*See* J.A. 570-571.) The

health risks associated with religious exemptions—both to the exempt individuals and their communities—were further exacerbated by the facts that (i) such exemptions tended to cluster geographically[15] and (ii) the rate of such exemptions had been increasing. *See* Senate Tr. at 5384-85, 5388-89, 5399; Assembly Tr. at 58-59; *see also COECD*, 76 F.4th at 137 (noting similar concerns in Connecticut).

Moreover, a medical exemption does not apply across the board but rather is limited to the specific vaccination that is medically contraindicated. 10 N.Y.C.R.R. § 66-1.3(c). Children with medical exemptions therefore may receive some, if not most, of the vaccines required by New York law. Religious exemptions do not face any similar constraint. Indeed, plaintiffs allege that they object to *all* of the vaccinations required by PHL § 2164. (*See* J.A. 13.)

---

[15] Multiple studies have documented the phenomenon of geographic clustering of nonmedical exemptions, which are associated with an increase in the risk of outbreaks of vaccine-preventable diseases. *See, e.g.*, Amer Imdad et al., *Religious Exemptions for Immunization and Risk of Pertussis in New York State, 2000-2011*, 132 Pediatrics 37, 38-40 (2013); Saad B. Omer et al., *Geographic Clustering of Nonmedical Exemptions to School Immunization Requirements and Associations with Geographic Clustering of Pertussis*, 168 Am. J. Epidemiology 1389, 1394-95 (2008).

The medical exemption is not only strictly limited in scope, but in duration as well. It is only valid until a vaccine "is found no longer to be detrimental to the child's health," PHL § 2164(8), with the duration specified in the child's medical records, 10 N.Y.C.R.R. § 66-1.3(c). As plaintiffs' complaint acknowledges, "the student must re-apply for a medical exemption on an annual basis." (J.A. 19.) Religious exemptions are not similarly time limited or periodically reassessed, *see Hochul*, 17 F.4th at 286, and plaintiffs acknowledge that their religious objections are not temporary (*see* J.A. 11).

The strictly limited scope and duration of any medical exemption thus provide further support for the conclusion that the medical exemption is not "at least as harmful" to the underlying objectives of PHL § 2164 rule as the religious exemption. *See Central Rabbinical Cong.*, 763 F.3d at 197. By contrast, the Supreme Court found that the secular activities permitted by the exemptions in *Roman Catholic Diocese* and *Tandon* were riskier than religious congregation, given various churches' and synagogues' larger physical venues and "admirable safety records." *See Roman Catholic Diocese*, 592 U.S. at 17-19; *see also Tandon*, 593 U.S. at 63-64

(noting that California had failed to "show that the religious exercise at issue is more dangerous").

Contrary to plaintiffs' suggestion (Br. at 32), this Court has squarely held that the comparability of medical and religious exemptions can be resolved on a motion to dismiss without further fact finding. In *COECD*, this Court held that because the "medical exemptions further the State's interest in a way a religious exemption would not, permitting plaintiffs to proceed to discovery would require more of the State than what the Supreme Court has prescribed." 76 F.4th at 154. The same is true here. Plaintiffs are mistaken to rely (Br. at 32) on this Court's decision in *M.A. ex rel. H.R. v. Rockland County Department of Health*, 53 F.4th 29 (2d Cir. 2022). That case raised questions of fact as to the categories of individuals eligible for exemptions—such as whether homeschooled children or philosophical objectors qualified for an exemption. 53 F.4th at 39. And as this Court recognized in *COECD*, *M.A.* did not "reach the constitutional question that case and this one share." 76 F.4th at 147.

