# 24·0681·cv

## United States Court of Appeals
### for the
## Second Circuit

JOSEPH MILLER, individually and on behalf of his minor children attending an Amish school in Clymer and as a board member of that school, SHADY LANE SCHOOL, EZRA WENGERD, as representative of all Amish schools in the State of New York, JONAS SMUCKER, individually and on behalf of his minor children, DYGERT ROAD SCHOOL, PLEASANT VIEW SCHOOL,

*Plaintiffs-Appellants,*

– v. –

DR. JAMES V. MCDONALD, in his official capacity as Commissioner of Health of the State of New York, DR. BETTY A. ROSA, in her official capacity as Commissioner of Education of the State of New York,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

CHRISTOPHER D. WIEST
CHRIS WIEST
 ATTORNEY AT LAW, PLLC
50 East Rivercenter Boulevard,
 Suite 1280
Covington, Kentucky 1011
(516) 257-1895

HIRAM SASSAR
JUSTIN BUTTERFIELD
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075

(972) 941-4444

ELIZABETH A. BREHM
WALKER D. MOLLER
SIRI & GLIMSTAD LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
(888) 747-4529

KYLE HAWKINS
SHANNON GRAMMEL
LEHOTSKY KELLER COHN LLP
408 West 11th Street, Fifth Floor
Austin, Texas 78701
(512) 693-8350

*Attorneys for Plaintiffs-Appellants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 4

    I.   Neither *Smith* nor *We the Patriots* Applies Here................................. 4

        A.  PHL 2164 is not generally applicable. ........................................ 4

        B.  PHL 2164 is not neutral................................................................ 19

        C.  Plaintiffs allege a *Yoder* hybrid-rights claim............................. 27

        D.  PHL 2164 is amenable to exemptions. ....................................... 29

    II.  PHL 2164 Fails Strict Scrutiny. .......................................................... 32

        A.  The State has not identified a compelling interest. ................... 32

        B.  PHL 2164 is not narrowly tailored. ............................................ 34

CONCLUSION ............................................................................................... 36

CERTIFICATE OF SERVICE .......................................................................... 38

CERTIFICATE OF COMPLIANCE ................................................................... 38

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agudath Israel of Am. v. Cuomo,*
 983 F.3d 620 (2d Cir. 2020) .......................................................5, 11, 34, 35, 36

*Arce v. Douglas,*
 793 F.3d 968 (9th Cir. 2015) ...............................................................................25

*Bassett v. Snyder,*
 951 F. Supp. 2d 939 (E.D. Mich. 2013) ............................................................25

*Buck v. Bell,*
 274 U.S. 200 (1927).................................................................................................6

*Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health*
 *& Mental Hygiene,* 763 F.3d 183 (2d Cir. 2014) .............................................20

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
 508 U.S. 520 (1993)....................................................................3, 15, 16, 24, 25

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day*
 *Saints v. Amos,* 483 U.S. 327 (1987) ..................................................................8

*Cutter v. Wilkinson,*
 544 U.S. 709 (2005)...............................................................................................8

*Dr. A v. Hochul,*
 142 S. Ct. 552 (2021).............................................................................................24

ii

*Employment Division v. Smith,*
  494 U.S. 872 (1990)................................................................4, 30

*Field Day, LLC v. Cnty. of Suffolk,*
  463 F.3d 167 (2d Cir. 2006) ............................................................9

*Fink v. Time Warner Cable,*
  714 F.3d 739 (2d Cir. 2013) ..........................................................34

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark,*
  170 F.3d 359 (3d Cir. 1999) ....................................................16, 17

*Fulton v. City of Philadelphia,*
  593 U.S. 522 (2021)......................................... 2, 5, 14, 15, 16, 24, 32

*Gillette v. United States,*
  401 U.S. 437 (1971)......................................................................22

*Goe v. Zucker,*
  43 F.4th 19 (2d Cir. 2022) ............................................................18

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006).........................................................8, 9, 29, 32

*Health Freedom Defense Fund, Inc. v. Carvalho,*
  104 F.4th 715 (9th Cir. 2024)........................................................34

*Hester ex rel. A.H. v. French,*
  985 F.3d 165 (2d Cir. 2021) ............................................................8

*Holt v. Hobbs,*
  574 U.S. 352 (2015)........................................................................9

*Intercommunity Ctr. for Just. & Peace v. INS,*
  910 F.2d 42 (2d Cir. 1990) ...............................................................29

*Jacobson v. Massachusetts,*
  197 U.S. 11 (1905).................................................................5, 6, 28

*Kane v. De Blasio,*
  19 F.4th 152 (2d Cir. 2021) .........................................................8, 23

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022).........................................................................11

*Kingdomware Techs., Inc. v. United States,*
  579 U.S. 162 (2016).........................................................................17

*Leebaert v. Harrington,*
  332 F.3d 134 (2d Cir. 2003) .......................................................27, 28

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n,*
  584 U.S. 617 (2018).....................................................................22, 24

*Mhany Mgmt., Inc. v. Cnty. of Nassau,*
  819 F.3d 581 (2d Cir. 2016) .............................................................25

*M.A. v. Rockland Cnty. Dep't of Health,*
  53 F.4th 29 (2d Cir. 2022) ...............................................................22

*Prince v. Massachusetts,*
  321 U.S. 158 (1944).................................................................5, 6, 28

*Ringhofer v. Mayo Clinic, Ambulance,*
  102 F.4th 894 (8th Cir. 2024).........................................................23

iv

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) ...................................................................5, 36

*Tandon v. Newsom,*
    593 U.S. 61 (2021) .......................................... 4, 5, 7, 10, 13, 28, 35

*United States v. Harrell,*
    268 F.3d 141 (2d Cir. 2001) .............................................................21