Plaintiffs are also mistaken to argue (*see, e.g.*, Br. at 34-35) that general applicability should be assessed on the basis of the risk of allowing plaintiffs specifically (or Amish individuals, generally) to forego vaccina-

45

tion rather than the aggregate risk of a religious exemption statewide. This Court has repeatedly rejected the argument that "we should cabin our analysis to the risk an individual child who is unvaccinated—whether for medical or religious reasons—might pose to" health and safety. *COECD*, 76 F.4th at 153; *see Hochul*, 17 F.4th at 286-87. The test for general applicability is whether the challenged law as a whole is under-inclusive at achieving its stated objectives. *See, e.g., Lukumi*, 508 U.S. at 543-46. The question is thus not whether DOH could allow these individual plaintiffs (or Amish individuals generally) to remain unvaccinated; just as in *Smith,* it would have been immaterial whether the two individual plaintiffs could have been safely exempted from Oregon's controlled-substance law. *See* 494 U.S. at 878-79. Rather, the question is whether allowing a broad exemption for all with sincere religious objections to vaccines would be comparable to the medical exemption. See *supra* at 41. That inquiry necessarily looks beyond the facts of the individual plaintiffs.

Finally, plaintiffs are mistaken to argue (Br. at 36-37) that DOH's supposed lax enforcement renders PHL § 2164 underinclusive. As the district court correctly noted (SPA 28), plaintiffs identify no facts suggest-

46

ing that those students who are not vaccinated are relying on secular rather than religious reasons. Nor is it feasible to require "perfect compliance" with a law to satisfy the general applicability test; "[t]hat is a standard that virtually no law could meet." (SPA 28.) While DOH cannot audit every school every year, it regularly conducts audits and enforcement proceedings like the one underlying this litigation to promote broader compliance statewide.

### b. The vaccine requirement does not provide for discretionary, individualized exemptions.

PHL § 2164 is also generally applicable because it does not vest any government official or agency with broad discretion to grant individualized exemptions. A law that permits such discretionary exemptions must satisfy strict scrutiny "because such a regime creates the opportunity for a facially neutral and generally applicable standard to be applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk*, 381 F.3d at 209.

In *Fulton*, the Supreme Court applied this principle to hold that a scheme for granting foster care contracts was not generally applicable because it allowed a state official to grant exceptions "in his/her sole

discretion" from applications of an antidiscrimination statute. 593 U.S. at 535-36 (quotation marks omitted). Similarly, *Smith* explained that the unemployment-compensation scheme at issue in *Sherbert v. Verner*, 374 U.S. 398 (1963), was not generally applicable because it allowed exceptions for "good cause," which was an undefined standard under that scheme. *See* 494 U.S. at 884. "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id.*

In *COECD*, this Court held that Connecticut's medical exemption did not constitute a discretionary exemption because it did not "give government officials discretion to decide whether a particular individual's reasons for requesting exemption are meritorious." 76 F.4th at 150. The Court explained that "where a law provides for an objectively defined category of people to whom the vaccination requirement does not apply, including a category defined by medical providers' use of their professional judgment, such an exemption affords no meaningful discretion to the State." *Id.* at 151 (quotation marks omitted); *see also Roman Cath. Diocese of Albany v. Vullo*, 2024 N.Y. Slip Op. 02764, at *6-10 (N.Y. May

48

21, 2024) (law providing objective criteria for exemption is not subject to strict scrutiny under *Fulton*).

The same result applies here. PHL § 2164 does not contain any broad discretionary scheme of individualized exemptions. Instead, it contains a single, limited exemption that applies to students for whom a vaccine would be detrimental to their health. The scope of the exemption is narrow and clearly defined—it applies only when consistent with a "nationally recognized evidence-based standard of care," such as the guidance issued by the CDC's Advisory Committee on Immunization Practices. 10 N.Y.C.R.R. § 66-1.1(*l*). The regulations deprive decision-makers of any discretion "to decide which reasons for not complying with the policy are worthy of solicitude" because exemptions must be based on clearly defined federal criteria. *See Hochul*, 17 F.4th at 289 (quotation marks omitted). The medical exemption thus bears no similarity to the broad discretionary schemes that have triggered heightened scrutiny in other cases.