*United States v. Rodgers,*
    461 U.S. 677 (1983) ........................................................................17

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................22, 24, 26

*We the Patriots USA, Inc. v. Connecticut Office of Early Childhood
    Development,* 76 F.4th 130 (2d Cir. 2023) .................... 1, 2, 4, 9, 10, 18, 21, 27

*Williams v. Annucci,*
    895 F.3d 180 (2d Cir. 2018) ...............................................................9

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972).............................................. 3, 4, 6, 7, 10, 12, 27, 28, 29, 32

## Statutes & Regulations

N.Y. Pub. Health L. § 2164 ......................................................... passim

10 N.Y. Comp. Codes R. & Regs. § 66-1.1...........................................18

10 N.Y. Comp. Codes R. & Regs. § 66-1.3.................................18, 19

**Other Authorities**

Assembly Record for Assembly Bill 2371A.............................................1, 18, 23

Senate Record for Senate Bill 2994A................................ 1, 23, 24, 26, 30, 31, 36

# INTRODUCTION

Motivated by hostility to what it perceived as "garbage" and "fake" religious views,[1] the New York Legislature in 2019 categorically eliminated any respect for religion in its school vaccination law. Now, the State seeks to wield that law to force Amish students in private Amish schools in private Amish communities to either be vaccinated against their sincerely held religious beliefs or incur catastrophic penalties. The First Amendment protects them from that impossible choice.

The State's primary response is to wave away Appellants' claims as foreclosed by *We the Patriots USA, Inc. v. Connecticut Office of Early Childhood Development*, 76 F.4th 130 (2d Cir. 2023). The State is wrong multiple times over. The question in *We the Patriots* was whether *Connecticut*'s school vaccination law was *facially* unconstitutional in *all of its applications* as to *every religious claimant statewide*—a question to which this Court simply answered

---

"no." Instead, the question here is whether *New York*'s school vaccination law, which is tainted by uniquely anti-religious animus, is unconstitutional *as applied* to *these specific* Amish claimants—a question this Court did not encounter in *We the Patriots*.

The cases involve different laws with different legislative histories and materially different language. And they also involve fundamentally different legal inquiries: a facial challenge vs. an as-applied challenge. This difference is central to the First Amendment analysis, which is trained on the "particular religious claimants" at issue. *Fulton v. City of Philadelphia*, 593 U.S. 522, 541 (2021) (citation omitted). Simply put, *We the Patriots* says nothing at all about whether New York's generalized interest in preventing a measles outbreak justifies compelling *these specific Plaintiffs* to vaccinate their children. The State has nothing at all to say about this fundamental distinction in its brief, and that silence is deafening.

The cause of the State's silence is no mystery: The State cannot explain why these "particular religious claimants," *Fulton*, 593 U.S. at 541 (citation omitted), who attend private Amish schools in private Amish communities

2

that are "separate and apart from the world," *Wisconsin v. Yoder*, 406 U.S. 205, 210 (1972), must be vaccinated in violation of their sincerely held religious opposition to vaccination. The State simply asserts that there was a limited problem (a measles outbreak in Brooklyn and Rockland) and that it has come up with a catchall solution (eliminate the religious exemption, including for the Amish). But the State has not identified any evidence—not in the legislative history, and not in its briefing to this Court—that Amish schools in Amish communities contributed in any way to the measles outbreak. *See* A-724. Nor has the State "explain[ed] why religion alone must bear the burden of" its solution. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544 (1993).

The First and Fourteenth Amendments accordingly shield these Amish Plaintiffs from the State's mandate that they violate their faith, and the district court's judgment and decisions should be reversed.

# ARGUMENT

## I. Neither *Smith* nor *We the Patriots* Applies Here.

The State argues that rational basis applies under *Employment Division v. Smith*, 494 U.S. 872 (1990), and *We the Patriots*. It is wrong. For at least four independent reasons, precedent dictates the application of strict scrutiny: (1) PHL 2164 is not generally applicable; (2) PHL 2164 is not neutral; (3) Plaintiffs bring a *Yoder* hybrid-rights claim; and (4) PHL 2164 is amenable to religious exemptions. The Amish here are entitled to strict scrutiny for any one of these independent reasons.

### A. PHL 2164 is not generally applicable.

PHL 2164 is not generally applicable for two reasons. First, it treats comparable secular activity more favorably than religious exercise. Second, it contains an individualized exemption that the State has categorically determined may not be extended to religious exercise.

**1.** The Supreme Court recently reiterated that a law that "treat[s] *any* comparable secular activity more favorably than religious exercise" is not generally applicable within the meaning of *Smith*. *See Tandon v. Newsom*, 593

U.S. 61, 62 (2021) (emphasis in original). PHL 2164 falls squarely within this category: it permits (for example) nonvaccination for secular reasons but prohibits Plaintiffs' nonvaccination for religious reasons. It treats the very same activity (nonvaccination) more favorably when undertaken for secular reasons than when undertaken for religious reasons. PHL 2164 therefore is not generally applicable. The State resists *Tandon*'s application for four primary reasons, none of which is persuasive.

*First*, the State would have this Court rely on ancient precedents like *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and *Prince v. Massachusetts*, 321 U.S. 158 (1944). But as this Court recently recognized, "*Jacobson* predated the modern constitutional jurisprudence of tiers of scrutiny, was decided before the First Amendment was incorporated against the states, and 'did not address the free exercise of religion.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 635 (2d Cir. 2020) (citation omitted). The proper standard was set out in *Tandon* just three years ago. *See Tandon*, 593 U.S. at 62; *see also Fulton*, 593 U.S. at 533-34; *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17-18 (2020). This Court should heed the "great care" the Supreme Court has taken "to

5

confine" its century-old cases "to a narrow scope." *Yoder*, 406 U.S. at 230 (citing *Prince*, 321 U.S. at 169-70). Put simply, any force *Jacobson* still retains is limited to the context of responding to an ongoing "emergency," 197 U.S. at 27, and decisions adopting broader applications of *Jacobson* have been universally condemned, *see, e.g.*, *Buck v. Bell*, 274 U.S. 200, 208 (1927) ("The [*Jacobson*] principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes.").