Plaintiffs are mistaken to suggest (Br. at 40, 45-47) that a physician need only certify that immunization *may* be detrimental to the child's health to obtain a medical exemption under PHL § 2164. "May be detri-

49

mental to the child's health" is a defined term meaning that "a physician has determined that a child has a medical contraindication or precaution to a specific immunization consistent with ACIP guidance or other nationally recognized evidence-based standard of care." 10 N.Y.C.R.R. § 66-1.1(*l*). As plaintiffs' own complaint acknowledges, medical providers "are instructed to refer to guidance issued by vaccine manufacturers and the CDC for valid exemption conditions." (J.A. 18-19.) Ultimately, both New York and Connecticut's vaccination laws allow a medical exemption for an objectively defined category of people—individuals who, in a medical providers' professional judgment, have a medical contraindication for a specific immunization. This Court has already held that such an exemption "affords no meaningful discretion to the State."[16] *COECD*, 76 F.4th at 151 (quotation marks omitted).

---

[16] In fact, New York's medical exemption provides less discretion than Connecticut's medical exemption. As this Court observed, Connecticut "broadened the grounds on which a provider may determine that a vaccine is contraindicated for a patient," by allowing them to include reasons that are not recognized by the CDC but "nevertheless, in the provider's discretion, constitute contraindication." *COECD*, 76 F.4th at 141 (quotation and alteration marks omitted). Even with that broader degree of discretion, the Court still concluded that Connecticut's vaccination requirement is generally applicable.

Plaintiffs mistakenly claim (*e.g.*, Br. at 40) that school administrators have broad discretion to grant exemptions. The role of school administrators is actually quite limited; they can do no more than confirm that a physician's certification properly demonstrates the subject child's medical contraindication or precaution to a specific immunization based on a nationally recognized evidence-based standard of care. *See Matter of Kerri W.S. v. Zucker*, 202 A.D.3d 143, 159 (4th Dep't 2021). And their limited role serves an important purpose: to prevent physicians from providing invalid medical exemptions to families who are seeking to avoid school vaccination requirements. Because school administrators merely confirm that a physician's certification satisfies the regulatory criteria, they have no discretion "to decide which reasons for not complying with the policy are worthy of solicitude." *Hochul*, 17 F.4th at 289 (quotation marks omitted).

**B.    Plaintiffs' Alternative Theories for Invoking Heightened Scrutiny Are Meritless.**

Plaintiffs suggest two other grounds for invoking heightened scrutiny: the so-called "hybrid-rights theory" and the purported workability of religious exemptions. Neither ground warrants heightened scrutiny here.

Contrary to plaintiffs' argument (Br. at 56-60), this Court has repeatedly declined to apply a heightened level of scrutiny in cases invoking the hybrid-rights theory. The Court has explained that there is no good reason "for the standard of review to vary simply with the number of constitutional rights that plaintiff asserts have been violated." *Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003); *see id.* at 143-44 (recognizing that the theory arises from dicta and declining to apply it in a case involving both free exercise and parental rights). This Court reiterated that point in *COECD*. 76 F.4th at 159.

Plaintiffs are wrong to claim (Br. at 58-59) that this case falls directly under the hybrid-rights theory discussed in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Even if *Yoder* supported a heightened form of scrutiny

52

in some circumstances involving hybrid-rights claims,[17] *Yoder* would not do so where, as here, public health and safety are implicated. The Supreme Court said so expressly in *Yoder*, where it distinguished the case before it (in which the Court barred enforcement of a compulsory education statute against Amish adherents) from cases in which "any harm to the physical or mental health of the child or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred." 406 U.S. at 230. In drawing this distinction, the Court cited its earlier opinion in *Jacobson* as an example of a case involving public health and safety. *Id.* at 230 & n.20.

The purported workability of religious exemptions (Br. at 60-62) does not warrant strict scrutiny, either. Plaintiffs' contrary argument puts the cart before the horse. While workability might be relevant to the strict scrutiny analysis if that analysis applied, purported workability does not trigger strict scrutiny in the first place. Plaintiffs identify no

---

[17] If such review did exist, it would not be strict scrutiny. At most, judicial review would require a balancing of the state interest at issue against the free exercise interest to determine whether "there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Yoder*, 406 U.S. at 214.

authority holding otherwise. And plaintiffs' novel theory runs counter to this Court's precedent that the absence or removal of a religious exemption does not trigger strict scrutiny. *See COECD*, 76 F.4th at 149; *Hochul*, 17 F.4th at 282.