*Jacobson* and *Prince* are also factually distinguishable. *Prince* was a case about child labor laws. 321 U.S. at 159. And *Jacobson* involved a substantive due process challenge. 197 U.S. at 14. Neither case has anything to say about whether the First Amendment permits PHL 2164's secular-exemption-only scheme.

*Second*, the State urged the Court to look to "the aggregate risk … a religious exemption statewide" would pose to the State's interest in "protect[ing] the health of children while they are physically present in the school environment and … protect[ing] the health of the public in general against

6

disease outbreaks." Response Br. 37, 46. The State gets the inquiry doubly wrong.

This is an as-applied challenge. Plaintiffs claim that PHL 2164 violates the First and Fourteenth Amendments as applied to them. Because this case involves the religious exercise of these particular Plaintiffs, the Court should look to the risk posed by nonvaccination of these particular Plaintiffs. *Tandon*, 593 U.S. at 63 (looking to the specific "*applicants'* proposed religious exercise at home"); *cf. Yoder*, 406 U.S. at 221 (looking to the risk "that would flow from recognizing the *claimed Amish exemption*" (emphasis added)). *Smith* contained no instruction to the contrary, *contra* Response Br. 46, and regardless *Tandon*'s directive from three years ago could not be clearer.

The State would rather this be a facial challenge, so it suggests this case should be treated as such because the exemption Plaintiffs seek "could not be limited to the Amish" consistent with the First Amendment. *Id.* at 42. But as-applied challenges are nothing new, and they do not offend the First Amendment. The Supreme Court "has long recognized that the government may … accommodate religious practices … without violating the

7

Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (citation omitted); *see Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338 (1987) ("[T]here is ample room for accommodation of religion under the Establishment Clause.").

Courts regularly award as-applied relief in free-exercise challenges. *See, e.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 427, 439 (2006) (affirming injunction awarded to single religious sect in as-applied Religious Freedom Restoration Act ("RFRA") challenge); *Kane v. De Blasio*, 19 F.4th 152, 158-59 (2d Cir. 2021) (awarding injunction to fifteen teachers and administrators in as-applied First Amendment challenge); *Hester ex rel. A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021) (awarding injunction to single Catholic school student in as-applied First Amendment challenge).

Such as-applied relief simply recognizes that the First Amendment may be offended for some in some circumstances, but not for others in other circumstances. The free-exercise rights of these particular Plaintiffs in their particular circumstances are violated here. But it doesn't follow that another individual in different circumstances will necessarily have suffered a First

Amendment violation. That is simply how as-applied challenges work. *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) ("An 'as-applied challenge' … requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right.").

To the extent the State asserts Plaintiffs' challenge should be treated as facial because the grant of one exception would lead to the grant of others, the Supreme Court has specifically rejected such "[i]f I make an exception for you, I'll have to make one for everybody, so no exceptions" arguments specifically in the context of religious exercise. *Gonzales*, 546 U.S. at 436; *see Holt v. Hobbs*, 574 U.S. 352, 368 (2015) (such arguments are "formulation[s] of the 'classic rejoinder of bureaucrats throughout history'" (citation omitted)); *Williams v. Annucci*, 895 F.3d 180, 192 (2d Cir. 2018) (rejecting another invocation of this argument).

Perhaps the State refuses to treat this as-applied challenge as such because *We the Patriots* involved a facial rather than an as-applied challenge—a fundamental distinction between the two cases that the State fails even to

acknowledge. The plaintiffs in *We the Patriots* brought a facial challenge against Connecticut's school vaccination law, arguing that the law's lack of a religious exemption was unconstitutional in all of its applications. 76 F.4th at 135-36. Because the law's application to all potential religious claimants across the state was at issue, the Court aggregated the risk posed by the religious exercise of all those claimants across the state in assessing the law's general applicability. *Id.* at 153.

This case, meanwhile, does not involve PHL 2164's application to all religious claimants—only to Plaintiffs. Thus, as in *Tandon*, the Court must look to the risk posed by the religious exercise of Plaintiffs specifically. 593 U.S. at 63. That risk is substantially lower than the risk at issue in *We the Patriots*, as Plaintiffs are part of small Amish communities, A-41; live a unique lifestyle "separate and apart from the world," *Yoder*, 406 U.S. at 210; and are healthy, A-41. *See* Opening Br. 34-35.

The State's inability to articulate a coherent and consistent interest is also a tell. It claims in its brief an interest in protecting children in the school environment, Response Br. at 37-38, but it never invoked that interest when it

10

repealed the religious exemption. Rather, the sole asserted interest motivating the repeal at the time was a desire to prevent transmission. *See* Opening Br. 33-34. That actual motivation is what matters, not the State's new post hoc interests. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022); *Agudath Israel*, 983 F.3d at 633-34.

In any event, the State cannot make up its mind about what are its post hoc interests. In its brief, the State at various times asserts different (and even conflicting) interests. *See* Response Br. 22 ("protecting public safety and health"); *see also id*. at 19 ("maximizing the number of schoolchildren safely immunized against vaccine-preventable diseases"); *id*. at 22 ("protecting communities from serious, vaccine-preventable diseases through immunization"); *id*. at 59 ("protecting school-aged children from the potentially severe and permanent harms that may result from these diseases"); *id*. at 59 n.19 ("protecting the health of the public in general against disease outbreaks outside the school environment"). Some of these interests are equally undermined by providing any medical exemption (public safety and health, protecting communities), while others are not. The State does not get to play fast

11

and loose with its asserted interest as convenient. Rather, the State is limited to the interest it actually expressed at the time of enactment. *See supra* p.11.