In any event, as demonstrated above (at 6-10), the Legislature enacted the 2019 amendment precisely because the religious exemption was proving unworkable. The number of religious exemptions had increased precipitously, threatening herd immunity in many parts of the State. And because particularly high rates of those exemptions were clustered, some schools had immunization rates that fell well below the threshold for herd immunity, making New York the epicenter of a measles outbreak.

The fact that some other States with religious exemptions have not thus far encountered such issues (*see* Br. of Alabama and 19 Other States as *Amici Curiae* in Support of Appellants at 24-27) does not require New York to follow their approach. New York's lack of a religious exemption to its school vaccination requirement is hardly unique. *See COECD*, 76 F.4th at 138-39 (noting that Connecticut's repeal followed "in other States' footsteps"). In any event, New York's unique experience with the

measles outbreak would justify even a unique approach to preventing the spread of infectious disease.

## C. The Vaccine Requirement Is a Rational Response to the Spread of Infectious Diseases in Schools and Would Survive Heightened Scrutiny in Any Event.

### 1. The vaccine requirement satisfies rational-basis review.

As a neutral law of general applicability, the vaccine requirement easily satisfies rational-basis review because it demonstrates a "reasonable fit" between the State's purpose and "the means chosen to advance that purpose." *Leebaert*, 332 F.3d at 139 (quotation marks omitted). Plaintiffs do not argue otherwise that New York's law does not satisfy rational basis review.

This Court has recognized that "protecting communities from serious, vaccine-preventable diseases through immunization" is a legitimate state objective and that New York's measles outbreak implicated that interest. *Goe v. Zucker*, 43 F.4th 19, 32 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1020 (2023).

As was the case in *COECD*, the repeal of New York's religious exemption to PHL § 2164 is reasonably related to furthering that interest.

The Legislature reasonably concluded that continuing to permit religious exemptions—at that time the State's only nonmedical exemption—to multiply would increase the risk of further outbreaks of vaccine-preventable infectious disease. *See COECD*, 76 F.4th at 154. The fact that the State has not gone further and regulated *more* activities in which children engage (*see* Br. at 68) does not render the vaccine requirement irrational because "only at school is attendance mandated by law," *COECD*, 76 F.4th at 156.

### 2. The vaccine requirement satisfies heightened scrutiny in any event.

Even if some form of heightened scrutiny applied here—and it does not—the 2019 amendment to Public Health Law § 2164 would satisfy it. "A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (quotation marks omitted).

It has long been recognized that protecting public safety and health are essential and compelling governmental interests. *See, e.g.*, *Roman Cath. Diocese*, 592 U.S. at 18; *Jacobson*, 197 U.S. at 26-27; *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011).

56

Further, the 2019 amendment was properly targeted to address the primary cause of the recent decrease in measles immunization rates—increased reliance on the religious exemption—by eliminating that exemption. As explained above (*supra* at 6-10), the Legislature was aware of the following facts: New York had become the epicenter of an outbreak of measles, a disease that had been eradicated in the United States since 2000. There was a statewide trend of decreasing immunization rates, and rates had reached alarmingly low levels in certain school districts that fell below the CDC's recommendation for herd immunity. Data showed a marked increase in religious exemptions in the years proceeding this decrease in immunization rates. While immunization rates had not yet reached alarmingly low levels on a statewide basis, the Legislature was not required to wait for a public health crisis on such a large scale, but rather could take preventative action to avoid further outbreaks. The Legislature thus tailored the amendment to ameliorate the precise public health threat facing the State: the increase in religious exemptions leading to measles immunization rates falling below the CDC's recommended threshold for herd immunity in a significant number of schools. *See, e.g.*, *Workman*,

57

419 F. App'x at 354; *F.F.*, 66 Misc. 3d at 482-83. For these very reasons, anything less than repeal of the religious exemption would not have achieved the government's interest. *See Fulton*, 593 U.S. at 541.