*Third*, the State argues that the medical exemption is not comparable to Plaintiffs' requested religious exemption because it furthers the State's interests in a way that a religious exemption would not. Response Br. 38-45. Specifically, the State asserts that the medical exemption "advances the State's interest in health and safety by protecting … students from potential medical harms" vaccines would cause. *Id.* at 38. But that argument relies on an improper post hoc justification and conflicts with other interests the State contends it has. *See supra* p.11.

With respect to the State's actual asserted interest in preventing transmission, both medical nonvaccination and religious nonvaccination pose a similar risk of transmission, if any. A-32. If anything, the risk posed by Plaintiffs' religious exercise is far lower than the medical nonvaccination the State allows: the Amish communities here are "separate and apart from the world," *Yoder,* 406 U.S. at 210; *see* A-14, and have a "tiny number" of "healthy" Amish children, A-41; *see* A-32 n.4. Medical and religious

12

nonvaccination are thus at least comparably risky as "judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Yet the State pursues ruinous enforcement actions against the Amish, while leaving the medical exemption scheme untouched.

The State also suggests that the medical exemption is limited in scope and duration—it lasts only as long as the contraindication exists, and only exempts those vaccines for which a contraindication exists. Response Br. 41-45. Plaintiffs introduced evidence showing that these limitations may not be so limited in practice, with students receiving medical exemptions year after year. A-698. Furthermore, any religious exemption would likewise be available only as long as the individual holds the religious objection.

*Fourth*, the State argues that other groups are not similarly situated because Plaintiffs have not pleaded enough facts about unvaccinated adults in schools or gatherings of children outside of schools. Response Br. 40. But at the motion to dismiss stage, Plaintiffs' allegations must be taken as true, and all inferences must be drawn in Plaintiffs' favor. *See* Opening Br. 30.

PHL 2164 does not apply to adults and does not apply outside of schools. Plaintiffs have alleged that the adult population of New York far exceeds the child population of New York at 79% of the State's total population. A-32. And it is a matter of common sense that there are many adults in schools—from teachers to administrators to custodians. It would be reasonable to infer that some of those adults—both in the school setting and outside of it—may not be vaccinated for reasons that are not religious. It would also be reasonable to infer that—if, as Plaintiffs allege and the State does not contest, at least 66,000 children remain unvaccinated throughout the State, A-32 to 33—gatherings of children outside of school may also include unvaccinated children. Such nonvaccination risks transmission just as religious nonvaccination does, yet the State permits it.

**2.** The Supreme Court also recently underscored that a law is not generally applicable if it "provid[es] 'a mechanism for individualized exemptions'" but does not allow for religious exemptions. *Fulton*, 593 U.S. at 533 (citation omitted). As noted, PHL 2164 allows for individualized medical exemptions but categorically bars religious exemptions. *See* Opening Br. 39-42.

14

The State nonetheless resists *Fulton*'s applicability for two reasons, both of which are misguided.

*First*, the State asserts that PHL 2164's medical exemption is generally applicable because it applies to an "objectively defined category of people." Response Br. 50. This "objectively defined" limitation finds no support in Supreme Court precedents. *See* State Amicus Br. 10-12. *Fulton* made clear that it is the "creation of a formal mechanism for granting exceptions [that] renders a policy not generally applicable," not whether such exceptions are objective.[2] 593 U.S. at 537. In *Lukumi*, for example, the animal slaughter laws were subject to objectively defined secular exemptions, such as the "slaughter of animals for food, eradication of insects and pests, and euthanasia." 508

---

[2]   Plaintiffs' opening brief inaccurately described the exemption at issue in *Fulton* as subject to "statutory criteria," Opening Br. 46 (quoting *Fulton*, 593 U.S. at 530), when in fact the exemption is better described as arising in a contract and subject to the government's "sole discretion," *Fulton*, 593 U.S. at 535. We regret the inadvertent misstatement, which fortunately has no impact on the bottom line. The Court found the exemption not generally applicable not because it was discretionary, but rather because it "incorporate[d] a system of individual exemptions" and the government "'may not refuse to extend that [exemption] system to cases of "religious hardship" without compelling reason.'" *Id.* (citation omitted).

U.S. at 537. Yet the Court still found the laws to be not neutral and generally applicable and subject to strict scrutiny. *Id.* at 542; *see Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-66 (3d Cir. 1999) (Alito, J.) (law subject to categorical "medical" and "undercover" exemptions not neutral and generally applicable).

What the First Amendment is really concerned with is not how discretionary an exemption is but rather whether that exemption allows for "the prospect of the government's deciding that secular motivations are more important than religious motivations." *Fraternal Ord. of Police*, 170 F.3d at 365; *see Fulton*, 593 U.S. at 537 (expressing concern that "the government [would] decide which reasons for not complying with the policy are worthy of solicitude"). This concern can be present whether the exemption is phrased objectively or discretionarily—and in fact may be heightened when the government grants a categorical exemption using objective terms. *See Lukumi*, 508 U.S. at 542 ("All laws are selective to some extent, but *categories* of selection are of paramount concern when a law has the incidental effect of burdening religious practice." (emphasis added)); *Fraternal Ord. of Police*, 170

16

F.3d at 365 (explaining that the concern is "only further implicated when the government … actually creates a categorical exemption").