Plaintiffs' challenges to the vaccines' efficacy (*see* Br. at 64-66) are meritless. Plaintiffs do not contest that vaccination for measles, mumps, rubella, and chicken pox prevent transmission. *See* Br. at 65. (*See* J.A. 42.) Rather, they argue that contracting measles might serve certain public health interests, primarily relying on a Japanese study finding that men who had contracted measles and mumps had lower risks of mortality from cardiovascular disease later in life. (*See* J.A. 42 n.9.) But the Legislature is entitled to conclude that the serious harms of contracting those diseases in the first place far outweigh plaintiffs' speculation that those who contract those diseases and are fortunate enough to fully recover may ultimately enjoy health benefits decades later.

Plaintiffs' arguments concerning the vaccines for pertussis, tetanus, diphtheria, and polio fare no better. While plaintiffs claim that those vaccines do not prevent transmission, they concede that they "provide a level of personal protection by preventing recipients from experiencing the symptoms of these infections." (J.A. 42.) In the case of polio, for

58

example, those symptoms include paralysis, potentially leading to permanent disability and death. According to the CDC, the polio vaccine led to the elimination of wild poliovirus—and its harsh consequences—in this country.[18] Even accepting plaintiffs' allegations that certain vaccines do not prevent transmission, the Legislature was entitled to conclude that protecting school-aged children from the potentially severe and permanent harms that may result from these diseases serves New York's compelling interest in protecting public health.[19]

As discussed above (at 42), plaintiffs are also wrong to claim that the State must show "Amish-specific interests." *See* Br. at 63. Treating the Amish more favorably than others with sincerely held religious beliefs contrary to vaccination would run afoul of basic First Amendment principles. The Free Exercise Clause protects diverse religious views, including individualized beliefs that may not reflect any institutionalized

---

[18] *See* U.S. Centers for Disease Control and Prevention, *About Polio in the United States* (May 9, 2024).

[19] With respect to Hepatitis B, plaintiffs claim that there is no evidence of transmission in a school setting. *See* Br. at 65. But that argument ignores the State's compelling interest in protecting the health of the public in general against disease outbreaks outside the school environment by using the school vaccination requirement to promote vaccination of the general population as children. *See F.F.*, 194 A.D.3d at 89.

creed, and the State may not treat one preferentially to another. *See Larson*, 456 U.S. at 244; *Gillette*, 401 U.S. at 457. Finally, plaintiffs' remaining arguments (Br. at 67-72), rehash their contention that PHL § 2164 is underinclusive, which is wrong for the reasons described above (at 36-47).

## CONCLUSION

For the foregoing reasons, this Court should affirm the March 11, 2024, judgment.

Dated: New York, New York
July 17, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:  /s/ Mark S. Grube
MARK S. GRUBE
Senior Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
MARK S. GRUBE
  *Senior Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-8028

60

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,358 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.


 /s/ *Emily Paule*

# Addendum

Case: 24-681, 07/17/2024, DktEntry: 59.1, Page 73 of 75

7/1/2019     Governor Cuomo Signs Legislation Removing Non-Medical Exemptions from School Vaccination Requirements | Governor Andrew M. Cu…



**JUNE 13, 2019** Albany, NY

# Governor Cuomo Signs Legislation Removing Non-Medical Exemptions from School Vaccination Requirements

## New Law Will Protect Public Health in the Midst of Ongoing Measles Outbreak

## Follows Extensive Efforts by State Health Department to Contain Measles Outbreak in Pockets of the State

Governor Andrew M. Cuomo today signed legislation (S.2994A/A.2371), sponsored by Senator Brad Hoylman and Assembly Member Jeffrey Dinowitz, removing non-medical exemptions from school vaccination requirements for children. The United States is currently experiencing the worst outbreak of measles in more than 25 years, with outbreaks in pockets of New York primarily driving the crisis. As a result of non-medical vaccination exemptions, many communities across New York have unacceptably low rates of vaccination, and those unvaccinated children can often attend school where they may spread the disease to other unvaccinated students. This new law will help protect the public amid this ongoing outbreak.