*Second*, the State launches a fact dispute claiming that government officials do not actually exercise discretion in granting or denying medical exemptions. Response Br. 49-51. But Plaintiffs have alleged the opposite, and at this motion to dismiss stage, those plausible allegations must be accepted as true. As Plaintiffs allege in their complaint, the medical exemption process is "discretionary" and results in "medical exemption rates [that] vary wildly between New York schools." A-30 to 31; *see also* A-16 to 19. This accords with documentary evidence Plaintiffs submitted showing that—even for the same student with the same medical contraindication—the medical exception is not consistently applied. *See* A-697 to 701.

Plaintiffs' allegations of inconsistent exercise of discretion are all the more plausible because PHL 2164 affords discretion on its face through use of the word "may." N.Y. Pub. Health L. § 2164(8); *see Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("the word 'may' … implies discretion"); *United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,'

17

when used in a statute, usually implies some degree of discretion."); *We the Patriots*, 76 F.4th at 150 & n.19 (explaining that "may" is less certain than "is"). The State tries to get around this by claiming that discretion is cabined by reference to "nationally recognized evidence-based standard[s] of care" in a regulation. Response Br. 49 (quoting 10 N.Y. Comp. Codes R. & Regs. § 66-1.1(*l*)). But the regulation does not specify which standard of care must be used. And doctors often disagree whether a contraindication is present. *See* Assembly Record at 35 (Raia, A.) ("I've seen case after case after case of legitimate doctors' findings that are overruled by another doctor.").

Furthermore, the doctor is not the only relevant actor. New York also "delegates to school officials the authority to grant a medical exemption." *Goe v. Zucker*, 43 F.4th 19, 33 (2d Cir. 2022) (citing N.Y. Pub. Health Law § 2164(7)(a); 10 N.Y. Comp. Codes R. & Regs. § 66-1.3(c)). This grant of discretionary authority to ostensibly medically untrained school officials is not guided by any objective criteria. It merely provides that those officials "may require additional supporting information before granting requests for exemptions." *Id.* at 26; *see* 10 N.Y. Comp. Codes R. & Regs. § 66-1.3(c) ("The

18

principal or person in charge of the school may require additional information supporting the exemption.").

### B. PHL 2164 is not neutral.

Strict scrutiny also applies because the repeal of PHL 2164's religious exemption was motivated by hostility to and presumptive disbelief of religious practices in conflict with vaccination. *See* Opening Br. 47-56. The State's five arguments to the contrary are belied by the record.

*First*, the State asserts that PHL 2164 is "neutral on its face." Response Br. 26. But the State ignores that the bill amending PHL 2164 to remove the religious exemption twice refers to religion in its title. S2994-A ("AN ACT to amend the public health law, in relation to exemptions from vaccination due to *religious beliefs*; to repeal subdivision 9 of section 2164 of the public health law, relating to exemption from vaccination due to *religious beliefs*; and providing for the repeal of certain provisions upon expiration thereof" (emphasis added)); A2371-A (same). This is strong evidence of a lack of facial neutrality. *See Cent. Rabbinical Cong. of the U.S. & Can. v. N.Y.C. Dep't of Health*

19

*& Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014) (deeming facial neutrality "doubtful" in light of regulation's "very title").

The bill's design is further evidence of its lack of facial neutrality. A law need not, as the State suggests, specifically mention religion to lack facial neutrality. Rather, neutrality may be lacking where a law regulates religious practice only. *See Cent. Rabbinical Cong.*, 763 F.3d at 194 (regulation's application solely to person performing practice used exclusively in Orthodox Jewish ritual was further evidence of lack of facial neutrality). That is what happened here, when the Legislature referred simply to "[s]ubdivision 9"—which (as the bill's title underscores) sweeps in only religiously motivated exemptions. S2994-A, § 1; A2371-A, § 1.

*Second*, the State says that Plaintiffs "failed to preserve their argument" that the legislative record reveals hostility to religion because they "raised no such argument below when they opposed defendants' motion to dismiss." Response Br. 28. That contradicts the record and the State's arguments in district court. After Plaintiffs opposed the State's motion to dismiss, the State properly recognized that Plaintiffs argued "that, in amending PHL

§ 2164 to exclude the religious exemption, New York expressed hostility toward religious beliefs and that the proffered justifications for said change were merely pretext." A-905 (citing A-656 n.8). That argument originated in Plaintiffs' complaint. *See* A-33 (arguing that the bill was not neutral because "[s]tate leaders spearheading the legislative removal of the religious exemption spoke openly about the need to eliminate any process for reviewing a religious exemption"). And it was carried through their briefing on the State's motion to dismiss. *See* A-656 n.8 (arguing that there is "evidence of pretext"); A-674 (incorporating "the neutrality issues raised in the Complaint"); A-686 & n.27 (quoting sponsor statements).

That the district court resolved Plaintiffs' neutrality argument puts to bed any claim of forfeiture. *See* SPA-19 ("[T]he legislative history related to the repeal of the non-medical exemption contains no evidence of hostility towards religious belief."). An issue is "reviewable on appeal" if it was either "'pressed or passed upon below.'" *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (citation omitted). This issue was both pressed and passed upon, and it is therefore suitable for this Court's review.

*Third*, the State argues that the legislative history in fact shows that the repeal of the religious exemption was the "product of legitimate public health concerns." Response Br. 29. But religious hostility can still exist even if it is only one of multiple "motivating factor[s]" behind the repeal. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). Even the State admits that the legislative record contains statements that were "intemperate," Response Br. 12, reflecting at the very least prohibited "subtle departures from neutrality," *Gillette v. United States*, 401 U.S. 437, 452 (1971). There is thus at minimum a "slight suspicion" of a departure from neutrality that triggers strict scrutiny. *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018).