"The science is crystal clear: Vaccines are safe, effective and the best way to keep our children safe. This administration has taken aggressive action to contain the measles outbreak, but given its scale, additional steps are needed to end this public health crisis," **Governor Cuomo said.** "While I understand and respect freedom of religion, our first job is to protect the public health and by signing this measure into law, we will help prevent further transmissions and stop this outbreak right in its tracks."

**Senator Brad Hoylman said,** "Today, New York is sending a strong message to people across our state that vaccines are safe and effective. We're putting science ahead of misinformation about vaccines and standing up for the rights of immunocompromised children and adults, pregnant women and infants who can't be vaccinated through no fault of their own. With our actions today, we can help avoid future outbreaks of vaccine-preventable illnesses like measles. I'm exceedingly grateful to Governor Cuomo for signing this vital legislation into law and thank Senate Majority Leader Stewart-Cousins, Senate Health Chair Rivera, Assembly Speaker Heastie, and Assemblymember Dinowitz for their support."

**Assembly Member Jeffrey Dinowitz said,** "I am incredibly proud that science has won with the passage of this bill. We should be taking medical advice from medical professionals, not strangers on the internet spreading pseudo-science misinformation. This will not be the end of our efforts to combat the ongoing measles outbreak, but it is an important step. I hope that we can move forward from here, with level heads, and work together to protect the health of New Yorkers - particularly those with compromised immune systems and those who are too young to be vaccinated. Thank you to Speaker Carl Heastie for his leadership in helping steward this legislation through the Assembly, to SenatorHoylman for leading the charge in the State Senate, to the Governor for his quick action on enacting the bill into law, and all the advocates who fought for this important public health policy change."

**New York State Health Commissioner Dr. Howard Zucker said,** "Governor Cuomo's leadership has continually raised the standard of public health and well-being across New York State. Immunizations give children the best protection from serious childhood diseases and are safe and effective. The efforts taken today stand in stark contrast to the disturbing anti-vaccination trends nationwide and underscore New York's commitment to protecting public health."

Although the State can claim high immunization rates overall, preventable diseases like measles remain a public health threat when administrative loopholes allow children to go unvaccinated, carrying the potential to harm communities—and especially our most vulnerable residents—throughout the state. Statewide, 96% of school-age children have been inoculated against measles, mumps and rubella, with the "MMR" vaccine, but a measles outbreak continues to affect communities in several parts of the state where the rate is lower. New York

Case: 24-681, 07/17/2024, DktEntry: 59.1, Page 75 of 75

7/1/2019          Governor Cuomo Signs Legislation Removing Non-Medical Exemptions from School Vaccination Requirements | Governor Andrew M. Cu…

State currently allows both medical and religious exemptions to the MMR and other vaccines for students attending school.

## Ongoing Department of Health Actions

Since October 1, 2018, the Department of Health has worked closely with local officials to launch an unprecedented public health response to the current measles outbreak—the largest in New York State since 1991. School and daycare exclusions issued by the Department of Health have proven effective in ensuring parents get their children vaccinated with MMR. The Department of Health's ongoing efforts, including messaging about the importance of vaccinations in several languages, have resulted in a drastic uptick in vaccinations. Since the measles outbreak began last fall, more than 49,000 doses of the MMR vaccination have been administered in Rockland, Orange and Westchester Counties.

Department of Health leadership, including Commissioner Dr. Howard Zucker, continue to meet with community leaders in the impacted areas in order to promote greater education and stem misinformation surrounding the safety of vaccinations.

# Contact the Governor's Press Office

**Contact us by phone:**

Albany:  (518) 474 - 8418

New York City:  (212) 681 - 4640

**Contact us by email:**

Press.Office@exec.ny.gov