Contrary to the State's assertion, however, such statements were not "outlier[s]" and there were not just "a handful."[3] Response Br. 12. These

---

[3] In fact, PHL 2164 is the "extreme outlier." *M.A. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 41 (2d Cir. 2022) (Park, J., concurring). The State is wrong to cast aside *M.A. See* Response Br. 45. This Court in that case specifically "address[ed] neutrality and general applicability in turn"—just as the Court is asked to do here. *M.A.*, 53 F.4th at 36. If the Court here finds "questions of fact" in the pleadings, Response Br. 45, those questions are resolved in Plaintiffs' favor.

statements were made repeatedly and by key legislators. Both primary sponsors of the bill were vocal about their distrust of religious beliefs.[4] Several other sponsors in both houses of the Legislature also voiced their hostility to religious beliefs.[5] And still other non-sponsor proponents of the bill

---

[4]   *See, e.g.*, Senate Record at 5381 (Hoylman, S.) (refusing to "give credence to those who would use a religious exemption as a guise"); Assembly Record at 68 (Dinowitz, A.) ("I'm not aware of anything in the Tora, the Bible, the Koran or anything else that would suggest that you should not get vaccinated. But people are entitled to believe what they want to believe. Call it religious beliefs if that's what they want to call it.").

These statements call to mind this Court's instruction that it would run afoul of the First Amendment to deny "a religious accommodation based on someone else's publicly expressed religious views—even the leader of her faith." *Kane*, 19 F.4th at 168; *cf. Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901 (8th Cir. 2024) ("The district court erred by emphasizing that many Christians elect to receive the vaccine.").

[5]   *See, e.g.*, Senate Record at 5443 (Skoufis, S.) (calling the religious exemption "made up" and "fake" because "no religion … objects to vaccines"); *id.* at 5441 (Thomas, S.) (calling religious exemptions "an affront to the rights of children and parents across New York State"); *id.* at 5446 (Krueger, S.) (suggesting the State needs "to step in and stop people from yelling 'fire' in a crowded theater"); Assembly Record at 115 (Burke, A.) (calling it "unAmerican" to "impose [one's] religious values on others"); *id.* at 98 (Jacobson, A.) (deeming it a "simple choice to put science and reason ahead of … religious belief").

denigrated religious beliefs.[6]

The State tries to excuse these statements as "merely express[ing] concern that the religious exemption was being misused." *Id*. at 33 n.13. But statements that "presuppose[] the illegitimacy of religious beliefs and practices" are precisely the sort of statements that evidence a lack of neutrality. *Masterpiece*, 584 U.S. at 638; *see Lukumi*, 508 U.S. at 547. The legislative record here "practically exudes suspicion of those who hold unpopular religious beliefs. That alone is sufficient to render the mandate unconstitutional as applied to these applicants." *Dr. A v. Hochul*, 142 S. Ct. 552, 555 (2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief); *see Fulton*, 593 U.S. at 532.

Courts regularly look to "contemporaneous statements made by members of the decisionmaking body" when assessing government motivation. *Lukumi*, 508 U.S. at 540 (citing *Arlington Heights*, 429 U.S. at 268). It is not necessary that every member of a decisionmaking body have spoken on the

---

[6]   *See, e.g.*, Senate Record at 5433 (Savino, S.) ("I'm not sure there is such a thing as a real religious exemption.").

record in a way that reveals religious animus. *See, e.g., Lukumi,* 508 U.S. at 541 (finding animus based on statements by some "supporter[s] of the ordinances" and "city officials"); *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 611 (2d Cir. 2016) (finding "abundant evidence" of animus based on statements by two members of board of trustees and other individuals); *Arce v. Douglas*, 793 F.3d 968, 979 (9th Cir. 2015) (finding "plausible inference" of animus based on statements by bill sponsor and testifying individual). And statements by bill sponsors—like the ones here—are particularly probative. *See Lukumi,* 508 U.S. at 541 (stressing statements of "supporter[s] of the ordinances"); *Arce*, 793 F.3d at 979 (stressing statements by bill sponsor).

The State is similarly misguided to suggest that contemporaneous statements made in fora other than the legislative chamber itself are not relevant. *See, e.g., Bassett v. Snyder*, 951 F. Supp. 2d 939, 969 (E.D. Mich. 2013) (finding evidence of animus in lawmakers' "press releases"). Animus may be expressed in a speech or press release just as it may be expressed on the floor of the legislature. Courts do not turn their heads to that animus merely

because it was expressed "to members of the public" rather than to other legislators. Response Br. 32.

Other evidence in the legislative record confirms the religious animus at play. Courts recognize that "[d]epartures from the normal procedural sequence" might provide evidence of "improper purposes." *Arlington Heights*, 429 U.S. at 267. Here, the bill repealing the religious exemption did not come before the relevant committee in the Senate. *See* Senate Record at 5377-78. That procedural irregularity was a cause of concern for some Senators. *See id.* (Ritchie, S.) ("Is there a reason why this bill did not come before the Health Committee?"); *id.* at 5380 (Antonacci, S.) ("[W]hy didn't the committee charged with evaluating these type of issues … get a shot at this bill?").

*Fourth*, the State suggests that repealing a religious exemption is not per se hostile to religion. Response Br. 26-27. But that is not Plaintiffs' argument. Plaintiffs argue that New York's repeal was hostile to religion because it singles out religious practice for disfavored treatment, and because the legislative record is replete with evidence demonstrating animosity to "fake" and "garbage" religious beliefs.

26

*Fifth*, the State argues that DOH's enforcement of PHL 2164 was neutral because the penalty was "modest" and based on a violation of the law. Response Br. 34. But $118,000 in penalties would be *ruinous* for these private Amish schools. A-39. And DOH imposed penalties specifically to not "encourage other schools to … assert a religious exemption." A-127. The penalties were designed to discourage religious practice, and to penalize Plaintiffs because their actions were religiously motivated. That is not neutral.

**C. Plaintiffs allege a *Yoder* hybrid-rights claim.**

Strict scrutiny applies for the additional reason that this case involves the same right to direct the religious upbringing of one's children that was implicated in *Yoder*. *See* Opening Br. 56-60. The State makes three arguments to the contrary, none of which has merit.

*First*, the State suggests that *Yoder* does not apply because this Court has declined to apply it in other cases. Response Br. 52. But none of those cases involved—as here and in *Yoder*—the distinctive religious culture of the Amish. *See Leebaert v. Harrington*, 332 F.3d 134, 137 (2d Cir. 2003) (Christian); *We the Patriots*, 76 F.4th at 159 (Greek Orthodox, Roman Catholic, and

Muslim). This Court in *Leebaert* did not overrule *Yoder*'s hybrid-rights hold-ing—nor could it—but simply cabined *Yoder* to cases in which there is an irreconcilable "clash between the essence of [one's] religious culture and the" law. *Leebaert*, 332 F.3d at 144. This case involves that same religious cul-ture, and that same irreconcilable clash. Forcing Plaintiffs to vaccinate their children would "endanger their … salvation." *Yoder*, 406 U.S. at 209.

*Second*, the State suggests that *Yoder* does not apply because PHL 2164—like the laws in *Jacobson* and *Prince*—involves "public health and safety." Re-sponse Br. 53. But the Supreme Court has categorically rejected the public health exception to the Free Exercise Clause that the State advocates. *Tandon*, 593 U.S. at 64. And this case is fundamentally different in kind from *Jacobson* and *Prince*. *See supra* pp.5-6. Furthermore, no "harm to … public safety … has been demonstrated or may be properly inferred" here. *Yoder*, 406 U.S. at 230. The State has not identified any evidence that nonvaccination by Amish students in private Amish schools poses any threat to public safety, and cer-tainly not a greater threat than the kaleidoscope of nonvaccination scenarios

the State permits. *See* Opening Br. 34-38. Even if the State could produce such evidence, that is an inquiry for discovery, not motion to dismiss proceedings.

*Third*, the State suggests that, even if *Yoder* applied, it would not dictate strict scrutiny but merely "a balancing of the state interest at issue against the free exercise interest." Response Br. 53 n.17. But *Yoder* applied—and would demand here—strict scrutiny. 406 U.S. at 215 ("[O]nly those interests of the *highest order* and those *not otherwise served* can overbalance legitimate claims to the free exercise of religion." (emphasis added)). Both the Supreme Court and this Court have confirmed as much. *See Gonzales*, 546 U.S. at 431; *Intercommunity Ctr. for Just. & Peace v. INS*, 910 F.2d 42, 44 (2d Cir. 1990).

### D.  PHL 2164 is amenable to exemptions.

Yet another reason strict scrutiny applies is that PHL 2164 is readily amenable to religious exemptions. *See* Opening Br. 60-62. The State offers two contrary arguments, each of which falls flat.

*First*, the State says there is no support in the case law for applying strict scrutiny on this basis. *See* Response Br. 53-55. But that is not true. One reason the Court applied rational basis in *Smith* was that the drug law at hand was

not amenable to religious exemptions. As the Court explained, allowing religious exemptions to the drug law would be "courting anarchy." 494 U.S. at 888. That unworkability meant that the Court could not "afford the luxury of deeming *presumptively invalid*, as applied to the religious objector, every regulation of conduct that does not protect an interest of the highest order." *Id*. So the Court applied rational basis review rather than strict scrutiny.

*Second*, the State argues that, even if strict scrutiny could be applied on this basis, PHL 2164 is not amenable to religious exemptions. *See* Response Br. 54. As an initial matter, that does not square with the State's telling of the "long and successful" history of its vaccination law, which included more than fifty years of religious exemptions. *Id*. at 3 (formatting altered).

It is also demonstrably untrue that religious exemptions to PHL 2164 are unworkable. The State offered religious exemptions for more than fifty years without every man "becom[ing] a law unto himself." *Smith*, 494 U.S. at 885 (citation omitted). Before the State repealed the religious exemption, less than 1% of students statewide had claimed such an exemption. *See* Senate Record at 5388. The "precipitous[]" increase the State points to, Response Br.

54, was of less than 0.3%, Senate Record at 5388. That 1 in 300 more people may have claimed a religious exemption recently as compared to ten years ago does not mean the exemption was unworkable—it just means the exemption was in use. A religious exemption is not unworkable merely because some people claim it. That is the point of an exemption, after all.

The State attempts to diminish the experience of "some other states" that have been able to offer workable religious exemptions. Response Br. 54. In reality, *nearly every* state has been able to offer workable religious exemptions. The amicus brief for Alabama and 19 other states explains that "45 States respect the religious freedom to decline school vaccination." State Amicus Br. 24. And they do so "without compromising public health." *Id.* at 3; *see id.* at 26 ("*Amici* States have not been flooded with frivolous or insincere claims as a result of accommodating religious objections."). Even if New York's measles outbreak were a "unique experience" that somehow exempted it from the First Amendment rules governing these 45 other states, Response Br. 54-55, that outbreak does not justify imposing a vaccine mandate against these specific Plaintiffs. *See supra* pp.2-3.

31

## II. PHL 2164 Fails Strict Scrutiny.

### A. The State has not identified a compelling interest.

Strict scrutiny requires the State to establish a "compelling interest … in denying an exception to" the Amish Plaintiffs here. *Fulton*, 593 U.S. at 541. The State has not done so, and its three arguments to the contrary fall flat.

*First*, the State suggests it need not "show 'Amish-specific interests.'" Response Br. 59. But that is exactly what the Supreme Court said in *Fulton*. The government may not "rely on 'broadly formulated interests,'" but rather must "'scrutinize[] the asserted harm of granting specific exemptions to *particular religious claimants*.'" *Fulton*, 593 U.S. at 541 (emphasis added) (citation omitted); *see also Gonzales*, 546 U.S. at 432 ("strict scrutiny *does* take 'relevant differences' into account" (citation omitted)); *Yoder*, 406 U.S. at 213 (examining the harms "that would flow from recognizing *the claimed Amish exemption*" (emphasis added)). "The question … is not whether the [State] has a compelling interest in enforcing its … policies generally, but whether it has such an interest in denying an exception to [Plaintiffs]." *Fulton*, 593 U.S. at 541.

*Second*, the State relies on a generalized "compelling interest in protecting public health." Response Br. 59. Even if the State could carry its burden with generalized interests, it has not done so. The State does not explain how its delayed enforcement of PHL 2164 against Plaintiffs and nonenforcement of PHL 2164 against 66,000[7] currently unvaccinated and unexempted students do not undermine the importance of its asserted interest. *See* Opening Br. 66-67. More fundamentally, the State's interest(s) here are a moving target. *See supra* pp.11-12.

*Third*, the State again manufactures a factual dispute, arguing about the vaccines' efficacy. Response Br. 58. But Plaintiffs' complaint cites numerous studies touted by the CDC and other public-health organizations showing that many of the vaccines at issue do not actually advance the State's stated goal of preventing transmission. *See* Opening Br. 71 (citing A-42 to 43). The State waived any arguments against these studies by failing to raise them below. Now, the State suggests that requiring such vaccines may serve

---

[7] By contrast, the Amish population of New York (both children and adults) is "21,000 souls." A-32 n.4.

different goals, such as "protecting school-aged children from the potentially severe and permanent harms that may result from these diseases." Response Br. 59. But that was not the goal that motivated the repeal of the religious exemption, *see supra* p.11, and the State cannot supply additional post hoc rationalizations now, *see Health Freedom Defense Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024) (distinguishing between the government's interest in "preventing [a vaccine's] recipient from spreading disease" and in "'forced medical treatment' for the recipient's benefit").

In all events, this case is currently at the motion to dismiss stage. The Court must therefore accept Plaintiffs' allegations about the vaccines' operation—backed by the CDC and other medical studies and not contested by Defendants below—as true. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

## B. PHL 2164 is not narrowly tailored.

The State also bears the burden to show that PHL 2164 is narrowly tailored. *See Agudath Israel*, 983 F.3d at 633. But the State fails to address several of Plaintiffs' narrow tailoring arguments. The State does not address the fact

that the recent measles outbreak did not occur in Amish communities. *See* Opening Br. 71-72; A-724. Nor does the State dispute that Amish children in those communities are healthy. *See* Opening Br. 64; A-41. Nor does the State explain how it "seriously undertook to address the problem with less intrusive tools readily available to it." *Agudath Israel*, 983 F.3d at 633 (citation omitted); *see* Opening Br. 70. The State gives two reasons why PHL 2164 is supposedly narrowly tailored, but neither is persuasive.

*First*, the State faults Plaintiffs with not providing sufficient facts regarding the "presence of unvaccinated adults in schools" or "congregation of unvaccinated children outside of schools." Response Br. 40. But it is the State's burden to produce evidence proving that its law is narrowly tailored, not Plaintiffs'. *See Tandon*, 593 U.S. at 62.

*Second*, the State suggests that the elimination of the religious exemption was aimed at the "primary cause of the recent decrease in measles immunization rates." Response Br. 57. But that fails to account for the many other vaccinations aside from the measles vaccination that PHL 2164 requires. *See* N.Y. Pub Health Law § 2164(2)(a). And the legislative record reflects that less

than 1% of students statewide had claimed a religious exemption.[8] Senate Record at 5388. Furthermore, there is no evidence whatsoever that Amish students in private Amish schools on private Amish land contributed in any way to the measles outbreak in Brooklyn and Rockland. A-724; *see Roman Cath. Diocese*, 592 U.S. at 18 (regulation not narrowly tailored where "no evidence that the applicants have contributed to the spread of COVID-19").

In sum, "[n]arrow tailoring requires the government to demonstrate that a policy is the 'least restrictive means' of achieving its objective." *Agudath Israel*, 983 F.3d at 633 (citation omitted). It is not enough for the government simply to assert that its "chosen route was easier." *Id.* (citation omitted). The State has not satisfied that burden here.

## CONCLUSION

The judgment and decisions below should be reversed.

---

[8]  By contrast, around 4% of New York students are unvaccinated and do not have a medical or religious exemption. *See* A-574.

Dated:  July 31, 2024

Respectfully submitted.

*/s/ Kyle D. Hawkins*

Elizabeth A. Brehm
Walker D. Moller
SIRI & GLIMSTAD LLP
745 Fifth Ave., Suite 500
New York, NY 10151
(212) 532-1091

Kyle D. Hawkins
LEHOTSKY KELLER COHN LLP
408 W. 11th St., 5th Floor
Austin, TX 78701
(512) 693-8350

Christopher Wiest
50 E. Rivercenter Blvd., Suite 1280
Covington, KY 41017
(513) 257-1895

Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave., NW
Washington, DC 20001
(512) 693-8350

Hiram S. Sasser, III
Justin Butterfield
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Suite 1600
Plano, TX 75075
(972) 941-4444

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

On July 31, 2024, this brief was served via ACMS on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4) because it contains 6,986 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins
